VINCENT FILARDO, JR. (admitted *pro hac vice*)
vincent.filardo@us.kwm.com
KING AND WOOD MALLESONS LLP
500 Fifth Avenue, 50th Floor
New York, NY 10110
Telephone:  (347) 926-7570
Facsimile:  (917) 591-8167

SEAN P. GATES (Cal. Bar No. 186247)
sgates@charislex.com
CHARIS LEX P.C.
155 N. Lake Ave., Suite 800
Pasadena, CA 91101
Telephone:  (626) 508-1715
Facsimile:  (626) 508-1730

ELLEN LONDON (Cal. Bar No. 3255580)
elondon@londonstoutlaw.com
LONDON & STOUT P.C.
1999 Harrison Street, Suite 655
Oakland, CA  94612
Telephone:  (415) 862-8494
Facsimile:  (415) 573-0995

JANET SATTERTHWAITE
jsatterthwaite@potomaclaw.com
POTOMAC LAW GROUP, PLLC
1300 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
Trademark Counsel

*Attorneys for Defendant and
Counterclaimant Availink Inc.*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| HDMI LICENSING ADMINISTRATOR, INC., | Case No. 4:22-cv-6947-HSG |
| Plaintiff and Counterclaim Defendant, | **OPPOSITION OF AVAILINK INC. TO MOTION TO DISMISS COUNTERCLAIMS** |
| v. | Date: January 18, 2024 |
| AVAILINK INC., | Time: 2:00 pm |
| Defendant and Counterclaimant. | Courtroom: 2, 4th Floor. |

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................... 1

II.   THE COUNTERCLAIM ALLEGATIONS .............................................................. 2

    A.   The Founders secretly develop the now-dominant HDMI standard. ......................... 2

    B.   The Founders pool their patents, giving them market power, but face a problem. ................. 3

    C.   The Founders and HDMI LA conspire to preserve their market power. ................................. 3

        1.   Forcing rivals to pay for expired patents ............................................................ 4

        2.   Refusing to disclose the patents subject to the license ................................. 4

        3.   Exacting royalties for non-infringing products ................................................ 5

        4.   Compelling royalties for invalid trademarks ................................................... 5

        5.   Imposing royalties on products that do not use the trademarks ................................ 6

        6.   Requiring payments for versions manufacturers don't use or need ........................... 6

        7.   Levying higher royalties on small competitors ................................................ 7

        8.   Fixing the price for licensees' patents ............................................................. 8

    D.   Availink asks too many questions and gets sued. ................................................. 8

III.  LEGAL STANDARD ............................................................................................... 9

IV.   ARGUMENT ............................................................................................................ 9

    A.   Availink alleges a plausible violation of federal antitrust law ................................. 9

        1.   HDMI LA ignores numerous allegations of anticompetitive conduct ....................... 10

        2.   The separate licensing option is illusory and does not save HDMI LA's
            anticompetitive scheme ............................................................................. 11

            a)   The Adopter Agreement does not allow separate licensing of the Specification
                and the Trademarks. ................................................................................. 12

            b)   HDMI LA obscures the patents in the license, making the opportunity to
                license directly from the Founders illusory. .............................................. 12

            c)   HDMI LA rebuffed Availink's inquiries seeking information relevant to
                separate licensing. ................................................................................... 14

        3.   The lack of a step-down is anticompetitive. ................................................. 15

4.   The conspiracy harmed competition. ........................................................ 16

5.   Availink has standing to challenge the grantback provision. ...................... 18

B.   Availink states claims under the state antitrust and unfair competition laws. ........................ 19

1.   The California Cartwright Act ............................................................... 19

2.   California Business & Professions Code § 17200 ...................................... 20

3.   The New York Donnelly Act and General Business Law § 349 .............................. 22

C.   Availink has stated a claim for cancellation of the trademarks. ............................................. 22

1.   Availink has standing to petition to cancel HMDI LA's registrations. ..................... 22

2.   Availink has pled sufficient facts to show genericness. ............................................. 24

D.   Availink states a claim for declaratory relief. ......................................................................... 25

V.   CONCLUSION ........................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*3Point Distribution, LLC v. Cafepress.com*, Inc.,
   2008 WL 11341309 (C.D. Cal. Aug. 25, 2008)............................................................ 23

*Allied Tube & Conduit Corp. v. Indian Head*,
   486 U.S. 492 (1988)........................................................................................................ 1

*AT&T Mobility LLC v. AU Optronics Corp.*,
   707 F.3d 1106 (9th Cir. 2013) ...................................................................................... 19

*Axon Enter., Inc. v. Luxury Home Buyers, LLC*,
   2023 WL 4636917 (D. Nev. July 19, 2023) ................................................................. 24

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................................................ 9

*Benavidez v. Cty. of San Diego*,
   993 F.3d 1134 (9th Cir. 2021) ....................................................................................... 9

*Boggild v. Kenner Prods.*,
   776 F.2d 1315 (6th Cir. 1985) ..................................................................................... 16

*Broad. Music, Inc. v. Moor-Law, Inc.*,
   484 F. Supp. 357 (D. Del. 1980).............................................................................. 13, 14

*Brown v. Amazon.com, Inc.*,
   2023 WL 5793303 (W.D. Wash. Sept. 7, 2023).......................................................... 17

*Brulotte v. Thys Co.*,
   379 U.S. 29 (1964)........................................................................................................ 15

*Buffalo Broad. Co. v. ASCAP*,
   744 F.2d 917 (2d Cir. 1984).................................................................................... 11, 12

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999) ................................................................................................. 21

*Chromalloy Am. Corp. v. Fischmann*,
   716 F.2d 683 (9th Cir. 1983) ....................................................................................... 16

*Cianci v. Superior Court*,
   40 Cal. 3d 903 (1985) .................................................................................................. 19

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962)...................................................................................................... 10

iii

*CRST Van Expedited, Inc. v. Werner Enters.*,
    479 F.3d 1099 (9th Cir. 2007) ................................................................ 21

*Doe v. CVS Pharmacy, Inc.*,
    982 F.3d 1204 (9th Cir. 2020) ................................................................ 21

*Elliott v. Google, Inc.*,
    860 F.3d 1151 (9th Cir. 2017) ................................................................ 24

*Entrepreneur Media, Inc. v. Dermer*,
    2019 WL 4187466 (C.D. Cal. July 22, 2019) ......................................... 25

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ................................................... 17, 20, 21

*Forsyth v. Humana, Inc.*,
    114 F.3d 1467 (9th Cir. 1997) ................................................................ 18

*FragranceNet.com, Inc. v. Les Parfums, Inc.*,
    672 F. Supp. 2d 328 (E.D.N.Y. 2009) .................................................... 25

*Gay Pro. Men of Color v. CBE Pride*,
    Opp. No. 91252308, 2020 WL 2394376 (TTAB May 8, 2020) .............. 23

*Gibson Brands, Inc. v. John Hornby Skewes & Co.*,
    2014 WL 4187979 (C.D. Cal. Aug. 22, 2014) ........................................ 24

*Glob. Apogee v. Sugarfina, Inc.*,
    2023 WL 3235934 (C.D. Cal. Mar. 31, 2023) ........................................ 23

*Green Prods. Co. v. Black Flag Brands LLC*,
    2010 WL 3910336 (N.D. Cal. Oct. 4, 2010) ........................................... 25

*In re Cipro Cases I & II*,
    61 Cal. 4th 116 (2015) ............................................................................ 19

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) ................................................... 9, 11, 17

*In re Pandora Media, LLC*,
    2022 WL 19299126 (C.D. Cal. Oct. 26, 2022) ............................... 13, 14

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) .................................................................................... 16

*Kimble v. Marvel Entm't, LLC*,
    576 U.S. 446 (2015) ................................................................................ 15

iv

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) ................................................................. 19, 20

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*,
  334 U.S. 219 (1948) ................................................................................ 19

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
  519 F.3d 1025 (9th Cir. 2008) ................................................................. 9

*Matsushita Elec. Indus. Co. v. Cinram Int'l, Inc.*,
  299 F. Supp. 2d 370 (D. Del. 2004) ......................................................... 13

*McKell v. Wash. Mut., Inc.*,
  142 Cal. App. 4th 1457 (2006) ................................................................. 21

*Meredith Corp. v. SESAC, LLC*,
  2011 WL 856266 (S.D.N.Y. Mar. 9, 2011) .............................................. 10

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ............................................................................ 17

Order, *Gibson Brands v. John Hornby Skewes & Co.*,
  2:14-cv-00609-DDP-SS (C.D. Cal. Oct. 23, 2014), Dkt. 57 ..................... 24

*Pitney Bowes, Inc. v. Mestre*,
  701 F.2d 1365 (11th Cir. 1983) ............................................................... 16

*PLS.COM, LLC v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2022) ................................................................... 17

*POM Wonderful LLC v. Hubbard*,
  2016 WL 3621281 (C.D. Cal.  June 29, 2106) ........................................ 24

*Quelimane Co. v. Stewart Title Guar. Co.*,
  19 Cal. 4th 26 (1998) .............................................................................. 20

*Radio Music License Comm., Inc. v. SESAC Inc.*,
  2013 WL 12114098 (E.D. Pa. Dec. 23, 2013) ......................................... 13

*Radio Music License Comm., Inc. v. SESAC, Inc.*,
  29 F. Supp. 3d 487 (E.D. Pa. 2014) ...................................................... 13, 14

*REX - Real Est. Exch. Inc. v. Zillow Inc.*,
  2021 WL 3930694 (W.D. Wash. Sept. 2, 2021) ...................................... 18

*Samsung Elecs. Co., Ltd. v. Panasonic Corp.*,
  No. C 10-03098 JSW, 2015 WL 10890655 (N.D. Cal. Sep. 30, 2015) .......... 13, 18, 19

v

*SanDisk Corp. v. Kingston Tech. Co.*,
  2010 WL 11595034 (W.D. Wis. Nov. 15, 2010) .......................................... 10, 18

*Sensory Path Inc. v. Fit & Fun Playscapes LLC*,
  2021 WL 4768247 (N.D. Miss. Oct. 12, 2021) ................................................... 24

*Slattery v. Apple Computer, Inc.*,
  2005 WL 2204981 (N.D. Cal. Sept. 9, 2005) .................................................... 20

*Spex Techs., Inc. v. Kingston Tech. Corp.*,
  2019 WL 8194714 (C.D. Cal. Dec. 23, 2019) ................................................... 21

*St. Regis Paper Co. v. Royal Indus.*,
  552 F.2d 309 (9th Cir. 1977) ......................................................................... 16

*Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*,
  735 F.2d 346 (9th Cir. 1984) ......................................................................... 23

*Toranto v. Jaffurs*,
  297 F. Supp. 3d 1073 (S.D. Cal. 2018) ........................................................... 18

*United States v. Paramount Pictures, Inc.*,
  334 U.S. 131 (1948) .................................................................................. 11, 12

*United States v. United States Gypsum Co.*,
  333 U.S. 364 (1948) ....................................................................................... 10

*Vital Pharms. v. PhD Mktg., Inc.*,
  2021 WL 6882435 (C.D. Cal. Mar. 3, 2021) ................................................... 23

*William Morris Endeavor Ent., LLC v. Writers Guild of Am., W., Inc.*,
  2020 WL 2559491 (C.D. Cal. Apr. 27, 2020) ................................................. 20

*Zenith Radio Corp. v. Hazeltine Research*,
  395 U.S. 100 (1969) .................................................................................. 10, 16

**Statutes**

15 U.S.C § 1119 ................................................................................................. 22

15 U.S.C. § 1064 ................................................................................................ 24

California Business & Professions Code § 17200 ............................................... 20

New York General Business Law § 349 .............................................................. 22

**Other Authorities**

Am. Bar Assoc., Antitrust Issues in Int'l IP Licensing Transactions (2012)....................................... 18

Dept. of Justice, *3C DVD Business Review Letter*,
    1998 DOJBRL LEXIS 15 (Dec. 16, 1998) ........................................................................... 15, 18

Dept. of Justice, *MPEG-2 Business Review Letter*,
    1997 DOJBRL LEXIS 14 (June 26, 1997) ............................................................................ passim

Dept. of Justice, *RFID Business Review Lette*r,
    2008 DOJBRL LEXIS 5 (Oct. 21, 2008) ...................................................................................... 15

## I.    INTRODUCTION

This case is about a conspiracy among some of the world's leading consumer electronics firms to restrain competition in markets for standardized electronic components used worldwide.  The "Founders" include such consumer electronics giants as Sony, Phillips, Panasonic, Hitachi, and Toshiba.  These competitors privately agreed on a standard to transmit digital video and audio and used their combined market power to ensure the standard became dominant.  The "HDMI" standard is now used in practically every digital television, personal computer, and game console on the planet.

As the Supreme Court has recognized, "There is no doubt that the members of such [standard-setting] associations often have economic incentives to restrain competition and that the product standards set by such associations have a serious potential for anticompetitive harm." *Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 500 (1988).  This case is no exception.

The Founders pooled and agreed to jointly license their intellectual property.  Such pools are not uncommon for standardized products and can be procompetitive.  But the Founders did not follow the procompetitive blueprint.  Instead, to exercise power over products that use the HDMI standard, the Founders and their licensing administrator, HDMI LA, devised an anticompetitive licensing scheme to perpetuate their market power, disadvantage rivals, and keep prices high.

The scheme is multifaceted.  It extracts royalties for expired patents, invalid trademarks, and non-infringing products.  It imposes trademark royalties regardless of trademark use.  It forces rivals to license unneeded versions of the standard.  It discriminates against small competitors.  And it fixes prices for rivals' patents.  Given the conspirators' undisputed market power, the results are predictable: the scheme raises rivals' costs, suppresses competition, and retards innovation, leading to supracompetitive royalties, fees, and prices.

HDMI LA defends the scheme by claiming: (1) companies can seek individual licenses from the Founders; (2) exacting royalties for unexpired patents is not unlawful; (3) Availink must plead more anti-competitive effects; and (4) Availink cannot challenge one aspect of the scheme, the grantback.

But HDMI LA ignores most of the alleged conduct, such as compelling royalties for invalid trademarks and non-infringing products.  This is fatal.  Antitrust law requires a "holistic" examination of the alleged conspiracy and its effects.  The Court must give Availink "the full benefit" of its allegations

"without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." Moreover, as we show, the individual license option is illusory. Compelling royalties for expired patents is not only patent misuse; it is an antitrust violation. Availink adequately pled anticompetitive effects in two ways. And Availink was harmed by and can challenge the grantback provision.

HDMI LA also says that because the Court dismissed its trademark infringement claim, Availink cannot seek to cancel the trademarks as generic. Not so. HDMI LA's remaining claim for breach of contract is premised on the continued use of trademarks. Availink has standing to challenge the trademarks, and it has adequately alleged they are now generic.

## II.   THE COUNTERCLAIM ALLEGATIONS

### A.   The Founders secretly develop the now-dominant HDMI standard.

The HDMI standard (also known as the "Specification") is used to transmit digital video and audio data in consumer electronics. (Dkt. 49 ¶ 16.) As evidenced by the HDMI ports on the backs of computers, televisions, gaming consoles, and other electronics, the standard is now ubiquitous. According to HDMI LA, as of 2022, the standard is incorporated in "over 11 billion products." (*Id.* ¶ 35.)

The HDMI standard is unique. Most consumer electronics standards are developed by open standard-setting organizations, ensuring transparent processes, publicly available specifications, and protection from exploitation by patent holders. (*Id.* ¶¶ 17, 69.) The openness and transparency of these organizations help prevent anticompetitive manipulation and ensure small competitors are not unfairly disadvantaged.

In contrast, the HDMI standard was developed by a private consortium. The so-called "Founders," which include five of the world's leading consumer electronics firms, developed the standard in secret. (*Id.* ¶¶ 18, 19, 30.) They also refuse to make the standard public, disclosing it only as part of a license and subject to strict confidentiality requirements. (*Id.* ¶¶ 18, 60, 78.)

The Founders issued the first version of the HDMI standard in 2002. (*Id.* ¶¶ 19, 59.) Because they had significant shares in key consumer electronics markets, the standard enjoyed an immediate installed base. (*Id.* ¶ 27.) This base, combined with a first-mover advantage, network effects, and switching costs, catapulted the HDMI standard to dominance. (*Id.* ¶¶ 20-28.) According to HDMI LA, "The HDMI Specification is ubiquitous and is the undisputed global standard," and "almost all recently manufactured digital TVs, AV receivers, DVRs, Bluray disc players, and set-top boxes, as well as many multimedia PCs,

1  laptops and netbooks, gaming consoles, camcorders, digital still cameras, mobile devices, etc., incorporate

2  the HDMI Specification." (*Id.* ¶ 29.)

3  **B.  The Founders pool their patents, giving them market power, but face a problem.**

4  To gain market power over products using the standard, the Founders pooled their necessary pa-

5  tents (i.e., patents necessarily infringed by compliance with the standard) and agreed to jointly license

6  them as a package through a standardized "Adopter Agreement." (*Id.* ¶¶ 3, 31, 33, 45.) By pooling their

7  patents, the Founders jointly possess power in the markets for HDMI technology, HDMI-compatible prod-

8  ucts (such as computers, monitors, Blu-Ray players, and digital televisions), and components of those

9  products (such as system-on-chip integrated circuits ("SoC ICs")). (*Id.* ¶¶ 32, 35, 37, 121, 122.)

10  But the Founders faced a problem: patents expire. (*Id.* ¶ 39.) For patent pools, expiration dimin-

11  ishes market power and provides only a limited time to extract royalties. (*Id.* ¶¶ 39-40.)

12  **C.  The Founders and HDMI LA conspire to preserve their market power.**

13  To address this problem, the Founders and HDMI LA conspired to implement a licensing scheme

14  to extend their market power. According to the CEO and President of HDMI LA, the first part of the

15  Founders' strategy was to create a unique licensing structure that seeks to insulate the pooled patents. (*Id.*

16  ¶ 42.) Unlike patent pools for other standards, the Founders combined a license to their necessary patents

17  with a license to certain trademarks. (*Id.*)

18  The Founders then engaged in a number of practices to raise rivals' costs and restrict competition.

19  The scheme forces rivals to pay royalties for expired patents, invalid trademarks, non-infringing products,

20  and trademarks they do not use. (Dkt. 49 ¶¶ 42-57, 66, 82, 103-12.) It requires rivals to license versions

21  of the HDMI standard they do not need. (*Id.* ¶¶ 58-66.) It forces component manufacturers to pay higher

22  royalties unless they police customer use of the trademarks. (*Id.* ¶¶ 84-96.) And it gives the Founders the

23  power to jointly determine what they will pay for certain licensee patents. (*Id.* ¶¶ 97-102.) To prevent

24  potential licenses from avoiding this scheme, the Founders and HDMI LA obscure what patents are in-

25  cluded in their pooled license, allow access to the Specification only to those who take a license, and

26  otherwise keep the Specification confidential. (*Id.* ¶¶ 60, 67-83.)

27  The scheme has marketwide effects. Over "1,900 of the largest and most innovative electronics

28  and PC manufacturers worldwide" are under the Adopter Agreement. (Dkt. 1 ¶ 13.) By their scheme, the

Founders exercise their combined market power to raise the costs of these rival manufacturers and suppress competition.  (*Id.* ¶ 123.)  The result has been supracompetitive royalties, fees, and prices.  (*Id.*)

### 1.    Forcing rivals to pay for expired patents

A "hybrid" package license—one that includes patents and non-patent rights—is not per se problematic.  But such a license can be used unlawfully to extract royalties for expired patents.  (Dkt. 49 ¶ 44.)  Absent a "step-down" in the overall royalty rate as pooled patents expire, the licensee ends up paying royalties on the expired patents, unlawfully extending the temporal scope of those patents.  (*Id.*)

That is the case here.  The HDMI standard is over 20 years old.  (*Id.* ¶ 28.)  Patents that covered the first version of the standard have now expired.  (*Id.* ¶ 48.)  But under the Adopter Agreement, the licensing rate has remained unchanged, despite the expiration of key patents.  (*Id.* ¶¶ 45, 48.)  Moreover, the Adopter Agreement term is ten years, with an automatic renewal for another five, trapping licensees while patents expire.  (*Id.* ¶¶ 46-47.)

The failure to include any step-down in the royalty rate for the HDMI license is a form of patent misuse.  (*Id.* ¶ 50.)  And it raises rivals' costs, allowing the Founders and HDMI LA, to continue to exercise market power in the markets for HDMI-compatible products and components.  (*Id.*)

### 2.    Refusing to disclose the patents subject to the license

The Founders and HDMI LA seek to hide that the Adopter Agreement's royalty rate includes payment for expired patents.  (*Id.* ¶ 67.)  Standard practice among licensors and licensing agents is to disclose the licensed patents.  (*Id.* ¶ 68.)  Without such a disclosure, licensees are forced to conduct a freedom-to-operate investigation, which is difficult to perform, cost-prohibitive for many (especially smaller) companies, and often fails to identify all relevant patents.  (*Id.*)  Alternatively, the licensee must sign the license without knowing whether it is necessary.  (*Id.*)  It is also standard practice for standards-setting organizations to make their specifications public.  (*Id.* ¶ 69.)  A public specification allows potential licensees to evaluate the necessity of a licensor's patents.  (*Id.*)

Contrary to these standard practices, HDMI LA refuses to identify the patents licensed under the Adopter Agreement and keeps the HDMI Specification confidential.  (*Id.* ¶ 70.)  This conduct is designed to prevent licensees from discovering that patents no longer protect early versions of the HDMI standard.  (*Id.* ¶ 77.)  It also prevents potential licensees from evaluating whether obtaining separate licenses from

the Founders is feasible.  (*Id.* ¶ 79.)  Thus, although the Adopter Agreement states that "each Founder is willing to provide separate patent licenses," the refusal to disclose and secrecy over the Specification nullifies this option.  (*Id.* ¶¶ 79, 83.)  For example, Availink cannot determine whether it would need to take a license from HDMI LA to develop SoC ICs compatible with HDMI 2.1, whether it needs only take licenses directly from one or more of the Founders, or whether it needs a license at all.  (*Id.* ¶ 80.)

### 3.   Exacting royalties for non-infringing products

The refusal to disclose the licensed patents also allows the Founders and HDMI LA to extract royalties for non-infringing products.  (*Id.* ¶ 81.)  Patent licensors and licensing agents for other standards not only disclose relevant patents but also require royalties for the manufacturing or sale of compliant products *only* in countries in which they have patents.  (*Id.*)  In contrast, the Adopter Agreement requires the payment of a full royalty, *no matter where* the product is manufactured, shipped, or sold.  (*Id.* ¶ 82.)

The refusal to disclose facilitates these unlawful   iscoures.  (*Id.*)  Without disclosure, licensees do not know which countries the Founders' patents cover.  (*Id.*)  Availink, for instance, asked HDMI LA to disclose the jurisdictions in which the licensed patents were issued.  (*Id.*)  HDMI LA refused.  (*Id.*)  The Adopter Agreement nonetheless forces licensees to pay royalties for products manufactured and sold in countries where the Founders have no patent rights, thereby raising rivals' costs, restraining competition, and unlawfully expanding the geographic scope of the Founders' purported patent rights.  (*Id.*)

### 4.   Compelling royalties for invalid trademarks

The conspiracy also compels the payment of royalties for invalid trademarks.  The Founders and HDMI LA claim rights to the mark "HDMI," which they license under the Adopter Agreement.  (*Id.* ¶¶ 104-106.)  That term, however, has become generic, and the trademark is thus no longer valid.

A trademark must function as an indicator of source or origin.  (*Id.* ¶ 107.)  Once the relevant consuming public perceives that the mark is a generic term for a type of goods, the mark ceases to function as a trademark.  (*Id.*)  Famous examples of generic terms that no longer function as trademarks include "elevator," "trampoline," and "aspirin."  (*Id.*)

"HDMI" has become a generic term for a type of product.  Third parties commonly use the term to refer to a connector or matching input port with a specific physical configuration.  (*Id.* ¶ 109.)  When a consumer buys a new television, the salesperson or online retail site will remind them to purchase "HMDI

cables." (*Id.* ¶ 110.)  Television specifications on retailer websites include the number of "HDMI inputs." (*Id.*)  Online retailers often depict the term HDMI without a TM or R symbol denoting that it is a registered trademark.  (*Id.*)  And manufacturers of HDMI-compliant televisions and cables use the term HDMI generically.  (*Id.* ¶ 111.)

In short, the relevant consuming public does not perceive HDMI as an indicator of source or origin. Rather, HDMI is, or has become, a generic term for a type of connector and related goods.  (*Id.* ¶ 112.) Yet the Founders and HDMI LA force licensees to pay royalties for using this generic trademark, thereby raising rivals' costs and restricting competition.  (*Id.* ¶¶ 56-57.)

### 5.   Imposing royalties on products that do not use the trademarks

Even if the trademarks were valid, the Founders and HDMI LA make rival manufacturers pay for trademarks they don't use.  The term "HDMI" is used to identify end-user products compliant with the HDMI standard.  (*Id.* ¶ 51.)  But manufacturers of components incorporated in end-user products do not use the trademark.  (*Id.*)  And even many end-user product manufacturers do not use the HMDI trademarks.  (*Id.* ¶ 52.)  Indeed, Stacey-Lee Messam, Trademark Compliance Manager at HDMI LA, has admitted that many end-user products "do not use any of our trademarks anywhere."  (*Id.*)

Nonetheless, licensees must pay the full royalty rate under the Adopter Agreement, even if the trademarks are never used.  (*Id.* ¶ 55.)  Availink, for instance, manufactures only SoC Ics.  (*Id.* ¶ 53.)  It does not use the trademarks because these components are not visible—they are incorporated into end-user products.  (*Id.*)  Many of Availink's customers, who manufacture end-user products, do not use the HDMI trademark.  (*Id.*)  But when Availink raised this issue, HDMI LA insisted that "[n]on-use of HDMI trademark will not eliminate the royalty responsibility."  (*Id.* ¶ 54.)  This imposition of royalties raises rivals' costs and restricts competition.  (*Id.* ¶ 57.)

### 6.   Requiring payments for versions manufacturers don't use or need

The conspiracy also restricts competition by bundling licenses for different versions of the HDMI standard.  (*Id.* ¶ 58.)  Over the years, the Founders have released multiple versions of the Specification. (*Id.* ¶ 59.)  The continual updating forces companies to license under the Adopter Agreement.  (*Id.* ¶ 60.) Unlike other standard-setting organizations, which make all versions of their standards publicly available, the Founders and HDMI LA refuse to make the Specification available without a license to their

intellectual property.  (*Id.*)  Licensees must therefore continue to renew the Adopter Agreement to access the updated HDMI Specification.  (*Id.*)

But manufacturers of products compliant only with the earlier versions do not need access to the new versions.  (*Id.* ¶ 62.)  For example, Availink manufactures SoC Ics compliant only with HDMI 1.x.  (*Id.*)  Other standard-essential package licensors offer separate licenses for the various versions of their standards.  (*Id.* ¶ 63.)  The Founders and HDMI LA, however, refuse to do so.  (*Id.*)  Instead, the Adopter Agreement bundles the rights to all the versions of HDMI.  (*Id.*)

This bundling restricts competition.  Many products do not require the additional features incorporated in the newer versions.  (*Id.* ¶ 64.)  For example, industry data show that HDMI version 1 cables comprise nearly 13% of the worldwide market for HDMI cables in 2022.  (*Id.*)  Because the HDMI standards retain backward compatibility, HDMI 1 products compete with newer versions of HDMI products.  (*Id.*)  The bundling of versions into a single license artificially raises the costs of HDMI 1 products, thereby restricting competition in the HDMI markets.  (*Id.* ¶ 65.)

### 7.   Levying higher royalties on small competitors

The conspiracy further restricts competition by levying higher royalties on small competitors.  The Adopter Agreement requires manufacturers of HDMI components, such as Availink, to pay a higher royalty unless they can demonstrate that their components were incorporated into end-user products subject to the HDMI royalty.  (*Id.* ¶ 85.)  Smaller component manufacturers, like Availink, sell most, if not all, of their products through a network of distributors and wholesalers, which in turn sell to end-product manufacturers.  (*Id.* ¶ 88.)  The component manufacturers cannot verify whether their components end up in end-user products manufactured by HDMI-licensed entities.  (*Id.* ¶ 90.)  Even if the end-user manufacturers are known, they have no obligation to disclose whether they use the trademarks.  (*Id.*)  And without the ability to enforce the trademarks, the component manufacturers cannot corral end-user manufacturers to use them.  (*Id.* ¶ 92.)  As a result, these component manufacturers must bear the higher HDMI royalty, which is a substantial percentage of the average selling price of their products.  (*Id.* ¶ 91.)  In contrast, under the Founders' scheme, larger manufacturers like the Founders—who are either vertically integrated or can bypass the network of distributors and wholesalers—pay the lower royalty rate.  (*Id.* ¶¶ 93-94.)

1    Further, exacerbating this disparity, HDMI LA has interpreted the Adopter Agreement differently

2 for smaller competitors and selectively enforces the reporting requirement against only such competitors.

3 (*Id.* ¶ 95.)  Thus, HDMI LA discriminates against small component manufacturers, restraining competition

4 in the markets for HDMI components and HDMI-complaint SoC Ics.  (*Id.* ¶¶ 95-96.)

5           **8.      Fixing the price for licensees' patents**

6    Finally, the conspiracy restricts innovation by fixing the price for licensee HDMI-related patents.

7 The Adopter Agreement requires licensees to give up their right to assert their necessary patents against

8 any Founder or any of their 1900-plus licensees.  (*Id.* ¶ 100.)  Unlike pool licensing agreements approved

9 by the Department of Justice, the Adopter Agreement does not allow licensees to seek "fair and reasona-

10 ble" royalties for their patents.  (Id. ¶ 101.)  In return for giving up the right to assert their current and

11 future patents, licensees receive only a right to "petition" the Founders for a share of "future royalties

12 collected under HDMI."  (*Id.*)  The Founders—not an independent expert—"make the final determination

13 regarding a reasonable allocation of future royalties" for the licensee's patents.  (*Id.*)

14    This provision is an anticompetitive price-fixing agreement.  (*Id.* ¶ 102.)  The Founders, who are

15 competitors of each other and licensees, jointly determine whether they will pay anything for the rights to

16 the licensee's patents and, if so, how much.  (*Id.*)  The effect of this anticompetitive agreement is to reduce

17 the royalties paid by the Founders for licensees' patents.  (*Id.*)  This anticompetitive reduction in royalties

18 retards incentives to innovate in the market for HDMI technology.  (*Id.*)

19           **D.      Availink asks too many questions and gets sued.**

20    Availink signed the Adopter Agreement in 2015 and paid the annual fees, but due to economic and

21 financial conditions in 2018, it stopped paying, effectively withdrawing from the Agreement but remain-

22 ing subject to certain nonassertion obligations.  (*Id.* ¶¶ 47, 113.)  In 2021, when Availink sought reinstate-

23 ment, HDMI LA changed its interpretation of the Adopter Agreement.  For the first time, HDMI LA

24 insisted that Availink provide an expansive quarterly sales report, including a detailed breakdown of sales

25 by customer, so that it could use this information to seek royalties from Availink's customers.  (*Id.* ¶ 117.)

26 Availink has learned from other sources that HDMI LA was indeed selectively changing the interpretation

27 of the Adopter Agreement, discriminating against small component manufacturers.  (*Id.* ¶ 95.)

28

Given that the HDMI standard was first issued over twenty years ago, Availink started asking questions about what patents are included in the license, whether they had expired, who owned the patents, and why it should pay for a trademark license it does not need.  (*Id.* ¶¶ 53-54, 71-73.)  HDMI LA refused to answer these questions, other than to say that "[n]on-use of HDMI trademark will not eliminate the royalty responsibility."  (*Id.* ¶¶ 54, 71-74.)  Instead, HDMI LA sued Availink.  (*Id.* ¶ 74.)

## III.   LEGAL STANDARD

In assessing a motion under Rule 12(b)(6), the Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted).  To survive, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plausible claim includes "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Benavidez v. Cty. Of San Diego*, 993 F.3d 1134, 1144 (9th Cir. 2021) (internal quotations omitted).

## IV.   ARGUMENT

### A.   Availink alleges a plausible violation of federal antitrust law.

To state a claim under Section 1 of the Sherman Act, a plaintiff must plead: (1) a contract or conspiracy among two or more business entities; (2) by which the entities intended to harm or restrain trade; (3) which actually injures competition.  *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1150 (9th Cir. 2019).  Here, Availink alleges a contract or conspiracy among HDMI and the Founders intended to restrain trade.  (Dkt. 49 ¶¶ 31-41, 119-128.)  Availink further alleges two independent bases for actual injury to competition: (1) actual detrimental effects (higher royalties and fees, supracompetitive product prices, and reduced innovation); and (2) the conspirators possess market power and their conduct, as a matter of economic theory, harms competition.  (*Id.* ¶¶ 16-32, 37, 38, 49-50, 55-57, 62-66, 81, 82, 90-96, 102, 120-23.)

HDMI LA, however, insists: (1) its licensing scheme is lawful because the Adopter Agreement says licensees can supposedly obtain separate licenses to the various rights in the package license; (2) failing to reduce the package license royalty rate as bundled patents expire is not unlawful; (3) Availink

1  must allege even more to show anticompetitive effects; and (4) Availink cannot challenge the anticom-

2  petitive grant-back provision.  HDMI is wrong across the board.

### 1. HDMI LA ignores numerous allegations of anticompetitive conduct.

4  As a threshold matter, HDMI LA's motion must be denied because it fails to address the cumula-

5  tive impact of the numerous alleged anticompetitive practices under the licensing scheme.  Instead, HDMI

6  LA picks and chooses, defending the structure of the Adopter Agreement by focusing only on certain

7  provisions.  (Mot. 7-14.)  The law, however, requires that the "character and effect of a conspiracy are not

8  to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."

9  *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962).  The Court must

10  therefore give Availink "the full benefit" of its allegations "without tightly compartmentalizing the various

11  factual components and wiping the slate clean after scrutiny of each."  *Nat'l Football League's Sunday*

12  *Ticket Antitrust Litig.*, 933 F.3d at 1152-53 (internal quotation omitted).

13  This is fatal to HDMI LA's motion.  *First*, HDMI LA altogether ignores several anticompetitive

14  elements of the scheme.  HDMI LA never mentions that it compels royalties for non-infringing products

15  (Dkt. 49 ¶¶ 66, 82); invalid trademarks (*id.* ¶¶ 56, 103-112); and products that do not use the trademarks

16  (*id.* ¶¶ 51-57).  These practices are anticompetitive.  *See United States v. United States Gypsum Co.*, 333

17  U.S. 364, 397 (1948) (condemning as anticompetitive a provision in a license "that royalties should be

18  paid on the production of unpatented [products]"); *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S.

19  100, 138 (1969) (upholding injunction against collection of royalties on unpatented products); *SanDisk*

20  *Corp. v. Kingston Tech. Co.*, 2010 WL 11595034, at *3, *8 (W.D. Wis. Nov. 15, 2010) (imposition of

21  royalties on non-infringing products stated antitrust claim).  So too is imposing higher royalties on small

22  component manufacturers that cannot verify downstream products are subject to the HDMI trademark

23  royalties.  (Dkt. 49 ¶¶ 84-94.)  *See SanDisk Corp.*, 2010 WL 11595034, at *3, *8 (forcing "aggregators"

24  to pay royalties that manufacturers should have paid was anticompetitive imposition of additional costs

25  on certain competitors).

26  Nor does HDMI LA address the allegations of bundled licenses for different versions of the HDMI

27  standard (Dkt. 49 ¶¶ 58-66), which restricts competition among HDMI products.  *See Meredith Corp. v.*

28  *SESAC, LLC*, 2011 WL 856266, at *4, *13-*14 (S.D.N.Y. Mar. 9, 2011) (antitrust claim based on refusal

by licensing administrator to offer unbundled "per-program" license instead of blanket license).  HDMI LA also ignores the allegations that it discriminates against small competitors through differing contract interpretations and selective enforcement of licensing terms, which restricts competition. (Dkt. 49 ¶ 85).  *See, e.g.*, *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 160 (1948) (licensing contracts that discriminated against smaller competitors violated Sherman Act); Dept. of Justice, *MPEG-2 Business Review Letter*, 1997 DOJBRL LEXIS 14, *22 (June 26, 1997) (discriminatory application of pool license may exclude competitors).[1]

*Second*, while defending the structure of the Adopter Agreement, HDMI LA ignores the allegations regarding its operation.  Availink alleges not only that the *structure* of the licensing scheme is anticompetitive, but also that how the scheme *operates* restrains competition.  For instance, in operation, HDMI LA interprets the Adopter Agreement differently for small competitors and selectively enforces the licensing scheme to disadvantage these competitors.  (*See* Dkt. 49 ¶ 95.)  In operation, HDMI LA also imposes royalties on products sold in countries where the Founders have no patents.  (*Id.* ¶ 82.)  None of this anticompetitive conduct is apparent from the structure of the Adopter Agreement, and unsuspecting licensees are trapped in a ten-year license before they may learn of it.  (*Id.* ¶¶ 46-47.)

Together, the practices ignored by HDMI LA raise rivals' costs and suppress competition.  (Dkt. 49 ¶¶ 32, 38, 50, 65, 77, 82, 84-96, 102.)  "Looking holistically at the alleged conduct," Availink's complaint therefore adequately pleads an agreement to restrain competition.  *Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d at 1153.

### 2. The separate licensing option is illusory and does not save HDMI LA's anticompetitive scheme.

HDMI LA says its licensing scheme is lawful because the Adopter Agreement supposedly allows for separate licenses from the Founders.  (Mot. 7-9.)  Not so.  *First*, HDMI LA relies on cases involving copyright pools (BMI and ASCAP) that were subject to antitrust consent decrees that *prohibited* some of the very conduct HDMI LA engages in, such as refusing to grant unbundled licenses.  *See Meredith Corp.*, 2011 WL 856266, at *12 (distinguishing cases such as *Buffalo Broad. Co. v. ASCAP*, 744 F.2d 917 (2d Cir. 1984) because they "involved challenges to the practices of either ASCAP or BMI, both of which

---

[1] We provide the MPEG LA and other Business Review Letters in an appendix.

1  were already operating under the terms of the consent decrees that plaintiffs argue prohibit much of the

2  anticompetitive conduct alleged in the present complaint").

3    *Second*, as a factual matter, separate licensing is not realistically available.  The Adopter Agree-

4  ment expressly precludes licensing the Specification separately from the trademarks.  HDMI LA's conduct

5  makes illusory any opportunity to separately license the patents.  And HDMI LA rebuffed Availink's

6  attempts to get the information necessary to seek separate licenses.

7  **a)**  **The Adopter Agreement does not allow separate licensing of the Spec-<br>ification and the Trademarks.**

8

9    Contrary to HDMI LA's assertion, the Adopter Agreement does *not* allow for separate licensing

10  of the rights in the package license.  The Adopter agreement bundles three sets of rights: the patents; the

11  trademarks; and access to the Specification. (Dkt. 1-2 ¶¶ 2, 4, 5.)  The Agreement does state that "each

12  Founder is willing to provide separate patent licenses to any Necessary Claims."  (*Id.* ¶ 9.22.1.)  But by

13  its express terms, the Agreement does *not* permit licensing of the Specification without the trademarks.

14  (*Id.* ¶ 9.22.2.)  Those rights can only be licensed together.  (*Id.* ¶ 9.22.2 (speaking of "a separate license"

15  (singular) "to the Specification *and* … the Adopted Trademarks" (emphasis added)).)

16    This is tying.  *See, e.g.*, *Paramount Pictures, Inc.*, 334 U.S. at 156 (condemning agreement condi-

17  tioning copyright license for certain films on taking licenses for other films).  Companies seeking to man-

18  ufacture HDMI-compliant products need the Specification; due to the dominance of the HDMI standard,

19  "HDMI compatibility is a 'must have.'"  (Dkt. 49 ¶ 28.)  But many companies, such as Availink, do not

20  use the trademarks and thus have no need to license them.  (*Id.* ¶¶ 51-57.)  HDMI LA nonetheless requires

21  a full royalty payment, even if licensees do not use the trademarks.  (*Id.* ¶¶ 54-55.)  Tying the Specification

22  to the trademarks raises rivals' costs and restrict competition.  (*Id.* ¶ 57.)

23  **b)**  **HDMI LA obscures the patents in the license, making the opportunity<br>to license directly from the Founders illusory.**

24    Further, individual licensing of the Necessary Claims is not truly available.  As the courts have

25  made clear, it's not what the agreement *says* that counts; it's whether individual licenses are "*realistically*

26  *available*."  *Buffalo Broad. Co.*, 744 F.2d at 925 (emphasis added).

27    Individual licensing is not available when a licensing administrator "discourag[es] direct licensing

28  by … obscuring the [rights]" in its package license.  *Radio Music License Comm., Inc. v. SESAC, Inc.*, 29

12

1    F. Supp. 3d 487, 501 (E.D. Pa. 2014) (denying motion to dismiss).  The "lack of transparency" regarding

2    what rights are included forces companies to take the package license.  *Id.*  In other words, a licensing

3    agent's refusal to "adequately disclose" the rights in a package license *prevents* separate licensing.  *Radio*

4    *Music License Comm., Inc. v. SESAC Inc.*, 2013 WL 12114098, at *18 (E.D. Pa. Dec. 23, 2013), report

5    and recommendation adopted as modified, 2014 WL 12617437 (E.D. Pa. Feb. 20, 2014); *see also Broad.*

6    *Music, Inc. v. Moor-Law, Inc.*, 484 F. Supp. 357, 367 (D. Del. 1980) (agent's refusal to "supply a list of

7    the compositions within its repertory" made individual licensing infeasible). The lack of disclosure makes

8    the opportunity to separately license "illusory."  *In re Pandora Media, LLC*, 2022 WL 19299126, at *9

9    (C.D. Cal. Oct. 26, 2022) (denying motion to dismiss antitrust claims because plaintiff "adequately alleges

10   that the availability of any individual licenses is illusory").

11          That describes HDMI LA's conduct to a T.  As part of its anticompetitive scheme, HDMI LA—as

12   the agent of the Founders—refuses to disclose what patent rights are in its package license.  (Dkt. 49 ¶¶

13   67-77.)  This refusal flies in the face of standard practice among licensing agents for standards-related

14   licenses.  (*Id.* ¶ 68.)  After all, the licensing agent should know what patents are relevant.  (*Id.*)   That is

15   why other joint licensors provide potential licensees with a "brochure of 'essential' patents," list the pa-

16   tents in an attachment to the license, or identify the relevant patents by some other means, such as posting

17   them on a website.  *Matsushita Elec. Indus. Co. v. Cinram Int'l, Inc.*, 299 F. Supp. 2d 370, 377 (D. Del.

18   2004); *MPEG-2 Business Review Lette*r, 1997 DOJBRL LEXIS 14, *15; *Samsung Elecs. Co., Ltd. v.*

19   *Panasonic Corp.*, No. C 10-03098 JSW, 2015 WL 10890655, at *6 n.6 (N.D. Cal. Sep. 30, 2015).

20          In contrast, HDMI LA takes pains to keep potential licensees in the dark.  (Dkt. 49 ¶¶ 67-77.)

21   Without disclosure, potential licenses "cannot independently evaluate whether the license actually in-

22   cludes necessary patents."  (*Id.* ¶ 77.)  They can only resort to a difficult-to-conduct, cost-prohibitive

23   "freedom-to-operate investigation," which often fails to identify all relevant patents.  (*Id.* ¶ 68.)  The

24   refusal to disclose, therefore, "prevents potential licensees from seeking independent licenses from the

25   Founders."  (*Id.* ¶ 83.)  "[T]here is simply no [other] practical choice" than to take the package license.

26   *Radio Music License Comm.*, 2013 WL 12114098, at *18.

27          But that is not all.  HDMI LA's conduct goes beyond obscuring the patents in its package license.

28   Further exploiting its information asymmetry, HDMI LA keeps the Specification secret.  (*Id.* ¶¶ 70, 78-

                                                13

79.)  This too flies in the face of standard practice, which is to make standards-related specifications pub-

lic.  (*Id.* ¶ 69.)  The Specification is necessary to determine what patents would be infringed by manufac-

turing a standard-compliant product.  (*Id.*)  Without access to the Specification, there is *no way* for a

potential licensee to determine what patents it needs to license to practice the standard.  (*Id.*)

      HDMI LA's conduct thus "prevents potential licensees from evaluating whether obtaining separate

licenses from the Founders is feasible."  (*Id.* ¶ 79.)  For instance, "Availink cannot determine whether it

would need to take a license from HDMI LA to develop SoC ICs compatible with HDMI 2.1, whether it

needs only take licenses directly from one or more of the Founders, or whether it needs a license at all."

(*Id.* ¶ 80.)  The supposed opportunity to license directly from the Founders is illusory.  *Radio Music Li-*

*cense Comm.*, 29 F. Supp. 3d at 501.

### c) HDMI LA rebuffed Availink's inquiries seeking information relevant to separate licensing.

      HDMI LA, however, says it can avoid antitrust scrutiny because Availink supposedly "never made

an inquiry or attempted to negotiate a single individual license."  (Mot. 9 (cleaned up).)  HDMI LA is

wrong on the law and the facts.   As a matter of law, because the "availability of individual licenses is

illusory," Availink "need not allege any attempt to individually license."  *In re Pandora Media, LLC*, 2022

WL 19299126, at *9; *see also Broad. Music, Inc.*, 484 F. Supp. at 367 (agent's refusal to disclose rights

in package license made seeking individual licenses futile).

      As a matter of fact, contrary to HDMI LA's claim, Availink *did* make inquiries related to separate

licensing, *twice*.  HDMI LA rebuffed these requests.  (Dkt. 49 ¶¶ 71-74.)  Availink specifically asked for

information that would allow it to evaluate separate licensing:  a *list of patents*, *their owners*, and *which*

*version the patents covered*.  As stated in an email to HDMI LA:

> HDMI specification has been around for over twenty years, applicable patents, if
> any, should have been expired.  If you do think that we might infringe some of the
> patents, please send us the list of patents, including patents owners, authorization
> for you to represent the patent owners, applicable versions of HDMI specifications,
> also jurisdiction of the patent validity.

(*Id.* ¶ 71.) HDMI LA—the agent of the Founders— refused to provide the information.  (*Id.* ¶ 72.)  Later,

Availink again asked for information necessary to evaluate whether the package license or separate li-

censes made sense:

> HDMI specification is around over twenty years and patent rights last for up to 20 years. If you really want to assert IPR [intellectual property rights] on any patent, you do need first to give us exactly what are relevant IPs [intellectual property], patents you own or you are authorized to represent and versions of HDMI specification related. Any license term will need to tie to the period of the validity of the involved patent.

(*Id.* ¶ 73.)  But rather than answering, HDMI LA brought its lawsuit.  (*Id.* ¶ 74.)

HDMI LA's refusal to disclose the patents and the Specification is "an integral part of the Founders' and HDMI LA's efforts to raise rivals' costs and suppress competition from products compatible only with early versions of the HDMI standard."  (Dkt. 49 ¶ 77.)

### 3.    The lack of a step-down is anticompetitive.

Turning to the royalty rate for the package license, HDMI LA says it's okay to charge the same rate for 20 years, even though patents in the package have expired.  (Mot. 9-10.)  According to HDMI LA, no rate decrease is needed so long as some included patents remain valid.  That is not the law.

The Supreme Court has made clear that "the exaction of royalties" for use of patented technology "after the patent has expired" is an unlawful "assertion of monopoly power."  *Brulotte v. Thys Co.*, 379 U.S. 29, 33 (1964).  "Patents endow their holders with certain superpowers, but only for a limited time." *Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, 451 (2015).  Exacting post-expiration royalties is thus "analogous to an effort to enlarge the monopoly of the patent by tieing the sale or use of the patented article to the purchase or use of unpatented ones."  379 U.S. at 33.

Exacting royalties for expired patents is not just patent misuse.  It is an antitrust violation.  "A starting point for an antitrust analysis of any patent pool is an inquiry into the validity of the patents." *MPEG-2 Business Review Letter*, 1997 DOJBRL LEXIS 14 at *19.  As the DOJ Antitrust Division has repeatedly explained in reviewing proposed licenses like the one here, "A licensing scheme premised on invalid or expired intellectual property will not withstand antitrust scrutiny."  *Id.*; *see also* Dept. of Justice, *3C DVD Business Review Letter*, 1998 DOJBRL LEXIS 15, *19 (Dec. 16, 1998); Dept. of Justice, *RFID Business Review Lette*r, 2008 DOJBRL LEXIS 5, *17 (Oct. 21, 2008).  The DOJ has thus insisted on mechanisms, such as independent expert review, to ensure that pooled licenses do not shield invalid patents.  *See, e.g.*, 1997 DOJBRL LEXIS 14 at *21 (approving provisions designed to keep invalid patents out of portfolio license).

1    This principle applies with equal force in the context of "hybrid" licenses, which, like the Adopter

2    Agreement, include both patents and nonpatent rights.  A licensor cannot require the same royalty rate

3    after patents expire in such a package license.  *See Chromalloy Am. Corp. v. Fischmann*, 716 F.2d 683,

4    685 (9th Cir. 1983) (after patent expires, "hybrid agreements are not enforceable according to their

5    terms").  This is because, consistent with *Brulotte*, the "enforcement of the payment of royalties on invalid

6    patents is to be discouraged."  *Id.*  In other words, "the same rule which makes royalties for patent rights

7    uncollectible if the patent is invalid" applies to hybrid licenses.  *St. Regis Paper Co. v. Royal Indus*., 552

8    F.2d 309, 315 (9th Cir. 1977).  Although a licensor may collect royalties for unexpired patents or nonpatent

9    rights in the package, it cannot charge "royalties at the same rate and on the same basis after the patents

10   expired that [were] paid while the patent was in effect."  *Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365,

11   1373 (11th Cir. 1983) (holding that *Brulotte* applies to hybrid licenses); *see also Boggild v. Kenner Prods*.,

12   776 F.2d 1315, 1321 (6th Cir. 1985) (holding hybrid license "unlawful per se" because it did not include

13   "terms for reduction of post-expiration royalties").

14       HDMI LA is also wrong that Availink "has not alleged anything suggesting the license was not

15   voluntarily entered into."  (Mot. 10.)  As explained above, the Adopter Agreement conditions a license to

16   the Specification, which is necessary to manufacture compliant products, on also licensing and paying

17   royalties for the trademarks, even if the licensee does not use the trademarks.  (Section IV.A.2.a, *supra*.)

18   That sort of conditioning is unlawful coercion.  *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2,

19   12 (1984) ("the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of

20   its control over the tying product to force the buyer into the purchase of a tied product that the buyer …

21   did not want"); *Zenith Radio Corp.*, 395 U.S. at 136 (patent owner "may not condition the right" to use a

22   patent on payment of royalties for non-patented products).  Moreover, by obscuring what patents are in-

23   cluded in the license and keeping the Specification secret, HDMI LA effectively forces companies to take

24   a package license.  (Section IV.A.2.b, *supra*.)  There is nothing "voluntary" about this scheme.

25           **4.    The conspiracy harmed competition.**

26       According to HDMI LA, Availink did not allege "any anticompetitive effect."  (Mot. 10.)  Not so.

27   Anticompetitive effects, i.e., injury to competition, may be shown in two ways.  A plaintiff may show

28   "actual detrimental effects," such as "reduced output, increased prices, or decreased quality in the relevant

market." *PLS.COM, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022) (internal quotations omitted).  Or a plaintiff may show the "defendant has market power and present 'some evidence that the challenged restraint harms competition.'"  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023) (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018)).  That evidence need not "be extensive or highly technical"; it need only show that "the defendant's conduct, as a matter of economic theory, harms competition." *Id.*  Availink sufficiently alleged injury to competition under both criteria.

*First*, Availink alleges actual detrimental effects in the form of "reduced innovation," "supracompetitive fees and royalties," and "supracompetitive prices." (Dkt. 49 ¶¶ 50, 102, 118, 123, 124.) Ignoring the allegations of reduced innovation, HDMI LA claims that Availink's "only" allegation about supracompetitive prices is the lack of a step-down in the royalty rate and claims that Availink must show that the package license rate is "higher than the price of individual[] licensing." (Mot. 11.)  Not true.

HDMI LA again ignores the cumulative effect of all the alleged conduct.  True, pooled licensing of intellectual property rights may, in some circumstances, have procompetitive effects.  But pooled licenses may become tools for raising rivals' costs, shielding invalid patents, and increasing prices of downstream products.  *See, e.g.*, *MPEG-2 Business Review Letter*, 1997 DOJBRL LEXIS 14, *18-19 (pooled license "can restrict competition, whether among intellectual property rights within the pool or downstream products incorporating the pooled patents or in innovation among parties to the pool").  Availink alleges not only that the lack of step-down affects prices, but that the combination of a range of conduct led to supracompetitive pricing.  (*See* Section VI.A.1, *supra*.)  These allegations are sufficient to plead anticompetitive effects.  *See, e.g.*, *Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d at 1153 ("[l]ooking holistically at the alleged conduct, we conclude that the complaint adequately pleads … [injury to] competition); *Brown v. Amazon.com, Inc.*, 2023 WL 5793303, at *10 (W.D. Wash. Sept. 7, 2023) (denying motion to dismiss based on alleged "aggregation of alleged anticompetitive effects").

*Second*, Availink alleges that the conspirators have market power, which HDMI LA does not dispute, and that the challenged conspiracy restricts competition "as a matter of economic theory."  (Dkt. 49 ¶¶ 32, 37, 38, 50, 57, 84, 98, 102, 121-23.)  Availink alleges that the cumulative effect of the various conduct—exacting royalties for non-infringing products, bundling licenses for different versions of the standard, discriminating against small competitors, and the like—"raises rivals' costs," "disadvantages

small competitors," "suppress[es] competition" from early versions of HDMI products, and "retards in-centives to innovate." (*Id.* ¶¶ 50, 57, 66, 77, 84, 102.)  Those allegations are sufficient to show the con-spiracy harms competition.  *See, e.g., Samsung Elecs.*, 2015 WL 10890655, at *7 (denying motion to dismiss antitrust claims where complaint alleged "a variety of actions" by patent pool, including "coercive imposition of supracompetitive royalties" and "imposition of unequal grantback and cross licensing pro-visions"); *Sandisk Corp.*, 2010 WL 11595034, at *8-*9 (denying motion to dismiss antitrust claims where licensor with market power used licensing terms to "impose" additional costs on rivals and "reduce incen-tives" to innovate); *see also Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1478 (9th Cir. 1997) (conduct that "increased the operating cost" of competitors harms competition); *REX - Real Est. Exch. Inc. v. Zillow Inc.*, 2021 WL 3930694, at *7 (W.D. Wash. Sept. 2, 2021) (allegations of conspiracy to disadvantage certain competitors sufficient to show injury to competition); *Toranto v. Jaffurs*, 297 F. Supp. 3d 1073, 1088 (S.D. Cal. 2018) (allegations of conspiracy to exclude rival sufficient to avoid motion to dismiss).

### 5.    Availink has standing to challenge the grantback provision.

Finally, HDMI LA says that Availink has no standing to challenge the grantback provision.  (Mot. 13-14.) This too is wrong.  Again, HDMI LA cherry picks the potential benefits of a single provision but ignores its detriments and how it contributes to the scheme's overall anticompetitive effects.

*First*, the grantback (or "non-assertion") provision is a price-fixing agreement that retards innova-tion. (Dkt. 49 ¶¶ 101-102.)  As is well recognized, "such clauses may reduce the incentive for independent innovation by licensees."  Am. Bar Assoc., Antitrust Issues in Int'l IP Licensing Transactions, at II.D.4.e.2 (2012).  To prevent that anticompetitive effect, the DOJ has only approved grantback provisions that re-quire the payment of "fair and reasonable royalties" set by the package licensing rate or independently negotiated between the patent holder and potential licensees.  *See, e.g.*, *MPEG-2 Business Review Letter*, 1997 DOJBRL LEXIS 14, *16, *26 (grantback royalty same as per patent royalty of pooled license); *3C Business Review Letter*, 1998 DOJBRL LEXIS 15, *30 (requiring grantback license at "'reasonable, non-discriminatory conditions comparable to those' of the Portfolio Licenses").

Here, however, the Adopter Agreement gives the Founders complete discretion to set the royalty rate for any necessary patents held by licensee.  (Dkt. 49 ¶ 101.)  Licensees must agree not to assert any necessary patents "they may now or in the future own or control" against any Founder or any of the 1,900

18

Adopters.  (*Id.* ¶ 100.)  In return, licensees receive only a royalty that the Founders, in their "discretion," agree upon.  In other words, the Founders, who would otherwise be competing buyers, jointly set a price for licensees' patents.  That is an unlawful price-fixing agreement.  *See, e.g.*, *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948) (agreement among buyers on price they would pay seller is *per se* unlawful).

*Second*, although it did not have patents directly affected by the grantback requirement, Availink was nonetheless harmed by this price-fixing agreement.  Availink is "a consumer in the market for HDMI technology, it competes in the relevant markets for HDMI-compliant components and HDMI SoC ICs, and it sells components used in the market for HDMI-compliant end-user products." (Dkt. 49 ¶ 124.)  By suppressing innovation, the Founders and HDMI LA excluded potential competition in the markets for HDMI technology, HDMI-compliant products, and HDMI SoC ICs.  The grantback provision thus bolstered the conspirators' market power and allowed them to keep their royalties and fees higher.  (*Id.* ¶¶ 102, 118, 123-24.)  That harmed Availink.  *See Samsung Elecs.*, 2015 WL 10890655, at *7 (finding potential licensee suffered antitrust injury from grantback's restriction on innovation).

### B.   Availink states claims under the state antitrust and unfair competition laws.

#### 1.   The California Cartwright Act

According to HDMI LA, there is no difference between Availink's federal Sherman Act claim and its California Cartwright Act claim.  (Mot. 14.)  But in truth, the "'Cartwright Act is broader in range and deeper in reach than the Sherman Act.'"  *In re Cipro Cases I & II*, 61 Cal. 4th 116, 160 (2015) (quoting *Cianci v. Superior Court*, 40 Cal. 3d 903, 920 (1985)).  Thus, Sherman Act case law has only a "limited" role in Cartwright Act cases.  *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 985 (9th Cir. 2000).

This broader and deeper range makes a difference here.  For instance, HDMI LA (incorrectly) says that Availink has not pled sufficient "anticompetitive effects" for a Sherman Act violation.  (Mot. 10-11.)  But the Cartwright Act "reaches deep in proscribing anticompetitive conduct," including any agreement by which businesses "pool … any interests" that may affect prices "*in any manner*."  *AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1110 (9th Cir. 2013) (internal quotation omitted; emphasis original).  In this way, the "Act reaches beyond the Sherman Act to threats to competition in their incipiency," *id.*, and is violated by an agreement that *may* substantially lessen competition, *Cianci*, 40 Cal. 3d at 918.

1    Proof of actual anticompetitive effects is unnecessary; the Act "goes beyond 'clear-cut menaces to com-

2    petition' in order to deal with merely 'ephemeral possibilities.'" *Id.*   Availink's allegations of raising

3    rivals' costs, disadvantaging competitors, and retarding innovation easily meet this standard.

4            Moreover, HDMI LA argues (also incorrectly) that Availink has no standing under the Sherman

5    Act to challenge the grantback provision.  But the requirements for standing and antitrust injury under the

6    Cartwright Act are less stringent than under the Sherman Act.  *See, e.g.*, *Knevelbaard Dairies*, 232 F.3d

7    at 991 ("the more restrictive definition of 'antitrust injury' under federal law does not apply to the Cart-

8    wright Act" (internal quotations omitted)).  Thus, injuries that are "entirely derivative" from injuries to

9    others, which are insufficient under the Sherman Act, may be sufficient under the Cartwright Act.  *William*

10   *Morris Endeavor Ent., LLC v. Writers Guild of Am., W., Inc.*, 2020 WL 2559491, at *5 (C.D. Cal. Apr.

11   27, 2020) (denying motion to dismiss Cartwright Act claim but granting motion on Sherman Act claim

12   for lack of antitrust standing).  Availink's allegations of injury—that it was forced to pay higher prices

13   because of diminished innovation—are sufficient.  *Id.*

14           The elements of a Cartwright Act claim are: "(1) the formation and operation of the conspiracy,

15   (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts."

16   *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 47 (1998).  Availink pled facts showing each

17   of these elements.  (Dkt. 49 ¶¶ 31-112, 119-24.)  The Court should deny HDMI LA's motion as to the

18   Cartwright Act claim.

19           2.      **California Business & Professions Code § 17200**

20           HDMI LA also says that Availink's claim under California Business & Professions Code § 17200

21   stands or falls with its Sherman Act claim.  (Mot. 15.)  This too is wrong.  A claim under § 17200 "is far

22   broader than a federal antitrust claim, and thus Defendant's conduct may constitute a violation of section

23   17200 even if not rising for some technical reason to an antitrust violation."  *Slattery v. Apple Computer,*

24   *Inc.*, 2005 WL 2204981, at *5 (N.D. Cal. Sept. 9, 2005).

25           Section 17200 prohibits "any [1] unlawful, [2] unfair or [3] fraudulent business act or practice."

26   Cal. Bus. & Prof. Code § 17200.  As this "three-prong structure makes clear, a business practice may be

27   'unfair,' and therefore illegal under [§ 17200], even if not specifically proscribed by some other law."

28   *Epic Games*, 67 F.4th at 1000 (internal quotations omitted).  Availink alleges violations of all three prongs.

*First*, Availink alleges unlawful conduct.  This prong covers "anything that can properly be called a business practice and that at the same time is forbidden by law."  *CRST Van Expedited, Inc. v. Werner Enters.*, 479 F.3d 1099, 1107 (9th Cir. 2007).  The statute "'borrows' violations from other laws"—including both statutory and common law—"by making them independently actionable as unfair competitive practices."  *Id.*  Here, Availink alleges not only that HDMI LA's conduct violates federal and state antitrust law, but also that it "constitutes patent misuse."  (Dkt. 49 ¶ 144.)  That is sufficient.  *See Spex Techs., Inc. v. Kingston Tech. Corp.*, 2019 WL 8194714, at *5 (C.D. Cal. Dec. 23, 2019) (§17200 claim based on patent misuse).

*Second*, Availink alleges unfair practices.  The unfair prong is "'intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable 'new schemes which the fertility of man's invention would contrive.'"  *Epic Games*, 67 F.4th at 1000 (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)).  A practice may be "unfair" to competitors if it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."  *Id.*  It may be "unfair" to consumers if it is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" or "the practice's impact on the victim outweighs the reasons, justifications and motives of the alleged wrongdoer."  *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214-15 (9th Cir. 2020).

Availink meets these tests.  It is both a consumer and a competitor of the conspirators.  *See* 67 F.4th at 1000 (applying both tests because of plaintiff's market position).  It alleges that the conspiracy threatens competition by raising rivals' costs, suppressing competition, and reducing innovation.  (Dkt. 49 ¶ 123.)  And it alleges that conspiracy is injurious to competitors by raising prices.  (*Id.*)

*Finally,* Availink alleges fraudulent practices.  "A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under [§ 17200]."  *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1471 (2006) (internal quotations omitted).  HDMI LA falsely represents "that the HDMI license is necessary for manufacturers who produce components compatible only with HDMI 1.0, who do not use the HDMI trademark, and whose customers do not use the HDMI trademark, without disclosing that some or all of the

patents necessary for HDMI 1.0 have expired." (Dkt. 49 ¶ 145.)  Obviously, whether the patents covering standard-compliant products have expired is "relevant."  The Court should deny HDMI LA's motion as to the § 17200 claim.

### 3.   The New York Donnelly Act and General Business Law § 349

Turning to the New York state-law claims, the Court should deny HDMI LA's motion as to the Donnelly Act claim for the same reasons as for the Sherman Act claim.

As to the claim under the General Business Law, HDMI LA claims that Availink did not allege "harm to consumers in New York." (Mot. 19.)  But Availink alleges harm in the worldwide markets for HDMI-compliant components, HDMI SoC ICs, and HDMI-compliant end-user products.  (Dkt. 49 ¶¶ _.) These products include "digital televisions, personal computers, computer monitors, game consoles," and "smartphones."  (*Id.* ¶ 28.)  Almost "10 billion devices enabled with HDMI technology have shipped" since 2002.  (*Id.*)  And Availink alleges that as a result of HDMI LA's deceptive acts, "consumers have been harmed."  (*Id.* ¶ 156.)  Thus, unless New York is somehow devoid of consumer electronics, Availink has alleged harm in that state.  The Court should deny the motion as to the New York state-law claims.

### C.   Availink has stated a claim for cancellation of the trademarks.

Under 15 U.S.C § 1119, the Court may order cancellation of HDMI LA's trademark registrations:

> In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action.

### 1.   Availink has standing to petition to cancel HMDI LA's registrations.

Even after the dismissal of HDMI LA's trademark claims, a registered trademark is still "involved" in this case.  HDMI LA's breach of contract claim includes an allegation that Availink continued to use HDMI's registered marks after it ceased to be an adopter.  (Compl. Dkt. 1 ¶ 46.)  Unlike in the cases cited by HDMI LA, there remains a claim for breach of a trademark license agreement.  Availink has standing to bring a counterclaim that the claim of breach is invalid because the trademarks are now generic.

HDMI LA's cases are thus inapposite.  In *Apogee*, there was no standing because the Court had already found that the defendant's use of its mark did not infringe the plaintiff's mark, so there was no harm to the defendant by continued registration. *Glob. Apogee v. Sugarfina, Inc.*, 2023 WL 3235934, at

1   *7 (C.D. Cal. Mar. 31, 2023).  In *Vital Pharma*, once the trademark infringement claim was dismissed,

2   there was no remaining cause of action involving the trademark registration, unlike in this case, where

3   there is a breach of license claim.  *Vital Pharms. v. PhD Mktg., Inc.*, 2021 WL 6882435, at  *5 (C.D. Cal.

4   Mar. 3, 2021).[2]

5        The threshold for standing to seek cancellation of a registration is very low.  The person seeking

6   cancellation must simply be more than an intermeddler and allege how the continued registration of the

7   mark may harm it.  Proof of damages is not required.  *3Point Distribution, LLC v. Cafepress.com, Inc.*,

8   2008 WL 11341309, at *2-3 (C.D. Cal. Aug. 25, 2008) (citing *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*,

9   735 F.2d 346 (9th Cir. 1984)); *see also Gay Pro. Men of Color v. CBE Pride*, Opp. No. 91252308, 2020

10   WL 2394376, at *2 (TTAB May 8, 2020) ("To prove its standing to oppose the registration of an allegedly

11   generic or descriptive term, an opposer must show only that it is engaged in the manufacture or sale of the

12   same or related goods or services as those listed in the applicant's application such that the opposer has

13   the right to use the term in a descriptive or generic manner.").

14        Since Availink makes chips that are HDMI compliant, it has a competitive need to be able to refer

15   to that generic standard.  Availink is harmed by the continued existence of registrations for a term that no

16   longer functions as a trademark, first, because it may be at risk of litigation for correctly advertising that

17   its goods comply with HDMI standards, as HDMI LA threatened in its opposition to the motion to dismiss

18   the trademark claims.  (Dkt. 38 at p. 11.)  Second, Availink is harmed because HDMI LA's breach of

19   contract claim seeks damages for Availink's alleged use of these generic marks.  (Dkt. 1 ¶¶ 46-47, and

20   Prayer for Relief, ¶ 2.)  Third, not being a party to the Adopter Agreement will cause harm to Availink

21   (e.g., Dkt. 49 ¶ 47), but that same agreement would require Availink to license HDMI marks it does not

22   use (*id.* ¶¶ 51-57) and also hold Availink accountable for royalties for use of the HDMI trademark and

23   technology by its customers (*id.* ¶ 54).  There is no doubt that Availink has standing.[3]

24

---

25      [2] HDMI LA implies that the genericness count is a counterclaim to the dismissed trademark

26   claims.  It is not.  It was filed as a counterclaim to the breach of contract claim.  As the Court knows, Availink did not file an answer and counterclaim to the trademark claims, but instead filed a successful

27   12(b)(6) motion.  (*See* Dkt. 65.)
     [3] Moreover, HDMI LA claims that it is not planning to replead "at this time" (Dkt. 72 at p. 16),

28   which suggests that it may try to seek leave to revive the trademark claims even though the Court gave HDMI LA a deadline of November 2, 2023, to replead.  (Dkt. 65.)  This leaves Availink with a continued threat of being accused of infringement, and thus a need to clarify that the trademarks are generic.

1        **2.    Availink has pled sufficient facts to show genericness.**

2        Even a registered trademark can become generic as to the goods for which it is registered.  Trade-

3    mark law provides for cancellation "[a]t any time if the registered mark becomes the generic name for the

4    goods or services, or a portion thereof, for which it is registered."  15 U.S.C. § 1064(3).  A trademark

5    becomes generic when the primary significance of the registered mark to the relevant public is as the name

6    for a particular type of good or service irrespective of its source.  *Elliott v. Google, Inc.*, 860 F.3d 1151,

7    1155–56 (9th Cir. 2017).[4]

8        Availink has properly alleged that HDMI's primary significance to the public is for a particular

9    type of good.  (Dkt. 49 ¶¶ 108-112.)  Availink has also provided numerous examples, not mere conclusory

10   allegations, of non-trademark use of HDMI as a type of cable, port, or connection, by retailers and manu-

11   facturers, including, as HDMI LA notes, Samsung, an Adopter.  (Dkt. 49, Exs. 1 and 2.)  The fact that

12   Samsung may be an Adopter does nothing to support HDMI LA's position; if anything, evidence of

13   Adopters using HDMI generically bolsters Availink's allegations of genericness.

14       The cases cited by HDMI LA do not support dismissal.  First, HDMI LA relies on summary judg-

15   ment cases that do not test the sufficiency of allegations under Rule 12, but whether the evidence *proved*

16   the complaint allegations or whether a *genuine issue of fact* remained.  *Axon Enter., Inc. v. Luxury Home*

17   *Buyers, LLC*, 2023 WL 4636917 (D. Nev. July 19, 2023); *Sensory Path Inc. v. Fit & Fun Playscapes LLC*,

18   2021 WL 4768247 (N.D. Miss. Oct. 12, 2021).

19       The cases under Rule 12(b)(6) do not help HDMI LA either.  In *Gibson*, the defendant alleged that

20   other third-party manufacturers used the allegedly generic shape of a guitar but did not name any in its

21   pleading.  *Gibson Brands, Inc. v. John Hornby Skewes & Co.*, 2014 WL 4187979, at *1 (C.D. Cal. Aug.

22   22, 2014).  However, the defendant was able to cure this issue by simply repleading with more detailed

23   information.  *See* Order, *Gibson Brands v. John Hornby Skewes & Co.*, 2:14-cv-00609-DDP-SS (C.D.

24   Cal. Oct. 23, 2014), Dkt. 57.  In contrast, Availink has provided concrete examples in the Exhibits to the

25   Counterclaims of third-party use of HDMI in a non-trademark way.

26   _____

27       [4] The fact that there is a registration has no bearing on pleading, but only on the burden of proof.
28   Once again, HDMI LA cites a summary judgment case, not a Rule 12(b)(6) case, which evaluated the
     "anemic" evidence, not the sufficiency of the pleadings.  *POM Wonderful LLC v. Hubbard*, 2016 WL
     3621281, *8 (C.D. Cal.  June 29, 2106).

24

1    In *Entrepreneur*, the defendants simply alleged that the mark ENTREPRENEUR was generic for

2  a host of varied goods and services across many different kinds of goods and services.  *Entrepreneur*

3  *Media, Inc. v. Dermer*, 2019 WL 4187466 (C.D. Cal. July 22, 2019).  In this case, Availink has specifically

4  alleged that HDMI is generic for a type of connector or port.  (Dkt. 49 ¶¶ 109-112.)

5    Moreover, the level of detail provided in the Counterclaims is in line with other genericness cases

6  that have survived a motion to dismiss.  *See, e.g.*, *Green Prods. Co. v. Black Flag Brands LLC*, 2010 WL

7  3910336, at *5 (N.D. Cal. Oct. 4, 2010) (party adequately alleged trademark was generic where party

8  claimed that "(1) wood preservative that is green in color is the standard in the construction industry; (2)

9  competing wood preservatives products in the 'copper green' color have been sold in the market for more

10 than 20 years; and (3) Plaintiff's mark 'COPPER–GREEN' has become generic for the goods for which it

11 is registered, i.e., wood preservative products.").

12    As is typical in such cases, "the determination of [genericness] requires additional evidence that is

13 not currently before the Court, which could include 'consumer surveys, dictionary definitions, newspapers

14 and other publications, generic use by competitors, testimony of lexicographers, generic use of the term

15 by [the] mark's owner, and use of the term by third parties in trademark registrations.'"  *Fragran-*

16 *ceNet.com, Inc. v. Les Parfums, Inc.*, 672 F. Supp. 2d 328, 334 (E.D.N.Y. 2009).  That is the type of

17 evidence that Availink will provide later.  It is not required to provide it at the pleading stage.

18    **D.    Availink states a claim for declaratory relief.**

19    Finally, HDMI LA says that Availink's declaratory relief claim "merely recites issues … before

20 this Court."  (Mot. 20.)  But while based in part on its federal and state antitrust and unfair competition

21 claims, Availink seeks declaratory relief with regard to additional disputes and controversies, such as the

22 interpretation of the Adopter Agreement, whether the licensing program constitutes patent misuse, the

23 rights and remedies under the Adopter Agreement and the Trademarks, and noninfringement of the Trade-

24 marks.  (Dkt. 49 ¶¶ 159-67.)

25  **V.    CONCLUSION**

26    The motion should be denied.

27

28

1  December 6, 2023

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

KING AND WOOD MALLESONS LLP


_____/s/ _Vincent Filardo, Jr._____
VINCENT FILARDO, JR.

Attorneys for Defendant and Counterclaimant
Availink Inc.