**EPSTEIN DRANGEL LLP**
Peter J. Farnese (SBN 251204)
pfarnese@ipcounselors.com
700 South Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone: (310) 356-4668
Facsimile: (310) 388-1232

Kerry B. Brownlee (Pro Hac Vice)
kbrownlee@ipcounselors.com
Jason M. Drangel (Pro Hac Vice)
jdrangel@ipcounselors.com
60 East 42nd Street, Suite 1250
New York, NY 10165
Telephone: (212) 292-5390
Facsimile: (212) 292-5391
*Attorneys for Plaintiff*
*HDMI Licensing Administrator, Inc.*

**CONSTANTINE CANNON LLP**
Seth D. Greenstein (Pro Hac Vice)
sgreenstein@constantinecannon.com
1001 Pennsylvania Ave., NW, 1300 N
Washington, D.C. 20004
Telephone: (202) 204-3500
Facsimile: (202) 204-3501

Ankur Kapoor (Pro Hac Vice)
akapoor@constantinecannon.com
6 East 23rd St., 26th Floor
New York, NY 10017
Telephone: (212) 350-2700
Facsimile: (212) 350-2701

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| HDMI LICENSING ADMINISTRATOR, INC.,<br><br>Plaintiff and Counterclaim Defendant,<br><br>v.<br><br>AVAILINK INC.,<br><br>Defendant and Counterclaim Plaintiff. | Case No. 4:22-cv-6947-HSG<br><br>**HDMI LICENSING ADMINISTRATOR, INC.'S ANSWER TO DEFENDANT-COUNTERCLAIM PLAINTIFF AVAILINK INC.'S COUNTERCLAIMS** |

Plaintiff and Counterclaim Defendant HDMI Licensing Administrator, Inc. ("HDMI LA") hereby states its answer and affirmative defenses to the Counterclaims of Defendant and Counterclaim Plaintiff Availink, Inc. ("Availink"), as set forth in Availink's Answer (*Dkt. No. 49*) (the "Counterclaims"). Any factual averment or characterization that is not expressly admitted below in HDMI LA's answers to the paragraphs of the Counterclaims shall be deemed to be denied. Headings appearing in Availink's Counterclaims are included herein solely for convenience, and

require no response. To the extent any heading is deemed to include any factual averment, it is denied unless expressly admitted in the body of HDMI LA's answers to the paragraphs of the Counterclaims.

### INTRODUCTION

1.     Availink brings these counterclaims to expose a decades-long conspiracy and anticompetitive conduct restraining competition in markets that include billions of consumer electronic devices using the High-Definition Multimedia Interface (HDMI) standard.

**ANSWER**: HDMI LA admits that billions of devices incorporate the High-Definition Multimedia Interface (HDMI) technology. HDMI LA denies the remaining averments of this paragraph.

2.     The HDMI standard is now ubiquitous.  It is incorporated into almost every digital video and audio player and display device, including digital televisions, gaming consoles, personal computers, computer monitors, and (increasingly) automotive display devices.

**ANSWER**: HDMI LA admits that HDMI technology is used in certain digital video and audio player and display devices, including certain digital televisions, gaming consoles, personal computer monitors, and automotive display devices. HDMI LA denies the remaining averments of this paragraph.

3.     Unlike almost all other consumer electronics standards, the HDMI standard was developed by a private consortium of competitors, which kept the standard-setting process secret, refuses to disclose the standard publicly, and continues to implement a licensing program that restrains competition. These competitors, the so-called "Founders," include major consumer electronics firms with leading market shares.  The Founders pooled their HDMI patents, obtained trademark registrations for HDMI (even though that is now a generic term and no longer functions as a brand), and devised a licensing scheme that gives the consortium the power to control who can produce HDMI-compliant products and to demand supracompetitive licensing fees and royalties.

**ANSWER**: HDMI LA admits that seven companies jointly developed the HDMI technology specification and a program to license the HDMI specification (the "HDMI Specification") and certain related intellectual property rights, and that these companies are known as the "Founders".

HDMI LA's Answer to Counterclaims
Case No. 4:22-cv-6947-HSG

HDMI LA denies the remaining averments of this paragraph.

4.     Through this licensing scheme, which includes extending the temporal scope of patents beyond the expiration date, imposing trademark royalties on competitors that do not use the (invalid) trademark, bundling intellectual property rights for different versions of the HDMI standard (thereby raising the costs for rivals who produce older-generation devices), refusing to disclose the patents supposedly licensed, and requiring an uncompensated grantback of patent rights, the Founders have restrained competition in the markets for the technology necessary for HDMI-compliant products and the markets for those products.  The scheme intentionally blurs the line between patents and trademark rights, attempting to use the trademark system, which is intended to identify the source of goods, as a means to exclude competitors, the province of patent rights.

**ANSWER**: HDMI LA denies the averments of this paragraph.

5.     The scheme also seeks to coerce upstream manufacturers to police downstream usage of the HDMI trademarks.  If an upstream component manufacturer does not participate in the scheme by forcing its customers to use the HDMI trademark, the scheme penalizes the manufacturer with a higher royalty fee.  The scheme is designed to have upstream manufacturers herd the end-user product manufacturers to use the HDMI trademarks regardless of whether the manufacturer gains any benefit from doing so.  Under the scheme, a manufacturer of end-user products that does not need the HDMI trademarks for any marketing or commercial reason is coerced to do so nonetheless or face paying higher costs passed down from the upstream manufacturer.  As discussed below, the scheme's design discriminates against smaller manufacturers, restraining trade and resulting in higher prices.

**ANSWER**: HDMI LA denies the averments of this paragraph.

6.     HDMI Licensing Administrator, Inc. (HDMI LA) is the tip of the spear for this anticompetitive scheme.  It is the licensing administrator for the Founders' pooled set of intellectual property rights, making it the key player in this unlawful conspiracy.

**ANSWER:** HDMI LA admits that it is the current administrator for non-exclusive licensing of the HDMI Specification and trademarks and certain specified intellectual property rights owned by the Founders. HDMI LA denies the remaining averments of this paragraph.

HDMI LA's Answer to Counterclaims
Case No. 4:22-cv-6947-HSG

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PARTIES**

7.        On information and belief, HDMI Licensing Administrator, Inc. ("HDMI LA") is a Delaware corporation with its principal place of business located in San Jose, California. HDMI LA is the licensing administrator for a package of intellectual property rights pooled by a group of competitors that relate to a standard for an interface for transmitting digital video and audio data, the High-Definition Multimedia Interface ("HDMI") standard. HDMI LA is responsible for licensing, maintenance, policing, and enforcement of these pooled rights through a standard license called the "Adopter Agreement."

**ANSWER:** HDMI LA admits that it is a Delaware corporation with its principal place of business located in San Jose, California. HDMI LA further admits that it is the current administrator for non-exclusive licensing of the HDMI Specification and trademarks and certain specified intellectual property rights owned by the Founders, and that in its capacity as administrator HDMI LA may license and promote the HDMI Specification, including by negotiating, signing, and enforcing licensing agreements referred to as "Adopter Agreements." HDMI LA denies the remaining averments of this paragraph.

8.        Availink, Inc. is a Cayman Islands corporation with design facilities in Taiwan, which makes system-on-chip integrated circuits ("SoC ICs") in Taiwan and China that are compliant with an early version of the HDMI standard.

**ANSWER:** On information and belief, HDMI LA admits that Availink is a Cayman Islands corporation with facilities in Taiwan and China. HDMI LA denies that the HDMI Specification is a "standard." HDMI LA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph and therefore denies the allegations.

**JURISDICTION**

9.        This Court has jurisdiction pursuant to the Sherman Act, 15 U.S.C. § 15, which provides, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found." HDMI LA resides and is found within this judicial district.

**ANSWER:** The allegations in this paragraph contain legal conclusions, to which no response is required. HDMI LA admits that it has an office in this judicial district.

10.     This Court has jurisdiction pursuant to the Lanham Act, 15 U.S.C. § 1119, which provides that "in any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action.

**ANSWER:** The allegations in this paragraph contain legal conclusions, to which no response is required.

11.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a).

**ANSWER:** The allegations in this paragraph contain legal conclusions, to which no response is required.

12.     This Court also has jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

**ANSWER:** The allegations in this paragraph contain legal conclusions, to which no response is required.

13.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

**ANSWER:** The allegations in this paragraph contain legal conclusions, to which no response is required.

**VENUE**

14.     Venue is proper in this judicial district pursuant to Sections 4, 12, and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 22, 26.

**ANSWER:** The allegations in this paragraph contain legal conclusions, to which no response is required.

15.     Venue is also proper under 28 U.S.C. § 1391(b)(2) because HDMI LA is located and transacts business in this judicial district.

**ANSWER:** The allegations in this paragraph contain legal conclusions, to which no response is required. HDMI LA admits that it is located and transacts business in this judicial district.

**FACTUAL BACKGROUND**

**I.   HDMI becomes the dominant standard**

16.    High-Definition Multimedia Interface (HDMI) is a standard for transmitting digital video and audio data from a source device, such as a computer or DVD player, to a display device, such as a monitor or digital television. The standard includes specifications for protocols, signals, electrical interfaces, and mechanical requirements, which must be adopted to maintain compatibility between various components of the system, such as the system-on-chip integrated circuit (SoC IC), the cable connector, etc.

**ANSWER:** HDMI LA admits that High-Definition Multimedia Interface (HDMI) refers to a technology specification, including but not limited to protocols, signals, and electrical and mechanical interfaces, to transmit video and audio data together along a single connection between a source device and a display device. HDMI LA further admits that compliance with the voluntary HDMI Specification allows licensed adopters ("Adopters") to maintain compatibility with other products that comply with the HDMI Specification. HDMI LA denies the remaining averments of this paragraph.

17.    Most standards are developed by open standard-setting organizations, such as the American National Standards Institute (ANSI), the Institute of Electrical and Electronics Engineers (IEEE), and the European Telecommunications Standards Institute (ETSI). These organizations have procedural and substantive safeguards to ensure that standards are developed through transparent processes, the standards are publicly available, and adopters are protected from exploitation by those holding patents that would be infringed by the implementation of the standard.

**ANSWER:** HDMI LA denies that the HDMI Specification is a "standard." HDMI LA lacks knowledge or information sufficient information to form a belief as to the truth or falsity of the remaining allegations in this paragraph and therefore denies the allegations.

18.     HDMI, however, was developed by a private consortium of "Founders," which kept the standard-setting process secret, refuses to make the standard publicly available, and implemented a licensing program through HDMI LA that exploits small competitors with less legal sophistication or financial resources, such as Availink, enables patent misuse, and restrains competition.

**ANSWER:** HDMI LA admits that seven companies jointly developed the HDMI technology specification and a program to license the HDMI Specification and certain related intellectual property rights, and that these companies are known as the "Founders." HDMI LA denies the remaining averments of this paragraph.

19.     The Founders—Hitachi, Panasonic, Koninklijke Philips N.V, Silicon Image (now Lattice Semiconductor), Sony, Thomson (now Vantiva), and Toshiba—developed the first version of the HDMI standard in 2002.

**ANSWER:** HDMI LA denies that the HDMI Specification is a "standard." HDMI LA admits the remaining allegations in this paragraph, with the exception that the names of the Founders are truncated and, on that basis, denies that allegation.

20.     At the time, there were no standards for the transmission of digital video and audio through a single interface. For instance, the Digital Display Working Group developed Digital Visual Interface (DVI) in 1999. DVI may connect a video source, such as a DVD player, to a display device, such as a digital television. But DVI does not carry audio signals.

**ANSWER:** Upon information and belief, HDMI LA admits the allegations in this paragraph.

21.     As the first standard to combine video and audio, HDMI enjoyed a first-mover advantage. And due to network effects, HDMI became the de facto standard interface.

**ANSWER:** HDMI LA admits that the HDMI technology was the first commercially-available method for transmitting digital video and audio together through a single interface. HDMI LA denies the remaining averments in this paragraph.

22.     Network effects occur when the addition of new users spurs demand for complementary products. For example, as more source-device manufacturers adopted the HDMI standard, there was greater demand for compatible display technology products.

**ANSWER:** HDMI LA lacks information and belief concerning the averments in this paragraph and therefore denies them.

23.     Because of network effects, standards can exhibit increasing returns in consumption: the more users of the standard, the higher the average value of the standard to each user. Because the average value of the standard increases as more users adopt it, the standard becomes more attractive to potential users as it grows. This phenomenon, known as positive feedback, allows a standard to obtain a type of momentum.

**ANSWER:** HDMI LA lacks information and belief concerning the averments in this paragraph and therefore denies them.

24.     This momentum confers a first-mover advantage: the technology that hits the market first has a strategic advantage—it may become locked in. The first technology introduced may gain such momentum that manufacturers will not switch to a new technology, even if it is better. Thus, history matters. As more manufacturers adopt a standard, the standard becomes dominant. The costs associated with switching to an incompatible but superior technology create excess inertia— manufacturers will not adopt a superior technology not only because of sunk costs but because of lost value from network effects.

**ANSWER:** HDMI LA lacks information and belief concerning the averments in this paragraph and therefore denies them.

25.     Switching costs create barriers to entry, preventing other standards and technologies from effectively competing against the dominant standard. Network effects can therefore confer market power on those who control the dominant standard, such as through intellectual property that covers the standard.

**ANSWER:** HDMI LA lacks information and belief concerning the averments in this paragraph and therefore denies them.

26.     Importantly, there may well be better technologies than the dominant standard. History is littered with examples of how network effects have entrenched inferior standards. The QWERTY keyboard is an example of an inferior but ubiquitous standard. The history of the VHS

HDMI LA's Answer to Counterclaims
Case No. 4:22-cv-6947-HSG

versus Beta video tape players is another example of how network effects led to the domination of a technically inferior standard.

**ANSWER:** HDMI LA lacks information and belief concerning the averments in this paragraph and therefore denies them.

27.     HDMI benefitted from the fact that its Founders included major consumer electronics companies, whose combined market shares in key markets, such as digital televisions, allowed them to give the HDMI standard an almost immediate installed base, greatly contributing to the momentum built by their first-mover advantage. Network effects then entrenched HDMI as the dominant standard and created barriers that prevent entry by competing technologies.

**ANSWER:** HDMI LA admits that certain Founders marketed consumer electronics devices and that certain Founders marketed devices compliant with the HDMI Specification. HDMI LA denies the remaining averments in this paragraph.

28.     The dominance of the HDMI standard is now unquestionable. HDMI compatibility is a "must-have" for digital televisions, personal computers, computer monitors, game consoles, and, increasingly, smartphones. According to HDMI LA, almost 10 billion devices enabled with HDMI technology have shipped since the first HDMI specification was released in December 2002.

**ANSWER:** HDMI LA admits that billions of devices compliant with the HDMI Specification have shipped since the first HDMI Specification was released in December 2002. HDMI LA denies the remaining averments in this paragraph.

29.     Indeed, in this very litigation, HDMI LA states, "The HDMI Specification is ubiquitous and is the undisputed global standard for connecting high-definition transmitters to high-definition displays. Beginning in 2009, almost all recently manufactured digital TVs, AV receivers, DVRs, Blu- ray disc players, and set-top boxes, as well as many multimedia PCs, laptops and netbooks, gaming consoles, camcorders, digital still cameras, mobile devices, etc., incorporate the HDMI Specification." Complaint ¶ 12.

**ANSWER:** HDMI LA admits that Paragraph 29 accurately states the allegations in Paragraph 12 of HDMI LA's complaint in the above-captioned case.

HDMI LA's Answer to Counterclaims
Case No. 4:22-cv-6947-HSG

30.     The Founders include some of the world's leading consumer electronics companies, which manufacture HDMI-compliant components and sell HDMI-compliant products, including in the U.S. and in California. For instance, Sony is a global leader in manufacturing consumer electronics products, including HDMI-compliant gaming consoles, digital televisions, personal computers, and spatial reality displays. Phillips is a multinational conglomerate, which includes a consumer electronics division producing HDMI-compliant digital televisions, DVD and Blu-ray disc players, home theater products, projectors, and media players. Panasonic is a multinational conglomerate producing HDMI- compliant products, such as digital televisions, personal computers, cameras, and video production equipment. Hitachi and Toshiba are also leading consumer electronics manufacturers producing HDMI- complaint products.  Silicon Image produces HDMI-compliant transmitters, receivers, and digital video processors for consumer electronics products.

**ANSWER:** HDMI LA admits that certain Founders manufacture products and components that comply with the HDMI Specification, some of which are sold in the United States, including California, and that this paragraph lists certain products or components that at times may have been manufactured or marketed by various Founders and that may have been compliant with the HDMI Specification. HDMI LA denies the remaining averments in this paragraph.

**II.  The HDMI licensing scheme**

31.     The Founders also agreed to a joint licensing scheme, which includes the Founders' patents necessary to practice the HDMI standard. Through ownership of necessary patents, the Founders could jointly control who can manufacture HDMI-compatible products and jointly impose a price for the manufacture of those products.

**ANSWER:** HDMI LA admits that the Founders have agreed to license, jointly and individually, the HDMI Specification along with, inter alia, any Necessary Claims (as that term is defined in the Adopter Agreement) of patents they may own. HDMI LA denies the remaining averments in this paragraph.

32.     This control, in turn, allows the Founders to exercise market power in the market for HDMI-compatible products, including the markets for components of those products, such as

HDMI LA's Answer to Counterclaims
Case No. 4:22-cv-6947-HSG

compatible SoC ICs, and end-user HDMI-compliant products. With their necessary patents, the Founders had the ability to jointly exclude any rivals from manufacturing products compatible with the HDMI standard. Alternatively, the Founders could jointly license the patents and impose a royalty on rival manufacturers, thereby raising rivals' costs, which is another way to exercise market power.

**ANSWER:** HDMI LA denies the averments in this paragraph.

33.     The Founders jointly appointed Silicon Image as the licensing administrator for their pooled intellectual property rights. Silicon Image, which has its principal offices in Sunnyvale, California, has been a driving force behind the joint development of the HDMI standard and the HDMI licensing scheme. Indeed, Silicon Image received the Technology & Engineering Emmy Award from The National Academy of Television Arts & Sciences for its contribution to the development and implementation of HDMI.

**ANSWER:** HDMI LA admits that Silicon Image was appointed as the first licensing administrator for the HDMI Specification. HDMI LA further admits that the HDMI interface received a Technology & Engineering Emmy Award from The National Academy of Television Arts & Sciences for its contribution to the development and implementation of the HDMI technology. HDMI LA denies the remaining averments in this paragraph.

34.     The Founders later decided to form HDMI Licensing LLC, which took over the licensing administration functions from Silicon Image. HDMI Licensing LLC later became HDMI LA.

**ANSWER:** HDMI LA admits that the Founders appointed HDMI Licensing LLC as licensing administrator for the HDMI Specification, and that HDMI LA is the current licensing administrator for the HDMI Specification. HDMI LA denies the remaining averments in this paragraph.

35.     The licensing scheme has been extremely successful. As HDMI LA admits, "As of the third quarter of 2022, the HDMI Specification has been licensed to over 1,900 of the largest and most innovative electronics and PC manufacturers worldwide, such as Apple, Inc., Samsung

Electronics, Inc. and Sharp Corporation, etc., which have manufactured over 11 billion products using the HDMI Specification …" Complaint ¶ 13.

**ANSWER:** HDMI LA admits Paragraph 35 accurately transcribes portions of HDMI LA's allegations in Paragraph 13 of its complaint in the above-captioned case, and that the alternative to license the HDMI Specification and certain related rights through a single administrator has been successful. HDMI LA denies the remaining averments in this paragraph.

36.   These products generate billions in revenue every year. For instance, the market for HDMI cables alone was almost $1.7 billion in 2022.

**ANSWER:** HDMI LA admits that the value of products sold by HDMI Specification licensees are in the billions of dollars, and, upon information and belief, various market analysts estimated that more than $1 billion in cables that implement the HDMI Specification were sold worldwide in 2022. HDMI LA denies the remaining averments in this paragraph.

37.   On information and belief, the vast majority of HDMI-compatible components and products are manufactured by companies who have entered into licenses with HDMI LA. HDMI LA and the Founders, therefore, have market power in the markets for HDMI-compliant components and products.

**ANSWER:** Upon information and belief, HDMI LA admits that most companies that manufacture components or products that require a license to the HDMI Specification have entered into an Adopter Agreement with HDMI LA. HDMI LA denies the remaining averments in this paragraph.

38.   The Founders include leading consumer electronics companies with substantial market shares for HDMI-compatible products. For example, Sony is a global leader in manufacturing consumer electronics products. Its Playstation gaming console had 45% of the global console gaming market in 2022. The Playstation and the other two leading gaming consoles, the Nintendo Switch (27.7% market share) and the Microsoft Xbox (27.3%), all incorporate HDMI technology, which is necessary to ensure compatibility with high-definition displays. Both Nintendo and Microsoft are licensees under the Adopter Agreement. Through the HDMI licensing scheme,

Sony, the Founders, and HDMI have the power to raise the costs of these rivals and affect market competition.

**ANSWER:** HDMI LA admits that Playstation, Nintendo Switch, and Microsoft Xbox gaming consoles may incorporate HDMI technology and are manufactured by companies that have signed Adopter Agreements to license the HDMI Specification. HDMI LA denies the remaining averments in this paragraph.

39.     But the Founders faced a problem. Patent pools regarding standards are common. But patent pools are time-bound because patents expire.  Prior to 1995, the patent term for U.S. patents was 17 years from issuance. After 1995, the patent term is 20 years from the filing date of the earliest U.S. or international application to which priority is claimed.

**ANSWER:** HDMI LA admits that prior to 1995, the patent term for U.S. patents was 17 years from issuance, and that after 1995, the patent term is now 20 years from the filing date of the earliest U.S. or international application to which priority is claimed. HDMI LA denies the remaining averments in this paragraph.

40.     The Founders thus faced the issue common to all patent pools, the prospect of a limited time to extract royalties from adopters of the underlying standard. After the expiration of the patents, the Founders who manufacture HDMI-compatible products (i.e., the majority of Founders) would lose their ability to exercise power over the market for HDMI-compatible products. They would then face unfettered competition in those markets.

**ANSWER:** HDMI LA denies the averments in this paragraph.

41.     To address this issue, the Founders developed a multipronged strategy to extend the life of their licensing program. This strategy results in the unlawful exploitation of small competitors, involves the misuse of patents, and restrains competition in the markets for HDMI-compatible products. As the licensing administrator, HDMI LA is part and parcel of this unlawful strategy, serving as the implementor of the scheme.

**ANSWER:** HDMI LA denies the averments in this paragraph.

A. **The never-ending royalty rate**

42.     As the CEO and President of HDMI LA, Rob Tobias, has admitted, the first part of the Founder's strategy was to create a unique licensing structure that seeks to insulate the pooled patents. Unlike patent pools for other standards, the Founders combined a license to their necessary patents with a license to certain HDMI trademarks, including marks consisting of or containing the term "HDMI" ("the HDMI trademarks").

**ANSWER:** HDMI LA admits that the Adopter Agreement grants licensees the right to use the trademarks and logos created by the Founders in connection with the promotion of the HDMI Specification and licensed products that adopt the HDMI Specification. HDMI LA denies the remaining averments in this paragraph.

43.     Trademarks, unlike patents, do not expire after a set amount of time. U.S. Trademark Registrations remain in force so long as the owner continues to use the trademark and files proof of use with the U.S. Trademark Office every ten years. Similar indefinite timelines apply to foreign trademark registrations.

**ANSWER:** HDMI LA admits that domestic and international trademarks may be renewed, and denies the remaining averments in this paragraph.

44.     Licenses that combine patents with other intellectual property rights (so-called hybrid licenses) are not per se problematic. But hybrid licenses can be used to unlawfully continue to extract royalties for expired patent rights. Absent a "step-down" in the royalty rate as the pooled patents expire, the licensee is effectively paying royalties on the expired patents, unlawfully extending the temporal scope of those patents.

**ANSWER:** HDMI LA admits that licensing multiple forms of intellectual property in a single agreement is lawful. HDMI LA denies the remaining averments in this paragraph.

45.     That is exactly what the HDMI license (the "Adopter Agreement") accomplishes. Under the Adopter Agreement, the licensing rate has remained unchanged for over twenty years, despite the expiration of key patents that were included in the license. From the beginning of the HDMI licensing program to today—over twenty years later—the Adopter Agreement requires a royalty payment of "$0.15 per unit sold."

**ANSWER:** HDMI LA admits that the schedule of required royalty payments under the Adopter Agreement has not increased since the license to the HDMI Specification was first made available. HDMI LA denies the remaining averments in this paragraph.

46.     This constant, never decreasing royalty rate is especially problematic because the term of the Adopter Agreement is ten years, and the Agreement automatically renews for another five years absent notice from the licensee.  Only HDMI LA can terminate the Agreement during the initial ten-year term or during the five-year renewal term. Thus, licensees cannot terminate the Agreement during its term, even if all the necessary patents were to expire.

**ANSWER:** HDMI LA admits that the initial term of the Adopter Agreement is ten years, with an optional renewal term of an additional five years. HDMI LA denies the remaining averments in this paragraph.

47.     The Adopter Agreement does provide a means for a licensee to "withdraw," but withdrawal comes with a steep cost. The licensee cannot assert any of its patents necessary for the implementation of the HDMI standard against any Founder or other licensee for three years after withdrawal. This non-assertion provision applies even to future licensees, i.e., any licensee who enters an Adopter Agreement during the three years. And the non-assertion provision applies to future patents, i.e., any patents that issue during the three-year period.

**ANSWER:** HDMI LA admits that Adopters may withdraw from the Adopter Agreement at any time. HDMI LA admits that the Adopter Agreement includes a provision under which all Adopters agree not to bring actions asserting Necessary Claims against fellow Adopters. HDMI LA further admits that if an Adopter chooses to withdraw from the Adopter Agreement, the Adopter agrees that its obligations under the non-assertion provision continue for a period following the date of withdrawal, including with regard to entities who become Adopters after such withdrawal. HDMI LA denies the remaining averments in this paragraph.

48.     On information and belief, given that the original HDMI standard was issued over 20 years ago, a number of necessary patents have expired. For example, the following patents, which on information and belief were necessary for HDMI version 1, have expired:

a.    U.S. patent number 6,914,637 included claims directed to a communication system with a receiver and transmitter using a serial link for video data and auxiliary data where encoded video is transmitted during active video periods while auxiliary data is transmitted during data island time periods. Further, control data is transmitted to the receiver during control data periods which are distinct from the data island and active video periods. On information and belief, the claims in the '637 patent were necessarily infringed in order to implement and comply with the HDMI standard. The '637 patent was assigned to Silicon Image, one of the Founders. The '637 patent is now expired.

b.    U.S. patent number 6,564,269 included claims directed to bi-directional communication between the source and the sink—in particular, sending data in reverse from a monitor (sink) back to a processor (source). The claims call for sending the data in reverse during a time period different than the time periods during which video content is transmitted from the processor (source) to the monitor (sink). On information and belief, the claims in the '269 patent were necessarily infringed in order to implement and comply with the HDMI standard. The '269 patent was assigned to Silicon Image, one of the Founders. The '269 patent is now expired.

c.    U.S. patent number 6,492,984 included claims covering transmitting digital pixel data and auxiliary digital data from a source to a sink in the forward direction using the same two differential wire pairs by manipulating the DC offsets in the two differential wire pairs so as to minimize the number of wires used. On information and belief, the claims in the '984 patent were necessarily infringed in order to implement and comply with the HDMI standard. The '984 patent was assigned to Silicon Image, one of the Founders. The '984 patent is now expired.

d.    Canadian patent number 2,404,926 included claims directed to a blanking period and transmission of video signals during that time, including sending multiple encoded versions of the superimposed data (e.g. audio) for the purpose of reducing data errors. On information and belief, the claims in the '926 patent were necessarily infringed in order to implement and comply with the HDMI standard. The '926 patent was owned by Sony Corp., one of the Founders. The '926 patent is now expired.

HDMI LA's Answer to Counterclaims
Case No. 4:22-cv-6947-HSG

e.      EP 1332602 includes claims directed toward transmission of video and audio data over a serial link to minimize bit error rate. The claims cover the encoding scheme, including encoding video data as a set of video code words and the auxiliary/audio data as a separate set of code words and then transmitting video followed by auxiliary followed again by more video.  On information and belief, the claims in the '602 patent were necessarily infringed in order to implement and comply with the HDMI standard. The '602 patent was owned by Silicon Image, one of the Founders. The '602 patent is now expired.

**ANSWER:** HDMI LA admits that the patents identified in subparagraphs (a)-(e) above were owned by the identified Founders, that an independent evaluation opined that each such patent included one or more Necessary Claims, and that each such patent has expired. HDMI LA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph and therefore denies them.

49.     Because these and other necessary patents have expired, licensees under the Adopter Agreement are paying royalties for expired patents.

**ANSWER:** HDMI LA denies the averments in this paragraph.

50.     The failure to include any step-down in the royalty rate for the HDMI license is a form of patent misuse. It also is a form of raising rivals' costs, allowing the Founders, in cahoots with HDMI LA, to continue to exercise market power in the markets for HDMI-compatible products and components. Through the HDMI licensing scheme, HDMI LA and the Founders are able to obtain supracompetitive royalties and licensing fees.

**ANSWER:** HDMI LA denies the averments in this paragraph.

**B.  The imposition of royalties on products that do not use the trademarks**

51.     The anticompetitive effects of the hybrid license are even more pronounced because the $0.15 royalty rate applies even if the licensee and its customers do not use the HDMI trademarks. The term HDMI is used to identify end-user products that are compliant with the HDMI standard. But many potential licensees manufacture only components for end-user products and thus do not use the trademark.

HDMI LA's Answer to Counterclaims
Case No. 4:22-cv-6947-HSG

**ANSWER:** HDMI LA admits that a royalty rate of $0.15 per unit sold applies to certain Licensed Products (as defined in the Adopter Agreement), and that a reduced royalty payment may apply to end-user Licensed Products that use the HDMI trademarks. HDMI LA admits the HDMI trademarks indicate to end users that the product bearing the trademark is compliant with the HDMI Specification. HDMI LA denies the remaining averments in this paragraph.

52.     Moreover, many end-user products do not use the HMDI [sic] trademarks. Indeed, Stacey-Lee Messam, Trademark Compliance Manager at HDMI LA, has admitted that many end-user products "do not use any of our trademarks anywhere."

**ANSWER:** HDMI LA admits that Licensed Products are not required to use the HDMI trademarks, and that certain Licensed Products do not do so. HDMI LA denies the remaining averments in this paragraph.

53.     Availink manufactures only SoC ICs, which are components of end-user products. Availink does not put the HDMI trademark on its products; in fact, it would be useless to do so because Availink's products are not visible when incorporated into an end-user product. Moreover, many of Availink's customers do not use the HDMI trademark. For instance, some of Availink's SoC ICs have been incorporated into digital audio broadcasting (DAB) receivers. These small devices do not receive video signals, nor do they have HDMI cable ports. These products do not use the HDMI trademark in any way.

**ANSWER:** HDMI LA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the factual allegations in this paragraph and therefore denies them.

54.     When Availink informed HDMI LA of this situation, HDMI LA insisted that "[n]on-use of HDMI trademark will not eliminate the royalty responsibility." According to HDMI LA, unless Availink can show that its customer is paying the royalty, the language of the Adopter Agreement requires Availink to pay the full royalty for every SoC IC it sells.

**ANSWER:** HDMI LA admits that the Adopter Agreement requires payment by all Adopters of a running royalty fee on each end-user Licensed Product, that component manufacturers pay no royalty where the royalty is paid by the manufacturer of an end-user Licensed Product, and that

components otherwise are considered end-user Licensed Products subject to payment of royalties. HDMI LA denies the remaining averments in this paragraph.

55. Accordingly, the Adopter Agreement purports to impose the full royalty on every component sold by a manufacturer, even though neither the manufacturer nor its customers use the HDMI trademark.

**ANSWER:** HDMI LA denies the averments in this paragraph.

56. Thus, HDMI LA and the Founders are extracting the full royalty amount, with no step- down, even though necessary patents have expired and neither the licensee nor its customers use the HDMI trademark. What is more, the Founders continue to extract the full royalty despite the fact that the HDMI trademarks are invalid because "HDMI" is a generic term not protectable as a trademark. This, again, is patent misuse.

**ANSWER:** HDMI LA denies the averments in this paragraph.

57. This imposition of royalties also allows the Founders and HDMI LA to raise rivals' costs and restrict competition.

**ANSWER:** HDMI LA denies the averments in this paragraph.

**C. The bundling of versions**

58. Compounding the anticompetitive effects caused by the lack of any step-down in the royalty rate, the Adopter Agreement bundles licenses for different versions of the HDMI standard.

**ANSWER:** HDMI LA denies the averments in this paragraph.

59. Over the years, the Founders have released multiple versions of the HDMI standard. HMDI [sic] 1.0 was released in 2002. HDMI 1.1 was released in 2004. A series of versions, 1.2, 1.3, 1.4, 1.4a, 1.4b, 2.0, 2.0a, 2.0b, 2.1, has led to the latest version, HDMI 2.1a, released in 2022.

**ANSWER:** HDMI LA admits that that the Founders released HDMI Specification version 1.0 in 2002, and that there have been subsequently-released released versions of the HDMI Specification, including versions 1.0. 1.1, 1.2, 1.3, 1.4, 1.4a, 1.4b, 2.0, 2.0a, 2.0b, 2.1, and 2.1a. HDMI LA denies the remaining averments in this paragraph.

60. One of the goals of the continual updating of the HDMI specification is to force companies to license under the Adopter Agreement. Unlike other standard-setting organizations,

HDMI LA's Answer to Counterclaims
Case No. 4:22-cv-6947-HSG

which make their standards and all versions publicly available, the Founders and HDMI LA refuse to make the standards available without a license to their intellectual property. Further, the Adopter Agreement includes strict provisions requiring licensees to keep HDMI specifications confidential. Licensees must therefore continue to renew the Adopter Agreement to access the updated HDMI standard specifications.

**ANSWER:** HDMI LA denies the averments in this paragraph.

61.   Another goal of the continual updating is to give the Founders additional opportunities to obtain patents necessary to manufacture HDMI-compliant products that incorporate new features that are specified in the new versions.

**ANSWER:** HDMI LA denies the averments in this paragraph.

62.   But manufacturers of products compliant only with the earlier versions do not need a license to these new patents. For example, Availink manufactures SoC ICs compliant only with HDMI 1.0. On information and belief, a number of the patents necessary to implement HDMI 1.0 have now expired.

**ANSWER:** HDMI LA denies the averments in this paragraph.

63.   Other licensors of standard-essential package licenses offer separate licenses for the various versions of the relevant standard. HDMI LA, however, refuses to license only the rights to HDMI 1.0.  Instead, the Adopter Agreement bundles the rights to all the versions of HDMI.

**ANSWER:** HDMI LA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of this paragraph and therefore denies them. HDMI LA denies the remaining averments in this paragraph.

64.   A substantial number of products do not require the additional features incorporated in the newer versions. For example, industry data show that HDMI version 1 cables comprise nearly 13% of the worldwide market for HDMI cables in 2022. Further, HDMI version 1 cables are used in automotive systems, which is predicted to be the fastest-growing segment of the HDMI-compliant products market. But because the HDMI standards retain backward compatibility, HDMI 1 products compete with products compliant with the newer HDMI versions.

**ANSWER:** HDMI LA admits that products compliant with an HDMI Specification retain backward compatibility with products compliant with earlier versions of the HDMI Specification. HDMI LA denies the remaining averments in this paragraph.

65.     The bundling of versions into a single license, combined with the lack of step-down in the royalty rate, has the effect of artificially raising the costs of HDMI 1 products, thereby restricting competition between HDMI products.

**ANSWER:** HDMI LA denies the averments in this paragraph.

66.     Further, on information and belief, the bundling of versions into a single license raises the costs of non-infringing products using HDMI 1.0 because the patents necessary for HDMI 1.0 have expired.

**ANSWER:** HDMI LA denies the averments in this paragraph.

**D. The refusal to identify patents and keeping the specification confidential**

67.     HDMI LA seeks to hide the fact that the royalty rate in the Adopter Agreement includes payment for expired patents. It does this by two means. First, HDMI LA refuses to identify the patents licensed under the Adopter Agreement. Second, HDMI LA takes several steps to keep the HDMI specification confidential.

**ANSWER:** HDMI LA denies the averments in this paragraph.

68.     Standard practice among licensors and licensing agents of package licenses is to disclose patents, and even patent applications, with claims that would necessarily be infringed by products compliant with the relevant standard. This standard practice applies even where a package license includes all "necessary" patents. The reason for the practice is that the licensors and the licensing agent are best positioned to identify the relevant patents. Without such a disclosure, licensees seeking to understand what the license encompasses are forced to conduct a freedom-to-operate investigation, which is difficult to perform, cost-prohibitive for many (especially smaller) companies, and often fails to identify all relevant patents. Alternatively, the licensee must sign the license without knowing whether it is necessary.

**ANSWER:** HDMI LA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph concerning "standard" practices. HDMI LA denies the remaining averments in this paragraph.

69.     It is also standard practice for standards-setting organizations to make their specifications public. A public specification allows potential licensees to evaluate whether a licensor's patents are in fact necessary to practice the standard. Without access to the specification, a potential licensee cannot evaluate whether patents are necessary or whether a package license includes expired patents. Without the specification, a potential licensee cannot even conduct a freedom-to-operation investigation.

**ANSWER:** HDMI LA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph concerning "standard" practices. HDMI LA denies the averments in this paragraph.

70.     Despite these standard practices, HDMI LA refuses to provide information about the patents that it claims would be infringed by standard-compliant products and keeps the HDMI confidential.

**ANSWER:** HDMI LA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph concerning "standard" practices. HDMI LA denies the averments in this paragraph.

71.     In fact, Availink repeatedly asked HDMI LA to provide information regarding the patents that it contends cover HDMI 1.0 products, but HDMI LA repeatedly refused to provide the requested information. For instance, in an email to HDMI LA, Availink specifically asked for a list of patents, their owners, and which version the patents covered:

> HDMI specification has been around for over twenty years, applicable patents, if any, should have been expired. If you do think that we might infringe some of the patents, please send us the list of patents, including patents owners, authorization for you to represent the patent owners applicable versions of HDMI specifications, also jurisdiction of the patent validity.

**ANSWER:** HDMI LA admits that Availink asked HDMI LA for information regarding patents containing claims necessary to practice the HDMI Specification, and that an email from

Availink to HDMI LA contains the quoted statement. HDMI LA denies the remaining averments in this paragraph.

72.    HDMI LA refused to provide the requested information. Instead, HDMI LA replied that the Adopter Agreement "covers the usage of all versions of HDMI specification" and includes a license to the HDMI trademark. But, as Availink had explained, Availink primarily produces HDMI 1.0 products, and it does not use the trademark. HDMI LA nonetheless refused to identify a single patent that would be infringed by an HDMI 1.0 product, instead insisting that Availink obtain information about the patents from a Chinese trade association to which Availink does not belong.

**ANSWER:** HDMI LA admits that the Adopter Agreement licenses, inter alia, the HDMI Specification 1.x versions and includes a license to the HDMI trademarks. HDMI LA admits that its representative informed Availink's representatives in China that "HDMI LA provided CVIA (China Video Industry Association) with a list of all patents that had been evaluated and determined by an impartial and independent expert to include "Necessary Claims" as defined in Section 1.16 of the HDMI Adopter Agreement." HDMI LA denies the remaining averments in this paragraph.

73.    Availink later renewed its request for information regarding the patents:

HDMI specification is around over twenty years and patent rights last for  up to 20 years. If you really want to assert IPR [intellectual property  rights] on any patent, you do need first to give us exactly what are relevant Ips [intellectual property], patents you own  or you are authorized to represent and versions of HDMI specification related. Any license term will need to tie to the period of the validity of the involved patent.

**ANSWER:** HDMI LA admits that an email from Availink to HDMI LA contains the quoted statement.

74.    In response, HDMI LA said, "We are currently in the process of reviewing your email internally and will get back to you later." Without ever getting back to Availink, HDMI LA filed its action against Availink. Tellingly, HDMI LA filed only trademark claims; it did not allege that Availink infringed any patents.

**ANSWER:** HDMI LA admits that an email sent on behalf of HDMI LA includes the quoted language in the first sentence, and that  the complaint it filed against Availink in the above-captioned

case did not include allegations of patent infringement. HDMI LA denies the remaining averments in this paragraph.

75.     On information and belief, HDMI LA has never sought to enforce a patent allegedly infringed by an HDMI-compliant product. Instead, as here, HDMI LA has attempted to enforce the HDMI license through trademark infringement suits. In fact, Trudi Bordi, Vice President of Licensing for HDMI LA, has admitted that HDMI LA's strategy is to avoid patent infringement litigation.

**ANSWER:** HDMI LA does not own the right to enforce any Necessary Claims and on that basis admits the allegations of the first sentence of this paragraph. It further admits that it has filed trademark infringement lawsuits, and that Trudi Bordi is the Vice President of Licensing for HDMI LA. HDMI LA denies the remaining averments in this paragraph.

76.     On information and belief, just as it did with Availink, HDMI LA refuses to disclose to other potential licensees the patents allegedly licensed under the Adopter Agreement.

**ANSWER:** HDMI LA denies the averments in this paragraph.

77.     On information and belief, HDMI LA's refusal to disclose any patents necessary for the implementation of the HDMI standard is designed to prevent licensees from discovering that early versions of the HDMI standard are no longer protected by patents. A company deciding whether to purchase the license cannot independently evaluate whether the license actually includes necessary patents. The refusal to disclose is thus an integral part of the Founders' and HDMI LA's efforts to raise rivals' costs and suppress competition from products compatible only with early versions of the HDMI standard.

**ANSWER:** HDMI LA denies the averments in this paragraph.

78.     HDMI LA also keeps the HDMI specification confidential, and paragraph 8 of the Adopter Agreement requires licensees to "maintain the Specification, including the HDMI Compliance Test Specification … in confidence."

**ANSWER:** HDMI LA admits that under the Adopter Agreement, Adopters agree to, among other things, "maintain the Specification, including the HDMI Compliance Test Specification, and any other information designated 'confidential' by [HDMI LA] or the Founders . . . in confidence

24

with at least the same degree of care that it uses to protect its own confidential and proprietary information, but no less than a reasonable degree of care under the circumstances."

79.    This secrecy not only hides the fact that the HDMI license includes expired patents, but also prevents potential licensees from evaluating whether obtaining separate licenses from the Founders is feasible. Thus, although paragraph 9.22.1 of the Adopter Agreement states that "each Founder is willing to provide separate patent licenses to any Necessary Claims owned by such Founder of the same scope and nature as offered herein to any person or entity on fair, reasonable and non-discriminatory terms and conditions," HDMI LA's keeping the specification confidential effectively nullifies this option.

**ANSWER:** HDMI LA admits that Section 9.22.1 of the Adopter Agreement states that "each Founder is willing to provide separate patent licenses to any Necessary Claims owned by such Founder of the same scope and nature as offered herein to any person or entity on fair, reasonable and non-discriminatory terms and conditions." HDMI LA denies the remaining averments in this paragraph.

80.    For example, because of the confidentiality provisions in the Adopter Agreement, Availink cannot determine whether it would need to take a license from HDMI LA to develop SoC ICs compatible with HDMI 2.1, whether it needs only take licenses directly from one or more of the Founders, or whether it needs a license at all.

**ANSWER:** HDMI LA denies the averments in this paragraph.

81.    In addition, the refusal to disclose the patents being licensed allows the Founders and HDMI LA to extract royalties for products manufactured and sold in countries in which they have no intellectual property rights. Patent licensors and licensing agents for other standards not only disclose relevant patents but they require royalties for the manufacturing or sale of compliant products only in countries in which they have patents.

**ANSWER:** HDMI LA denies the averments in the first sentence of this paragraph.  HDMI LA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of this paragraph and therefore denies them.

HDMI LA's Answer to Counterclaims
Case No. 4:22-cv-6947-HSG

82.     In contrast, the Adopter Agreement requires the payment of a full royalty, no matter where the product is manufactured, shipped, or sold. HDMI LA's refusal to disclose the licensed patents facilitates these unlawful royalties. Availink, for instance, asked HDMI LA to disclose the jurisdictions in which the licensed patents were issued.  HDMI LA refused. Because of the failure to disclose, licensees do not know which countries the Founders' patents cover. The Adopter Agreement nonetheless forces them to pay royalties for products manufactured and sold in countries in which the Founders have no patent rights, thereby restraining competition from non-infringing products and unlawfully expanding the geographic scope of the Founders' purported patent rights.

**ANSWER:** HDMI LA denies the averments in this paragraph.

83.     In addition, HDMI LA's refusal to disclose the allegedly licensed patents prevents potential licensees from seeking independent licenses from the Founders. Availink repeatedly asked HDMI LA to identify not only the licensed patents but also the owners of those patents. HDMI LA refused to do so. Absent this type of disclosure, potential licensees cannot know which patent owners they should contact if they want to sign individual patent licenses as opposed to the package license, making illusory the provision in the Adopter Agreement that permits independent licensing.

**ANSWER:** HDMI LA denies the averments in this paragraph.

**E. Discrimination against small competitors—forcing them to become tools for HDMI LA's trademark compliance program**

84.     The HDMI licensing scheme also disadvantages small competitors, such as Availink, to the benefit of large competitors, such as the Founders.

**ANSWER:** HDMI LA denies the averments in this paragraph.

85.     The Adopter Agreement purports to require manufacturers of HDMI components, such as Availink, to pay the $0.15 per unit royalty unless they can demonstrate that their components were incorporated into an end-user product subject to the HDMI royalty:

> For each end-user Licensed Product that is sold by Adopter, the royalty is $0.15 per unit sold. Manufacturers of Components, Cables and Connectors will pay no per unit royalty to the extent such Components, Cables and Connectors are incorporated into end-user Licensed Products subject to royalty hereunder. Components, Cables and Connectors sold otherwise shall be considered end-user Licensed Products subject to the payment of royalties.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Adopter Agreement, Attachment B.

**ANSWER:** HDMI LA admits that the quoted text is an accurate transcription of portions of the Adopter Agreement, Exhibit B to HDMI LA's complaint in the above-captioned case. HDMI LA denies the remaining averments in this paragraph.

86.     The Adopter Agreement further provides a "discounted rate of $0.05 per unit sold if Adopter reasonably incorporates the Adopted Trademarks on its Licensed Products and related documentation and promotional materials." *Id.*

**ANSWER:** HDMI LA admits the allegations in this paragraph.

87.     If a component manufacturer's customer is not an HDMI adopter, the component manufacturer must pay the $0.15 royalty. Alternatively, if a component manufacturer's customer is an HDMI adopter, the component manufacturer is excused from any royalty obligation. The customer that becomes an HDMI adopter can obtain the discounted $0.05 royalty only if it uses the HDMI trademarks. This scheme is designed to coerce the component manufacturer to force its customers to become HDMI adopters and use HDMI trademarks. For customers that do not become an adopter, the component manufacturer has to pass down the cost of the undiscounted $0.15 royalty. For the end-user product manufacturer, it will either accept $0.15 passed-down cost or become an adopter and use HDMI trademark to pay HDMI $0.05. Economically, this forces the end-user product manufacturer to become an adopter and use the trademarks, regardless of whether using the trademarks is any benefit from a marketing or commercial perspective.

**ANSWER:** HDMI LA admits that, under the Adopter Agreement, component manufacturer Adopters may not be required to pay a per unit royalty where they can demonstrate that their Licensed Products are incorporated into an end-user Licensed Product of an Adopter that pays the applicable royalty. HDMI LA denies the remaining averments in this paragraph.

88.     Smaller HDMI component manufacturers, like Availink, sell most, if not all, of their HDMI components through a network of distributors and wholesalers, which in turn sell to end-product manufacturers. For instance, Availink has sold its SoC ICs to wholesalers, who (on information and belief) sold the SoC ICs to circuit board manufacturers, who then sell circuit boards

incorporating the Availink SoC IC to end-product manufacturers, who incorporate the circuit boards into consumer electronic devices.

**ANSWER:** HDMI LA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding the first sentence of this paragraph or regarding the sale of Availink's SoC ICs and therefore denies those allegations. HDMI LA denies the remaining averments in this paragraph.

89.     Nothing requires these wholesalers, circuit board manufacturers, and consumer electronics manufacturers to inform the chip manufacturers, such as Availink, that they intend to activate the HDMI interface. Nor do they have any duty to report their intention to the HDMI trademarks.

**ANSWER:** HDMI LA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and therefore denies those allegations.

90.     Smaller HDMI component manufacturers are, therefore, unable to verify whether their components eventually end up in end-user products manufactured by HDMI-licensed entities. And these component manufacturers cannot take advantage of the discounted rate because their products are incorporated into other products and thus not visible.

**ANSWER:** HDMI LA denies the averments in this paragraph.

91.     As a result, these smaller manufacturers must bear the full HDMI royalty, even though the $0.15 royalty is a substantial percentage of the average selling price of their products.

**ANSWER:** HDMI LA denies the averments in this paragraph.

92.     Under the HDMI LA's scheme, as set forth in the Adopter Agreement, the only way for these small manufacturers to avoid the higher royalty rate is to corral the end-user product manufacturers to use the HDMI trademarks, making those manufacturers liable for the discounted royalty rate. But without any right to enforce the trademarks, small manufacturers, such as Availink, are unable to trace their products through the supply chain and with no ability to enforce compliance.

**ANSWER:** HDMI LA denies the averments in this paragraph.

93.     In contrast, many larger manufacturers are vertically integrated.  They manufacture both HDMI components and end-user products. These larger manufacturers may therefore take advantage of the discounted royalty rate.

**ANSWER:** HDMI LA admits that manufacturers of any Licensed Product may take advantage of the discounted royalty rates. HDMI LA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of this paragraph and therefore denies them.

94.     In addition, larger non-vertically integrated component manufacturers can bypass the network of distributors and wholesalers, allowing these manufacturers to verify that their end-user customers are licensed.  These component manufacturers, therefore, avoid paying any royalties.

**ANSWER:** HDMI LA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of this paragraph and therefore denies them..

95.     Further, on information and belief, HDMI LA has selectively enforced the reporting requirement under the Adopter Agreement, requiring such reporting for only smaller competitors. Indeed, for years HDMI LA did not require any reporting from Availink. Only when Availink sought to reinstate its license did HDMI LA reinterpret the Adopter Agreement to require such reporting and demand royalties for past shipments. On information and belief, HDMI LA interprets the Adopter Agreement in this fashion only for small competitors who it believes are without the ability to resist HDMI LA's demands. In other words, HDMI LA discriminates against small component manufacturers by forcing them to become tools for HDMI LA's trademark enforcement program, or paying higher royalties, while not requiring such obligations from larger manufacturers.

**ANSWER:** HDMI LA denies the averments in this paragraph.

96.     The effect of these provisions is to restrain competition in the markets for HDMI components and HDMI-complaint SoC ICs.

**ANSWER:** HDMI LA denies the averments in this paragraph.

**F.  The innovation-stifling grantback provision**

97.     A grantback provision in a patent pool license agreement requires licensees to license their patents necessary to practice the standard back to the other pool participants, including other

licensees. The purpose of such provisions is to clear potential blocking patents, allowing all licensees (and the pool's founders) to manufacture, sell, and use standard-compliant products without facing enforcement actions from other pool licensees.

**ANSWER:** HDMI LA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of this paragraph and therefore denies them.

98.     Such provisions, however, can be anticompetitive. Grantbacks can stifle innovation and entrench the pool founders' market power. To prevent this anticompetitive effect, therefore, the pool license must ensure that licensees are fairly and reasonably compensated for their patents subject to the grantback provision. Otherwise, the patent pool license becomes a tool to reduce incentives to innovate because licensees will not be adequately rewarded for their innovation efforts.

**ANSWER:** HDMI LA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of this paragraph and therefore denies them.

99.     To avoid impeding innovation, other patent pool licenses allow licensees to obtain "fair and reasonable" royalties from other pool participants through independent licensing.  Indeed, such a provision has been included in every patent pool reviewed by the Department of Justice, Antitrust Division. In addition, these patent pools provide for an independent expert to determine whether patents are indeed necessary.

**ANSWER:** HDMI LA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of this paragraph and therefore denies them.

100.     Not so the HDMI license. The Adopter Agreement provides that every licensee must agree not to assert its necessary patents against the Founders or any other licensee. The Agreement states, "Adopter and its Affiliates hereby agree not to bring, commence, maintain or prosecute any action or other proceeding based on any Necessary Claims that they may now or in the future own or control, or to otherwise assert any such Necessary Claims, worldwide, against any Founder or any Fellow Adopter …" Adopter Agreement ¶ 3.

**ANSWER:** HDMI LA admits that the quoted language is an accurate transcription of portions of Section 3 of the Adopter Agreement attached to HDMI LA's complaint as Exhibit B. HDMI LA denies the remaining averments in this paragraph.

101.    Unlike the pool licensing agreements approved by the Department of Justice, the Adopter Agreement does not allow licensees to seek "fair and reasonable" royalties for their necessary patents. In return for giving up the right to assert its current and future patents, licensees receive only a right to "petition" HDMI LA and the Founders for a share of "future royalties collected under HDMI." Adopter Agreement ¶ 9.23. The Founders—not an independent expert— "make the final determination regarding a reasonable allocation of future royalties based on any claims determined to be Necessary Claims." *Id.*

**ANSWER:** HDMI LA admits that under Section 9.23 of the Adopter Agreement, an Adopter that has a reasonable good faith belief that it owns a Necessary Claim may petition for a share of future royalty payments collected under HDMI LA, and that such Adopter may receive a reasonable allocation of such future royalties. HDMI LA denies the remaining averments in this paragraph.

102.    This provision is an anticompetitive price-fixing agreement. The Founders, who are competitors of each other and the petitioning licensee, jointly determine whether they will pay anything for the rights to the licensee's patents and, if so, how much. The effect of this anticompetitive agreement is to reduce the royalties paid by the Founders for licensees' patents. This anticompetitive reduction in royalties retards incentives to innovate in the market for HDMI technology.

**ANSWER:** HDMI LA denies the averments in this paragraph.

**G.    The required licensing of generic trademarks**

103.    Not only does the HDMI package license include expired patents, but it also includes invalid trademarks. HDMI adopters are required to license the HDMI trademarks. On information and belief, however, the term HDMI does not function as a trademark because it has become generic.

**ANSWER:** HDMI LA admits that under the Adopter Agreement, Adopters are given a license to use the "Adopted Trademarks" (as defined in Attachment A to the Adopter Agreement). HDMI LA denies the remaining averments in this paragraph.

104.    HDMI LA claims ownership of the mark HDMI, as set forth in U.S. Registration No. 3,268,924, for "Integrated circuits and semiconductors; computer software for use as an interface between audio/video sources and audio/video repeater devices; computer software for use as an

HDMI LA's Answer to Counterclaims
Case No. 4:22-cv-6947-HSG

interface between audio/video sources and audio/video monitors; computer software interface for use in connecting, controlling and networking a wide variety of computer and communications hardware, consumer electronic devices, components, and peripherals; connectors, cables, and components thereof; computer hardware, hardware components, namely computer monitors, and peripherals; communications hardware, hardware components, namely cable modems, Internet gateways, multimedia switches, and peripherals; consumer electronics devices, namely, cable, satellite and terrestrial digital set-top boxes, DVD players and recorders, digital VHS players and recorders, personal video recorders, cable boxes, audio/video receivers, integrated televisions, and television monitors."

**ANSWER:** HDMI LA admits the allegations in this paragraph.

105.    HDMI LA also claims ownership of the mark HDMI HIGH-DEFINITION MULTIMEDIA INTERFACE (stylized), as set forth in U.S. Registration 3,442,135, for "integrated circuits and semiconductors; computer software for use as an interface between audio/video sources and audio/video repeater devices; computer software for use as an interface between audio/video sources and audio/video monitors; computer software interface for use in connecting, controlling and networking a wide variety of computer and communications hardware, consumer electronic devices, components, and peripherals; connectors, cables, and components thereof; computer hardware, hardware components, namely, and peripheral; communications hardware, hardware components, namely, cable modems, internet gateways, multimedia switches, and peripherals; consumer electronics devices, namely, cables, satellite and terrestrial digital set-top boxes, DVD players and recorders, personal video recorders, cable boxes, audio/video receivers, integrated televisions, and televisions monitors."

**ANSWER:** HDMI LA admits the allegations in this paragraph.

106.    Any rights to the descriptive/generic words HIGH-DEFINITION MULTIMEDIA INTERFACE are disclaimed apart from the mark as a whole. This means that the only allegedly distinctive term in the '135 registration is HDMI.

**ANSWER:** HDMI LA admits that "HIGH-DEFINITION MULTIMEDIA INTERFACE" is disclaimed from U.S. Trademark Registration No. 3,442,135, and that HDMI LA does not claim

32

exclusive rights in the same, separate and apart from its mark as a whole. HDMI LA denies the remaining averments in this paragraph.

107.    A trademark must function as an indicator of source or origin. Once the relevant consuming public perceives that the mark is a generic term for a type of goods or services, however, the mark ceases to function as a trademark. Famous examples of generic terms that no longer function as trademark in the United States include "elevator," "trampoline" and "aspirin." Regardless of efforts, if any, by the mark owner, some trademarks are, or have become, generic.

**ANSWER:** This paragraph consists of Availink's characterizations of various legal concepts—rather than factual averments—to which no response is required. To the extent a response is required, HDMI LA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of this paragraph and therefore denies them.

108.    The term HDMI is an acronym for "high-definition multimedia interface," which refers to a connector having a particular physical configuration.

**ANSWER:** HDMI LA admits that HDMI is an acronym for "high-definition multimedia interface". HDMI LA denies the remaining averments in this paragraph.

109.    On information and belief, third parties commonly use the term HDMI simply to refer to a connector or matching input port having a specific physical configuration.

**ANSWER:** HDMI LA denies the averments in this paragraph.

110.    When a consumer buys a new television, for example, the salesperson or online retail site will remind them to purchase "HMDI cables." Television specifications on retailer websites include the number of "HDMI inputs." On information and belief, the term HDMI is often depicted by online retailers without a TM or R symbol denoting that it is a registered trademark. Exhibit 1 is a set of screenshots from major online retailers using the term HDMI in a generic sense.

**ANSWER:** HDMI LA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of this paragraph and therefore denies them.

111.    Manufacturers of HDMI-compliant televisions and cables, for example, also use the term HDMI generically. For example, Exhibit 2 hereto are screenshots from Samsung's and LG's websites using HDMI generically.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ANSWER:** HDMI LA admits that Exhibit 2 appears to be screenshots from Samsung's and LG's websites, which are documents that speak for themselves. HDMI LA denies the remaining averments in this paragraph.

112.     On information and belief, the relevant consuming public does not perceive HDMI as an indicator of source or origin of any of the goods covered by the subject registrations. Rather, HDMI is, or has become, on information and belief, a generic term for a type of connector and related goods.

**ANSWER:** HDMI LA denies the averments in this paragraph.

**III. Availink and the Adopter Agreement**

113.     Availink entered the Adopter Agreement in 2015, under which Availink paid the annual fees. Due to economic and financial conditions in 2018 that disrupted its business and staffing, Availink neglected to pay the annual fees under the Adopter Agreement. HDMI LA terminated the Agreement.

**ANSWER:** HDMI LA admits the first sentence of this paragraph, and that HDMI LA terminated Availink as an Adopter for failure to make required payments under the Adopter Agreement. HDMI LA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of this paragraph and therefore denies them.

114.     Prior to terminating Availink's Agreement, Availink never provided royalty reports because it did not sell any HDMI-compatible end-user products. HDMI LA never requested royalty reports during this time.

**ANSWER:** HDMI LA admits that Availink never provided royalty reports to HDMI LA, and denies the remaining averments in this paragraph.

115.     In 2021, Availink planned to restart its IC design product lines and sought to reinstate the license under the Adopter Agreement.

**ANSWER:** HDMI LA admits that in 2021 Availink requested to sign an Adopter Agreement with HDMI LA. HDMI LA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations of this paragraph and therefore denies them.

116.    To reinstate the Agreement, HDMI demanded payment of royalties for all the HDMI components manufactured by Availink from Q1 2015 and Q2 2021. These royalties would exceed $75,000.

**ANSWER:** HDMI LA admits that, prior to signing a new Adopter Agreement, HDMI stated that Availink was required to comply with all outstanding obligations under its terminated Adopter Agreement, including the payment of unpaid royalties, which could have exceeded $75,000. HDMI LA denies the remaining averments in this paragraph.

117.    In addition, for the first time, HDMI LA insisted that Availink provide an expansive quarterly sales report, including a detailed breakdown of sales by customer, so that it could use this information to seek royalties from Availink's customers. Availink objected to this new requirement by citing (i) the parties' prior contrary practice; (ii) the unreasonably burdensome nature of the demand, which would require Availink to attempt to track this information through its wholesalers; (iii) its concerns over non-disclosure obligations to its customers, and (iv) Plaintiff's apparent selective enforcement of this demand among the adopters. HDMI LA nonetheless refused to enter an agreement with Availink unless it provided the reports.

**ANSWER:** HDMI LA denies the averments in this paragraph.

118.    Availink has been injured in its property and business by being forced to pay, and being threatened to be required to further pay, unlawful supracompetitive fees and royalties under the Adopter Agreement.

**ANSWER:** HDMI LA denies the averments in this paragraph.

**IV. The conspiracy between HDMI LA and the Founders restrains competition**

119.    The HDMI licensing scheme and the enforcement of the Adopter Agreement are pursuant to a conspiracy among HDMI LA and the Founders.

**ANSWER:** HDMI LA denies the averments in this paragraph.

120.    There are no effective substitutes for HDMI-compliant components, HDMI SoC ICs, and HDMI-compliant end-user products. There are also no effective substitutes for the technologies necessary to make, use, or sell HDMI-compliant components, HDMI SoC ICs, and HDMI-compliant end-user products.

**ANSWER:** HDMI LA denies the averments in this paragraph.

121.    Due to possessing patents necessary to manufacture, use, or sell HDMI-compliant components, HDMI SoC ICs, and HDMI-compliant end-user products, HDMI LA and the Founders possess market power in the relevant market for technology necessary to make, use, or sell HDMI-compliant components, HDMI SoC ICs, and HDMI-compliant end-user products. This market is worldwide.

**ANSWER:** HDMI LA denies the averments in this paragraph.

122.    Due to possessing patents necessary to manufacture, use, or sell HDMI-compliant components, HDMI SoC ICs, and HDMI-compliant end-user products, HDMI LA and the Founders possess market power in the downstream market for HDMI-compliant components, HDMI SoC ICs, and HDMI-compliant end-user products. These markets are worldwide.

**ANSWER:** HDMI LA denies the averments in this paragraph.

123.    The aggregate effect of HDMI LA's anticompetitive conduct has significantly harmed competition in the relevant markets for HDMI technology, HDMI-compliant components, HDMI SoC ICs, and HDMI-compliant end-user products. The anticompetitive conduct has reduced innovation for HDMI-compliant products, resulted in the extraction of supracompetitive fees and royalties under the Adopter Agreement, and led to supracompetitive prices in the relevant markets.

**ANSWER:** HDMI LA denies the averments in this paragraph.

124.    Availink has suffered antitrust injury from HDMI LA's conduct because its injury flows directly from the anticompetitive effects of that conduct. Availink is a consumer in the market for HDMI technology, it competes in the relevant markets for HDMI-compliant components and HDMI SoC ICs, and it sells components used in the market for HDMI-compliant end-user products. Availink has paid supracompetitive licensing fees. Moreover, the supracompetitive prices in the relevant markets have impaired Availink's ability to sell its products.

**ANSWER:** HDMI LA denies the averments in this paragraph.

**CLAIMS FOR RELIEF**

**COUNT ONE**

**(Sherman Act – 15 U.S.C. § 1)**

125.    Availink incorporates by reference each of the allegations in the preceding paragraphs.

**ANSWER:** HDMI LA incorporates its answers to the allegations of the preceding paragraphs as if fully set forth herein.

126.    HDMI LA and the Founders have agreed among themselves to combine their intellectual property, including patents necessary to make, use, or sell HDMI-compliant components, HDMI SoC ICs, and HDMI-compliant end-user products, and to license those combined rights under the Adopter Agreement, which is a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER:** HDMI LA denies the averments in this paragraph.

127.    This conspiracy has adversely affected interstate commerce and restrained competition in the relevant markets.

**ANSWER:** HDMI LA denies the averments in this paragraph.

128.    As a proximate result of the conspiracy, Availink has been injured in its business and property.

**ANSWER:** HDMI LA denies the averments in this paragraph.

## COUNT TWO

### (Lanham Act – 15 U.S.C. §§ 1119 and 1064)

129.    Availink incorporates by reference each of the allegations in the preceding paragraphs.

**ANSWER:** HDMI LA incorporates its answers to the allegations of the preceding paragraphs as if fully set forth herein.

130.    This cause of action is for cancellation of U.S. Trademark registrations 3,268,924 and 3,442,135 on the grounds that the marks they cover are generic and do not function as trademarks.

**ANSWER:** The allegations in this paragraph constitute characterizations of the nature of the relief that Availink seeks via Count Two of its Counterclaims to which no response is required. To

the extent that a response is required, HDMI LA admits that Count Two seeks cancellation of U.S. Trademark Registrations 3,268,924 and 3,442,135, but denies that Count Two has any basis.

131.    The Court has authority to order the Director of the United States Patent and Trademark Office to cancel these registrations under the Lanham Act, 15 U.S.C. § 1119.

**ANSWER:** The allegations in this paragraph constitute legal conclusions to which no response is required. To the extent that a response is required, HDMI LA admits that this Court has the authority to order the Director of the United States Patent and Trademark Office to cancel registrations under the Lanham Act, 15 U.S.C. § 1119, but denies that there is any basis for the cancellation of Plaintiff's registrations.

132.    Pursuant to 15 U.S.C. § 1064, A trademark registration may be cancelled at any time if the registered mark becomes the generic name for the goods or services, or a portion thereof, for which it is registered.

**ANSWER:** This paragraph consists of Availink's recitation or characterization of legal concepts—rather than factual averments—to which no response is required.

133.    On information and belief, the terms HDMI and HIGH-DEFINITION MULTIMEDIA INTERFACE are generic terms for a connector having a particular physical configuration.

**ANSWER:** HDMI LA denies the averments in this paragraph.

134.    On information and belief, consumers in the United States perceive the term HDMI, not as a brand or trademark, but as a type of connector having a particular physical configuration.

**ANSWER:** HDMI LA denies the averments in this paragraph.

135.    The continued registration of these marks injures Availink because the Adopter Agreement forces Availink to license these registered trademarks that do not function as trademarks.

**ANSWER:** HDMI LA denies the averments in this paragraph.

136.    The continued registration of these marks injures Availink because they threaten Availink's right to use the term HDMI fairly to describe its goods as compatible with HDMI specifications.

**ANSWER:** HDMI LA denies the averments in this paragraph.

137.    As a proximate cause of the existence of these registrations, Availink is injured in its business and property.

**ANSWER:** HDMI LA denies the averments in this paragraph.

### COUNT THREE

### (Cartwright Act – Cal. Bus. & Prof. Code § 16720)

138.    Availink incorporates by reference each of the allegations in the preceding paragraphs.

**ANSWER:** HDMI LA incorporates its answers to the allegations of the preceding paragraphs as if fully set forth herein.

139.    HDMI LA and the Founders have agreed among themselves to combine their intellectual property, including patents necessary to make, use, or sell HDMI-compliant components, HDMI SoC ICs, and HDMI-compliant end-user products, and to license those combined rights under the Adopter Agreement, which is a conspiracy in unreasonable restraint of trade in violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16720.

**ANSWER:** HDMI LA denies the averments in this paragraph.

140.    This conspiracy has adversely affected interstate commerce and restrained competition in the relevant markets.

**ANSWER:** HDMI LA denies the averments in this paragraph.

141.    As a proximate result of the conspiracy, Availink has been injured in its business and property.

**ANSWER:** HDMI LA denies the averments in this paragraph.

### COUNT FOUR

### (Unfair Competition – Cal. Bus. & Prof. Code § 17200)

142.    Section 17200 of the California Business & Professions Code is written in the disjunctive and covers three forms of unfair competition: acts that are unlawful, unfair, or fraudulent. The statute's purpose is to protect both consumers and competitors by promoting fair competition.

**ANSWER:** HDMI LA admits that Section 17200 of the California Business & Professional Code prohibits certain acts determined to be "unlawful," "unfair," or "fraudulent." HDMI LA denies the remaining averments in this paragraph.

143.    As alleged above, HDMI LA has engaged in "unfair" business practices. A practice may be "unfair" even if some other law does not specifically proscribe it. Unfair business practices include any conduct that threatens an incipient violation of an antitrust law, violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition. Here, HDMI LA's conduct violates the spirit of the Sherman, Cartwright, and Donnelly Acts and has threatened and harmed competition.

**ANSWER:**  HDMI LA denies the averments in this paragraph.

144.    Availink HDMI LA has also engaged in "unlawful" business practices. HDMI LA's conduct violates the Sherman, Cartwright, and Donnelly Acts, and it also constitutes patent misuse.

**ANSWER:** HDMI LA denies the averments in this paragraph.

145.    HDMI LA has also engaged in "fraudulent" business practices by representing that the HDMI license is necessary for manufacturers who produce components compatible only with HDMI 1.0, who do not use the HDMI trademark, and whose customers do not use the HDMI trademark, without disclosing that some or all of the patents necessary for HDMI 1.0 have expired.

**ANSWER:** HDMI LA denies the averments in this paragraph.

146.    As a proximate result of HDMI LA's acts of unfair competition, Availink has been injured in its business and property.

**ANSWER:** HDMI LA denies the averments in this paragraph.

**COUNT FIVE**

**(Donnelly Act – N.Y. Gen. Bus. L. § 340)**

147.    Availink incorporates by reference each of the allegations in the preceding paragraphs.

**ANSWER:** HDMI LA incorporates its answers to the allegations of the preceding paragraphs as if fully set forth herein.

148.    The Adopter Agreement purports to require it be "construed and controlled by the laws of the State of New York."

**ANSWER:** HDMI LA admits that the Adopter Agreement provides that it "shall be construed and controlled by the laws of the State of New York applicable to agreements made and to be performed entirely in such state."

149.    HDMI LA and the Founders have agreed among themselves to combine their intellectual property, including patents necessary to make, use, or sell HDMI-compliant components, HDMI SoC ICs, and HDMI-compliant end-user products, and to license those combined rights under the Adopter Agreement, which is a conspiracy in unreasonable restraint of trade in violation of the Donnelly Act, N.Y. Gen. Bus. L. § 340.

**ANSWER:** HDMI LA denies the averments in this paragraph.

150.    This conspiracy has adversely affected interstate commerce and restrained competition in the relevant markets.

**ANSWER:** HDMI LA denies the averments in this paragraph.

151.    As a proximate result of the conspiracy, Availink has been injured in its business and property

**ANSWER:** HDMI LA denies the averments in this paragraph.

**COUNT SIX**

**(Deceptive Acts and Practices – N.Y. Gen. Bus. L. § 349)**

152.    Availink incorporates by reference each of the allegations in the preceding paragraphs.

**ANSWER:** Because Count Six has been dismissed from the case, HDMI LA will not provide a response to the allegations in this paragraph.

153.    The Adopter Agreement purports to require it be "construed and controlled by the laws of the State of New York."

**ANSWER:** Because Count Six has been dismissed from the case, HDMI LA will not provide a response to the allegations in this paragraph.

154.     HDMI LA has engaged in deceptive acts by representing that the HDMI license is necessary for manufacturers who produce components compatible only with HDMI 1.0, who do not use the HDMI trademark, and whose customers do not use the HDMI trademark, without disclosing that some or all of the patents necessary for HDMI 1.0 have expired.

**ANSWER:** Because Count Six has been dismissed from the case, HDMI LA will not provide a response to the allegations in this paragraph.

155.     As a proximate result of HDMI LA's deceptive acts, Availink has been injured in its business and property.

**ANSWER:** Because Count Six has been dismissed from the case, HDMI LA will not provide a response to the allegations in this paragraph.

156.     As a proximate result of HDMI LA's deceptive acts, consumers have been harmed by the restriction of competition in the markets for HDMI-compliant components, HDMI SoC ICs, and HDMI- compliant end-user products.

**ANSWER:** Because Count Six has been dismissed from the case, HDMI LA will not provide a response to the allegations in this paragraph.

**COUNT SEVEN**

**(Declaratory Relief – 28 U.S.C. § 2201)**

157.     HDMI LA contends that Availink breached the Adopter Agreement by allegedly failing to pay fees and royalties due under the Agreement. HDMI seeks damages from Availink based on this alleged breach of contract.

**ANSWER:** HDMI LA admits the allegations in this paragraph.

158.     A dispute exists over whether public policy prohibits the enforcement of the Adopter Agreement against Availink because the HDMI licensing scheme and Adopter Agreement violate the Sherman Act, the Cartwright Act, the Donnelly Act, California unfair competition law, and N.Y. Gen. Bus. L. § 349.

**ANSWER:** HDMI LA denies the averments in this paragraph.

159.     A further dispute exists over the interpretation of the Adopter Agreement. The Agreement states, "All Adopters shall pay Agent a running royalty for each end-user Licensed

HDMI LA's Answer to Counterclaims
Case No. 4:22-cv-6947-HSG

Product sold by such Adopter." The Agreement defines an "end-user Licensed Product" as "a product that is typically designed and sold for use by end-users, and where such products are not themselves incorporated into a royalty-bearing end-user Licensed Product." Availink does not sell any "end-user Licensed Product." HDMI LA, relying on contradictory language in the Adopter Agreement, contends nonetheless that Availink's products are subject to royalties if they are incorporated in end-user Licensed Products sold by others.

**ANSWER:** HDMI LA admits that the Adopter Agreement, which is a document that speaks for itself, contains the language quoted in the first sentence of this paragraph. HDMI LA denies the remaining averments in this paragraph.

160.    HDMI LA further contends that Availink has infringed the HDMI trademarks.

**ANSWER:** HDMI LA admits that it has contended that Availink has infringed the HDMI trademarks; however, currently, there is no longer any claim for trademark infringement by HDMI LA against Availink in this action.

161.    HDMI further contends that Availink has engaged in contributory infringement by third parties of the HDMI trademarks.

**ANSWER:** HDMI LA denies that it alleged "contributory infringement by third parties", but admits that it contended that Availink has contributorily infringed the HDMI trademarks. However, currently, there is no longer any claim for contributory trademark infringement by HDMI LA against Availink in this action

162.    A dispute exists over whether the HDMI licensing program and the Adopter Agreement constitute patent misuse, precluding the enforcement of the Adopter Agreement and the HDMI trademark.

**ANSWER:** HDMI LA denies the averments in this paragraph.

163.    A valid case or controversy exists sufficient for this Court to declare the rights and remedies of the parties in that HDMI is seeking to enforce both the Adopter Agreement and the trademarks against Availink. The enforcement of the Adopter Agreement or the trademarks against Availink would cause Availink injury.

**ANSWER:** HDMI LA denies the averments in this paragraph.

164.   A valid case or controversy exists sufficient for this Court to declare that the Adopter Agreement is unenforceable due to public policy.

**ANSWER:** HDMI LA denies the averments in this paragraph.

165.   A valid case or controversy exists sufficient for this Court to declare that the Adopter Agreement does not require Availink to pay royalties products it sells that are not end-user Licensed Products.

**ANSWER:** HDMI LA denies the averments in this paragraph.

166.   A valid case or controversy exists sufficient for this Court to declare that Availink has not infringed any HDMI trademarks.

**ANSWER:** HDMI LA denies the averments in this paragraph.

167.   A valid case or controversy exists sufficient for this Court to declare that Availink has not engaged in contributory infringement of the HDMI trademarks.

**ANSWER:** HDMI LA denies the averments in this paragraph.

## PRAYER FOR RELIEF

HDMI LA denies that Availink is entitled to any relief, including, but not limited to, the relief sought in Paragraphs A through J of the Prayer for Relief of the Counterclaims. Instead, HDMI LA submits that it should be granted the relief requested in its complaint.

## DEMAND FOR JURY TRIAL

In its complaint, HDMI LA likewise has included a demand for a jury trial for this action on all issues so triable.

## AFFIRMATIVE DEFENSES

Pleading further, and without waiving the above Answer, HDMI LA asserts that Availink's Counterclaims are barred, in whole or in part, based on one or more of the following defenses:

## FIRST AFFIRMATIVE DEFENSE

The Counterclaims fail to state a claim against HDMI LA upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Availink lacks standing to bring the Counterclaims.

### THIRD AFFIRMATIVE DEFENSE

The Counterclaims fail to state a cause of action under the Sherman Act, 15 U.S.C. § 1, because they fail to satisfy the requirements for conduct involving trade or commerce with foreign nations under the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a.

### FOURTH AFFIRMATIVE DEFENSE

The Counterclaims are barred by the doctrine of laches.

### FIFTH AFFIRMATIVE DEFENSE

The Counterclaims are barred, in whole or in part, because any and all of HDMI LA's conduct has been reasonable and based on independent, legitimate business and economic justification.

### SIXTH AFFIRMATIVE DEFENSE

The Counterclaims are barred, in whole or in part, by the applicable statutes of limitations.

### SEVENTH AFFIRMATIVE DEFENSE

The Counterclaims are barred, in whole or in part, by the doctrine of unclean hands.

### EIGHTH AFFIRMATIVE DEFENSE

HDMI LA reserves the right to assert other affirmative defenses, which may become appropriate after further discovery.


Date: May 21, 2024

Respectfully submitted,


**CONSTANTINE CANNON LLP**

BY: _S/ Seth D. Greenstein_
Seth D. Greenstein (Pro Hac Vice)
sgreenstein@constantinecannon.com
1001 Pennsylvania Ave., NW 1300N
Washington, D.C. 20004
Telephone: (202) 204-3500
Facsimile: (202) 204-3501

BY: *S/ Ankur Kapoor*
Ankur Kapoor (Pro Hac Vice)
akapoor@constantinecannon.com
335 Madison Avenue, Fl. 9
New York, NY 10017
Telephone: (212) 350-2700
Facsimile: (212) 350-2701

*Attorneys for HDMI Licensing
Administrator, Inc.*

**EPSTEIN DRANGEL LLP**

BY: *S/ Kerry B. Brownlee*
Kerry B. Brownlee (Pro Hac Vice)
kbrownlee@ipcounselors.com
Jason M. Drangel (Pro Hac Vice)
jdrangel@ipcounselors.com
60 East 42nd Street, Suite 1250
New York, New York 10165
Telephone: (212) 292-5390
Facsimile: (212) 292-5391

BY: *S/ Peter J. Farnese*
Peter J. Farnese (SBN 251204)
pfarnese@ipcounselors.com
700 South Flower Street, Suite 1000
Los Angeles, California 90017
Telephone: (310) 356-4668
Facsimile: (310) 388-1232

*Attorneys for HDMI Licensing
Administrator, Inc.*

HDMI LA's Answer to Counterclaims
Case No. 4:22-cv-6947-HSG

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2024, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to the email addresses registered in the CM/ECF system.

DATED: May 21, 2024

By:    _S/ Kerry B. Brownlee_
Kerry B. Brownlee (Pro Hac Vice)
Epstein Drangel LLP

*Attorney for Plaintiff*
*HDMI Licensing Administrator, Inc.*

HDMI LA's Answer to Counterclaims
Case No. 4:22-cv-6947-HSG