1
2
3
4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   HDMI LICENSING ADMINISTRATOR,          Case No. 22-cv-06947-EKL
    INC.,
8                                          **ORDER ON CROSS-MOTIONS FOR**
              Plaintiff,                   **SUMMARY JUDGMENT AND**
9                                          **DAUBERT MOTIONS**
          v.
10                                         Re: Dkt. Nos. 160, 165, 168, 169, 173, 203
    AVAILINK INC.,
11
              Defendant.
12

13        This case began as a straightforward contract dispute over Defendant Availink Inc.'s

14  failure to pay royalties and fees due under an intellectual property licensing agreement.  Plaintiff

15  HDMI Licensing Administrator, Inc. ("HDMI LA") filed suit in 2022 to recover damages for

16  unpaid royalties and fees, and to enjoin Availink's unauthorized use of its technology after the

17  licensing agreement was terminated.  In response, Availink asserted a series of counterclaims –

18  including for cancellation of HDMI LA's registered trademarks, violations of antitrust and unfair

19  competition laws, and patent misuse – seeking to nullify its contractual obligations.  Extensive

20  discovery ensued, and the case is scheduled for a jury trial to begin February 23, 2026.

21        Now before the Court are cross-motions for summary judgment and four related *Daubert*

22  motions.  The Court carefully reviewed the parties' briefs, the complete summary judgment

23  record, and the relevant legal authorities, and heard argument on October 15, 2025.  For the

24  following reasons, the Court:  (1) GRANTS summary judgment in HDMI LA's favor on its breach

25  of contract claim and on Availink's counterclaims; (2) DENIES Availink's cross-motion for

26  summary judgment; and (3) DENIES as moot the parties' *Daubert* motions.[1]

27

28  ────────────────────
    [1] The parties' omnibus motion to seal, ECF No. 211, will be addressed by a separate order.

United States District Court
Northern District of California

## I.   BACKGROUND[2]

This case arises from the licensing agreement governing the well-known High-Definition Multimedia Interface specification ("HDMI Specification").  HDMI LA Compl. ¶ 1, ECF No. 1 ("Compl.").  The HDMI Specification is a standard audio-visual interface incorporated into many consumer electronic devices.  It was developed "in the transition from analog to high-definition digital video" when "consumers needed a convenient single connector to send digital audio and video from DVD players, computers, and set-top boxes to their televisions and monitors."  HDMI LA Mot. for Summ. J. at 2, ECF No. 157-2 ("HDMI MSJ").  The HDMI Specification has become "the global standard for connecting high-definition transmitters to high-definition displays." Compl. ¶ 12; *see also* Availink Opp. & Cross Mot. for Summ. Adjudication at 1, ECF No. 204 ("Availink Opp.").  By implementing the Specification, manufacturers ensure that their products are HDMI compliant, and that any end user product can seamlessly transmit audio and visual data through the use of a single HDMI cable.  Compl. ¶ 9.

The first version of the HDMI Specification was developed in 2002 through collaboration between Hitachi Maxwell, Ltd., Panasonic Corporation, Koninklijke Philips Electronics N.V., Silicon Image, Inc., Sony Corporation, Technicolor S.A., and Toshiba Corporation ("Founders"). Compl. ¶ 8; Availink's Am. Answer & Am. Countercls. at 11 ¶ 19, ECF No. 118 ("Availink Countercls.").  The Founders developed a licensing agreement, the Adopter Agreement, which governs the licensing of the HDMI Specification and all underlying intellectual property ("IP") necessary to practice the HDMI Specification.  HDMI MSJ at 3-4; Compl. ¶ 23; Availink Countercls. at 13 ¶ 31.  The underlying IP includes "copyrights and trade secrets in the HDMI Specification, necessarily-infringed patent claims, and trademarks[.]"  HDMI MSJ at 3-4.

---

[2] The facts cited in this Order are undisputed for purposes of the cross-motions.  *See* HDMI LA's Reply to Availink's Responsive Statement of Facts, ECF No. 211-6 ("HDMI Statement"); HDMI LA's Responsive Statement of Facts, ECF No. 211-7 ("Availink Statement").  To the extent a party objects to evidence, but concedes that the facts are undisputed, the objections are not material.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The Adopter Agreement provides two options for licensing versions 1.0-1.4 (collectively

2    version "1.x")[3] of the HDMI Specification. *Id.* The first option is a "blanket" license that includes

3    the relevant HDMI Specification and all underlying IP needed to practice the Specification,

4    including patents and trade secrets, as well as related trademarks.[4] Adopter Agreement §§ 2-6,

5    ECF No. 161-14 (PX2). In exchange for these rights, an Adopter must pay an annual fee of

6    $10,000 and a 15-cent royalty per product that uses the HDMI Specification. Adopter Agreement

7    Attach. B. The blanket license is administered through an agent appointed by the Founders. *Id.*

8    § 1.3. Since 2017, Plaintiff HDMI LA has served as the licensing agent. HDMI MSJ at 4. The

9    second option is to license the necessary patents *a la carte* directly from the Founders. To that

10    end, each Founder committed "to provide separate patent licenses to any Necessary Claims owned

11    by such Founder . . . on fair, reasonable and non-discriminatory terms and conditions." Adopter

12    Agreement § 9.22.1. To obtain separate patent licenses, a prospective licensee must "contact the

13    applicable Founder in writing." *Id.*

14    Defendant Availink Inc. is a Cayman Islands corporation with its principal places of

15    business in Beijing, China, and Taiwan. HDMI Statement at 9-10 (Facts 2-3). Availink makes

16    system-on-chip ("SoC") integrated circuits ("IC")[5] that use HDMI Specification 1.x. Availink

17    Countercls. at 10 ¶ 8; HDMI Statement at 4 (Fact 4). Availink's SoC products are components

18    that are incorporated into end-user products such as set-top boxes. Availink Countercls. at 18

19    ¶ 53; Sun 30(b)(6) Tr. 27:6-15, ECF No. 158-6 (PX21). Set-top boxes receive digital signals like

20

21    ─────────────────────

22    [3] Availink incorporates version 1.x of the Specification into its products. HDMI Statement at 4 (Fact 4).

23    [4] The "Adopter Agreement offered by HDMI LA today is nearly identical to the one offered . . . in 2003." HDMI MSJ at 4; *compare* HDMI LA Founder Agreement, ECF No. 161-2 (PX2), *with*

24    2017 HDMI LA Adopter Agreement, ECF No. 161-12 (PX12).

25    Citations to "PX" exhibit numbers refer to HDMI LA's exhibits attached to the Declarations of Seth Greenstein (ECF No. 161) and Patrick Kennedy (ECF No. 191). Citations to "DX" exhibit numbers refer to Availink's exhibits attached to the Declarations of James McGuire (ECF Nos.

26    167, 199). Citations to "Stoner PX" exhibit numbers refer to HDMI LA's exhibits attached to the Declaration of Patrick Kennedy in support of HDMI LA's Motion to Exclude the Expert

27    Testimony of Dr. Robert Stoner (ECF No. 174).

28    [5] SoC ICs are a particular type of integrated circuit. SoC and IC are used interchangeably in this order to refer to Availink's products.

1    television programs and transmit the audio and video signals to an external display.  HDMI-

2    compliant set-top boxes transmit via a single HDMI cable, while non-HDMI compliant set-top

3    boxes may require up to three cables, resulting in lower quality audio or images.  Compl. ¶¶ 9-11.

4         Availink signed the Adopter Agreement in June 2015.  HDMI Statement at 1 (Fact 1).

5    Availink admits that it did not pay its annual fee under the Adopter Agreement in 2018, and that it

6    never paid royalties for is SoCs that use the HDMI Specification.  *Id.* at 4 (Fact 5), 5 (Facts 6-7).

7    Following notice and an opportunity to cure its breach, Availink's Adopter Agreement was

8    terminated.  *Id.* at 5 (Facts 8-9).  Despite termination, Availink's SoCs continued to incorporate

9    the HDMI interface functionality, and Availink continued marketing its SoCs as HDMI-compliant.

10   *Id.* at 8 (Fact 4).  In manufacturing HDMI-compliant SoCs, Availink necessarily practiced certain

11   patents required to implement the Specification.  *See* Adopter Agreement § 1.16; *see also* Stoner

12   Report ¶ 54, ECF No. 171-3 (Stoner PX1) (identifying "active HDMI patents [that] may have been

13   infringed by Availink products").

14        In November 2022, HDMI LA brought this action for breach of contract and trademark

15   infringement under the Lanham Act.  HDMI LA's Lanham Act claims were dismissed at the

16   pleading stage and never reasserted.  *See* Min. Entry, ECF No. 65 (dismissing Lanham Act

17   claims); *see also* 10/12/23 Hr'g Tr. 4:4-5:7, 7:19-22, ECF No. 68.  Availink counterclaims that the

18   Adopter Agreement violates federal and state antitrust and unfair competition laws, and seeks

19   declaratory relief and cancellation of the registered HDMI trademarks.  Availink Countercls. at

20   40-45 ¶¶ 145-183.  The parties have filed cross-motions for summary judgment.  HDMI LA

21   moves on its breach of contract claim and Availink's counterclaims.  Availink moves only as

22   whether it owes royalties under the Adopter Agreement.

23   **II.    LEGAL STANDARD**

24        A court may grant summary judgment on any issue if there is "no genuine dispute as to any

25   material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A

26   fact is material if, under the governing substantive law, it could affect the outcome of the case.

27   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence

28   is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

United States District Court
Northern District of California

The moving party bears the initial burden of demonstrating that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may satisfy this burden in different ways depending on whether it has the burden of proof at trial. If the moving party bears the burden of proof at trial, it must cite to "particular parts of materials in the record" to demonstrate that no reasonable trier of fact could find for the non-moving party. Fed. R. Civ. P. 56(c)(1)(A). By contrast, if the non-moving party bears the burden of proof at trial, the moving party need only demonstrate that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

Once the moving party has met its burden, the burden shifts to the non-moving party to designate specific facts showing that there is a genuine dispute. *Celotex*, 477 U.S. at 324. To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to survive summary judgment. *Anderson*, 477 U.S. at 252. Instead, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.*

In determining whether there is a genuine dispute of material fact, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). The court does not "engage in credibility determinations or weigh evidence." *Munden v. Stewart Tit. Guar. Co.*, 8 F.4th 1040, 1044 (9th Cir. 2021). "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001).

At summary judgment, the focus is not "on the admissibility of the evidence's form," but rather "on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). "To survive summary judgment, a party does not necessarily have to produce evidence in a

United States District Court
Northern District of California

1    form that would be admissible at trial, as long as the party satisfies the requirements of Federal

2    Rule[] of Civil Procedure 56." *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001).

3    An affidavit or declaration "must be made on personal knowledge, set out facts that would be

4    admissible in evidence, and show that the affiant or declarant is competent to testify on the matters

5    stated." Fed. R. Civ. P. 56(c)(4).

6    **III.    DISCUSSION**

7         The Court addresses the parties' cross-motions for summary judgment as follows. First,

8    the Court addresses HDMI LA's motion for summary judgment on its breach of contract claim

9    and Availink's cross-motion on the related issue of its obligation to pay royalties under the

10   Adopter Agreement. Next, the Court addresses HDMI LA's motion for summary judgment on

11   Availink's counterclaims for trademark cancellation. Finally, the Court addresses HDMI LA's

12   motion for summary judgment on Availink's Sherman Act counterclaim, the related counterclaims

13   for violations of state antitrust and unfair competition laws, and the patent misuse counterclaim.

14        **A.    Breach of Contract Claim**

15        Central to this lawsuit is HDMI LA's claim that Availink breached the terms of the

16   Adopter Agreement. HDMI LA moves for summary judgment on this claim. HDMI MSJ at 7-10.

17   Availink cross moves for summary judgment on the issue of whether it owes royalties under the

18   Adopter Agreement. Availink Opp. at 9-13. For HDMI LA to prevail on its breach of contract

19   claim, it must prove (1) the formation of a contract; (2) that HDMI LA performed its obligations

20   under the contract; (3) that Availink breached the contract by failing to perform its obligations;

21   and (4) damages. *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156

22   (2d Cir. 2016).[6] The first and second elements are not in dispute.[7] Rather, the key issue is

23   whether Availink breached the terms of the Adopter Agreement by failing to pay its annual fee in

24   2018 and by failing to pay royalties on its SoCs that use the HDMI technology. Because HDMI

25

26   ───────────────────

27   [6] The Adopter Agreement is governed by New York law. *See* Adopter Agreement § 9.6.

28   [7] *See* HDMI Statement at 1 (Fact 1) (Availink signed the Adopter Agreement on June 23, 2015),
     3 (Fact 1) (Following execution, Availink received copies of the HDMI Specification per the
     terms of the Adopter Agreement).

1    LA bears the ultimate burden of proof at trial on the issue of breach, at summary judgment, HDMI

2    LA must cite to "particular parts of materials in the record" to demonstrate that no reasonable trier

3    of fact could find in favor of Availink.  Fed. R. Civ. P. 56(c)(1)(A).

4         Under New York law, "the words and phrases [in a contract] should be given their plain

5    meaning, and the contract should be construed so as to give full meaning and effect to all of its

6    provisions."  *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir.

7    2014) (quoting *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012)).  "When the

8    terms of a written contract are clear and unambiguous, the intent of the parties must be found

9    within the four corners of the contract[.]"  *Id.* (citation omitted).  The determination of whether a

10   contract is ambiguous "is a question of law to be resolved by the courts."  *Orlander v. Staples,*

11   *Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d

12   639, 642 (1990)).

13        "That the parties interpret a contract provision differently does not make it ambiguous."

14   *Volt Elec. NYC Corp. v. A.M.E., Inc.*, 586 F. Supp. 3d 262, 276 (S.D.N.Y. 2022) (citation omitted).

15   Instead, a contract is ambiguous if its terms "could suggest more than one meaning when viewed

16   objectively by a reasonably intelligent person who has examined the context of the entire

17   integrated agreement and who is cognizant of the customs, practices, usages and terminology as

18   generally understood in the particular trade or business."  *Chesapeake Energy*, 773 F.3d at 114

19   (quoting *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp*., 595 F.3d 458, 466 (2d Cir. 2010)).

20   Here, although the parties disagree as to the import of the terms, they both argue that the plain

21   language of the Adopter Agreement is unambiguous.  HDMI LA Reply in Support of Mot. for

22   Summ. J. at 2, 4, ECF No. 189-3 ("HDMI Reply"); Availink Opp. at 9-10.  As discussed below,

23   the Court agrees that the terms of the Adopter Agreement are unambiguous.[8]

24

25

26   _____

27   [8] Because the contract is unambiguous, evidence of how other Adopters allegedly interpret the
     Adopter Agreement is immaterial to the Court's analysis.  *See* Availink Opp. at 10-12 (arguing
     that "[t]he course of dealings between HDMI LA and IC manufacturers from 2003 to 2021 . . .

28   could hardly be more vivid or revealing").

United States District Court
Northern District of California

1              **1.        Terms of the Adopter Agreement**

2          Pursuant to the Adopter Agreement, HDMI LA granted Availink a non-exclusive, non-

3    transferable, worldwide license to use the HDMI Specification[9] "solely" to design, develop, make,

4    use, sell, lease, promote and otherwise distribute "Licensed Products."  Adopter Agreement § 4.

5    Licensed Products include Components such as the SoCs that Availink sells.  *See id.* § 1.14 &

6    Attach. B.  Section 8 of the Agreement provides that information deemed confidential by HDMI

7    LA or the Founders – including the HDMI Specification – shall not be used "except as necessary

8    . . . solely for the purpose of implementing a product according to the Specification."  *Id.* §§ 4, 8.

9    The confidentiality provisions of Section 8 "survive for a period of ten (10) years after any

10   expiration or termination" of the Adopter Agreement.  *Id.* § 9.11.

11         In exchange for the license to use and implement the HDMI Specification into Licensed

12   Products, Adopters like Availink agree to pay an annual fee of $10,000, due "upon each yearly

13   anniversary of the effective date of [the] Adopter Agreement," and per-product royalties as

14   described in Attachment B to the Adopter Agreement.  *Id.* Attach. B at 1.  Additionally, under the

15   "non-assertion" provision, Adopters "agree not to bring, commence, maintain or prosecute any

16   action or other proceeding" against the Founders or other Adopters based on any necessary patent

17   claims that ***the Adopter*** owns or controls.  Adopter Agreement § 3.  This provision functions as a

18   reciprocal license, or a "grantback" of the Adopter's patent rights, which enables all Adopters to

19   use the necessary patents that improve the HDMI Specification over time without fear of

20   infringement liability.

21         An Adopter may withdraw from the Adopter Agreement "at any time by providing written

22   notice" to HDMI LA.  *Id.* § 9.1.  A withdrawal effectively freezes the rights and obligations of a

23   withdrawing Adopter for a period of three years after the withdrawal date.  During that period, an

24   Adopter may continue to use the HDMI Specification and cannot be sued for infringement of the

25   underlying intellectual property because the non-assertion provision continues to apply.  *See id*.

26   The withdrawing Adopter loses access to new technological improvements to the HDMI

27   _____

28   [9] Following execution of the Adopter Agreement, Availink received copies of versions 1.x and 2.x
     of the HDMI Specification.  HDMI Statement at 3 (Fact 1).

Specification, but the Adopter is also excused in part from the non-assertion provision, meaning that it can seek royalties for its own technological improvements developed post-withdrawal. *See id.* Notably, this same arrangement applies when the Adopter is terminated for breaching the Adopter Agreement. *Id.* § 9.10 (providing that "termination shall be treated as a withdrawal . . . for the purposes of the rights and licenses granted under this Agreement"). This arrangement provides significant protections to Adopters because it ensures that an Adopter has a three-year wind-down period to transition to a new audio-visual interface. In other words, HDMI LA cannot abruptly cut off access to the HDMI Specification, which may be critical to the Adopter's products. However, the receipt of these benefits post-withdrawal or termination is still "subject to the terms and conditions" of the Adopter Agreement, *see id.* § 9.1, including the annual fee and royalty terms.

### 2.     Breach

As discussed below, HDMI LA has shown based on the undisputed facts that Availink breached the Adopter Agreement by failing to pay annual fees and royalties, and by continuing to use the HDMI Specification post-termination without paying fees and royalties. Availink has not produced any evidence that creates a triable issue as to breach.

### a.     Annual Fees

It is undisputed that Availink failed to pay the annual fee in 2018, which was due on the "yearly anniversary of the effective date of [the] Adopter Agreement." *Id.* Attach. B at 1; *see also* HDMI Statement at 5 (Fact 7) (admitting that "Availink failed to pay the annual administrative fee due under the Adopter Agreement for 2018-2019"). HDMI LA gave notice to Availink on November 14, 2018, that Availink was "in breach of the Adopter Agreement," and that Availink had "30 days to cure the breach, or the Adopter Agreement would be terminated." HDMI Statement at 5 (Fact 8). Availink admits that it did not pay the annual fee within 30 days of receiving this notice, and "Availink's Adopter Agreement terminated" as a result. *Id.* at 5 (Fact 9). Therefore, there is no dispute of fact that Availink breached the Adopter Agreement by failing to pay the annual fee.

United States District Court
Northern District of California

1    Availink's only rebuttal is found in a single sentence in its opposition brief.  Availink

2    argues that it "does not owe any fees for 2018" because HDMI LA later terminated Availink's

3    Adopter Agreement, and in the event of termination, Availink retained its rights under the Adopter

4    Agreement for a period of three years.  Availink Opp. at 8 (citing Adopter Agreement § 9.1).  This

5    is a *non sequitur*.  Nothing in the Adopter Agreement supports Availink's position that termination

6    excuses Availink from contractual obligations that accrued ***prior to*** termination, including the

7    obligation to pay the annual fee for 2018.  Nor is there any support for Availink's position that,

8    post-termination, Availink can enjoy the benefits, without any of the obligations, of the Adopter

9    Agreement.  As Availink would have it, an Adopter could refuse to pay the annual fee, wait for

10    HDMI LA to terminate the Agreement for breach, and then obtain a three-year license at no cost.

11    The plain language of the Adopter Agreement expressly forecloses this absurd outcome.  It states

12    that the licensing rights post-termination are still "subject to the terms and conditions" that applied

13    prior to termination.  Adopter Agreement § 9.1.  This includes the annual fee and royalty terms.

**b.    Royalties**

15     Both parties move for summary judgment as to whether Availink owes royalties under the

16    Adopter Agreement.  The royalty provision of the Adopter Agreement is unambiguous, and HDMI

17    LA has shown based on the undisputed facts that Availink owes royalties for its SoCs that

18    incorporate the HDMI Specification.

19    The royalty scheme in the Adopter Agreement is designed to require payment of a single

20    royalty per product that uses the HDMI Specification, even when multiple components of a

21    product use the HDMI technology.  HDMI LA Reply at 5.  The Adopter Agreement achieves this

22    goal by creating a default rule that "[a]ll Adopters shall pay [HDMI LA] a running royalty for each

23    end-user Licensed Product sold by such Adopter."  Adopter Agreement Attach. B at 1.  The

24    Adopter Agreement excludes "Components such as ICs" from the category of products that are

25    subject to royalties because such components are typically incorporated into end-user Licensed

26    Products, and charging a royalty on Components would therefore create a double royalty payment.

27    *See id.*  However, the Adopter Agreement clarifies that Component manufacturers like Availink are

28    not always exempt from royalty obligations.  Instead, the royalty exemption applies only "to the

extent such Components, Cables and Connectors are incorporated into end-user Licensed Products subject to royalty hereunder." *Id.* § (i).  By contrast, "Components, Cables, and Connectors sold otherwise," *i.e.*, that are not "incorporated into end-user Licensed Products subject to royalty," are themselves "considered end-user Licensed Products subject to the payment of royalites."  *Id.*  In other words, although Components may be exempted from royalty obligations, this exemption does not apply when the Components are sold to non-Adopters because non-Adopters do not pay royalties on the end-user products that they sell.  This royalty scheme allows HDMI LA to collect the royalty from the Adopter who makes the Component in circumstances where collecting a royalty on the end-user product would not be feasible.

It is undisputed that Availink "incorporates HDMI technology into SoCs/ICs, which Availink then sells to other entities."  Availink Opp. at 9; *see also* Availink Statement at 3 (Fact 5). Thus, under the plain terms of the Adopter Agreement, Availink's SoC/ICs are subject to royalties unless the SoCs are incorporated into royalty-bearing end user Licensed Products sold by another Adopter.  But, critically, Availink has not identified any Adopter that (1) incorporated its SoCs into end-user Licensed Products and (2) paid royalties on those products.  *See* Availink Resp. to Req. for Admis. Nos. 89-90, ECF No. 158-5 (PX18) (admitting that "Availink has not identified to HDMI LA any Adopter that has purchased Availink products" or "that has paid a royalty to HDMI LA upon an end user Licensed Product that incorporated Availink products").  Because HDMI LA has established that royalties were due under the Adopter Agreement, and Availink has offered no evidence to relieve itself of its royalty obligations, HDMI LA is entitled to summary judgment on this issue, and Availink's cross-motion must be denied.

### c.     Continuing Breach

Following termination of the Adopter Agreement, Availink's "SoC products continued to incorporate HDMI interface functionality."  HDMI Statement at 8 (Fact 4).  HDMI LA argues that Availink's "continued unlicensed uses of the confidential HDMI Specifications" is a breach of the Adopter Agreement because the confidentiality provision, "which expressly survives termination, prohibits Availink from using the HDMI Specification except 'for the purpose of implementing a product according to the Specification,' which, following termination, Availink was no longer

permitted to do."  HDMI MSJ at 9; Adopter Agreement § 9.11.

Availink contends that its continued use of the HDMI Specification did not violate the confidentiality provision of the Adopter Agreement because the Specification is "publicly available on the internet," and therefore it is no longer "confidential."  Availink Opp. at 8.[10]  This argument is unpersuasive because Availink assumed an independent contractual obligation to treat the Specification as confidential.  *See* Adopter Agreement § 8 (defining "Confidential Information" as "the Specification, including the HDMI Compliance Test Specification, and any other information designated as 'confidential' by the Agent or Founders").  A third party's wrongful disclosure of the HDMI Specification does not abrogate Availink's own obligations, and does not permit Availink to use the HDMI Specification without paying royalties and annual fees.[11]

### 3.    Damages

Because Availink breached the Adopter Agreement by failing to pay fees and royalties, it necessarily follows that HDMI LA suffered damages from Availink's breach.  "Nonpayment is a quintessential form of contract damages."  *Bank Midwest, N.A. v. Hypo Real Estate Cap. Corp.*, No. 10 Civ. 232(WHP), 2010 WL 4449366, at *3 (S.D.N.Y. Oct. 13, 2010) (citing *Graham v. James*, 144 F.3d 229, 235 (2d Cir. 1998)).  Thus, it is undisputed that HDMI LA suffered damages

---

[10] In support of its argument that the Specifications are "publicly available on the internet," Availink cites to the declaration of its senior product marketing manager, who states that he "performed several internet searches in January, July, and August 2025 to find publicly available copies of the HDMI Specification and HDMI Compliance Test Specification."  Oktar Decl. ¶ 2, ECF No. 167-81 (DX81).  He further states that he was "able to access and download multiple versions of both Specifications from numerous sites" and that he "found internet history indicating that the Specifications were previously available from 2017 to 2019 but had since been removed." *Id.*

[11] At the hearing, Availink also argued that, under New York law, HDMI LA has "no right to relief for anything that took place after the date of termination" because "termination dissolves all future obligations under the contract."  10/15/25 Hr'g Tr. 28:21-29:9, ECF No. 213 ("MSJ Hr'g Tr.").  However, Availink's confidentiality obligations survive the termination of the Agreement.  *See* Adopter Agreement § 9.11; *see also Coach IP Holdings, LLC v. ACS Grp. Acquisition LLC*, No. 23-cv-10612-LGS, 2025 WL 1906641, at *3 (S.D.N.Y. July 10, 2025) ("Under New York law, a contract provision may 'survive[ ] and remain[ ] enforceable . . . subsequent to the termination' of the contract, 'irrespective of whether the termination . . . resulted from the natural expiration of the term of the agreement . . . or the breach of the agreement by one of the parties.'").

as a result of Availink's breaches.  The only triable issues are the amount of damages owed and the scope of injunctive relief that may be appropriate – neither of which were raised in HDMI LA's motion.

### 4.    Void for Public Policy

Availink argues that HDMI LA's motion "should be denied because . . . there are triable issues as to whether the Adopter Agreement is unenforceable as contrary to public policy because it violates federal and state antitrust statutes, federal trademark and patent misuse doctrine, and state unfair competition law."  Availink Opp. at 8.  As discussed below, the Court concludes that the Adopter Agreement does not violate antitrust or unfair competition laws, and does not constitute trademark or patent misuse.  *See infra* §§ III.C., D.  Therefore, there are no triable issues as to whether the Adopter Agreement is void for public policy.

\* \* \*

Having found that HDMI LA carried its burden as to each element of its breach of contract claim, the Court GRANTS HDMI LA's motion for summary judgment on this claim.  Because Availink failed to demonstrate a triable issue as to whether it owes royalties under the Adopter Agreement, and because the Court concludes that HDMI LA is entitled to judgment as a matter of law, Availink's cross motion for summary judgment as to royalties is DENIED.

### B.    Trademark Counterclaims

#### 1.    Declaratory Judgment of Non-Infringement

At the hearing, Availink withdrew its counterclaim for declaratory judgment of non-infringement of HDMI LA's trademarks.  Availink Countercls. at 43-44 ¶¶ 175, 176, 181, 182. Availink acknowledged that its counterclaim has "been mooted" by earlier rulings in this case – namely, the dismissal of HDMI LA's trademark infringement claim.  MSJ Hr'g Tr. 24:21-25:1, 29:14-30:20.  HDMI LA consented to withdrawal of the counterclaim.  *Id*. at 58:16-18.  The Court agrees that Availink's counterclaim for declaratory judgment of non-infringement is moot. Because HDMI LA is not asserting a trademark infringement claim, there is no longer an actual controversy between the parties with respect to infringement.  Therefore, the Court deems this claim withdrawn.  *See* Fed. R. Civ. P. 15(a)(2).

## 2.    Trademark Cancellation Pursuant to 15 U.S.C. § 1119

In its counterclaims, Availink seeks to cancel "all HDMI LA's U.S. trademark registrations containing the term HDMI on the grounds that the term 'HDMI' . . . is generic[.]"[12]  Availink Countercls. at 40 ¶ 150.  HDMI LA moves for summary judgment on the cancellation counterclaim on three independent grounds.  First, HDMI LA argues that the Court lacks subject matter jurisdiction over the cancellation counterclaim.  Second, HDMIA LA argues that Availink lacks statutory and Article III standing to bring the trademark cancellation counterclaim.  Third, HDMI LA argues that the cancellation counterclaim fails as a matter of law because Availink has not rebutted the statutory presumption that HDMI LA's federally registered marks are not generic.[13]  HDMI MSJ at 20-25.  As detailed below, the Court lacks subject matter jurisdiction over the trademark cancellation counterclaim.  And even if the Court had jurisdiction, Availink lacks statutory and Article III standing to bring this counterclaim.  Accordingly, HDMI LA's motion for summary judgment is GRANTED as to Availink's trademark cancellation counterclaim.

### a.    Subject Matter Jurisdiction

Federal courts may hear trademark cancellation claims "only . . . if there is already an ongoing action that involves a registered mark."  *Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt.*, 744 F.3d 595, 599 (9th Cir. 2014); *see also* 15 U.S.C. § 1119 (providing that cancellation is available in actions "involving a registered mark").  This is because Section 1119 "creates a remedy for trademark infringement rather than an independent basis for federal jurisdiction."  *Airs Aromatics*, 744 F.3d at 599 (citation omitted); *see also San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1037 (9th Cir.), *cert. denied*, 144 S.

---

[12] The marks that Availink seeks to cancel include "but [are] not limited to U.S. Registration Nos., 7138628, 3268924, 3442135, 5286835, 4124681, 4117692, 7139241, 2898044, 5453929, 5205499, 4124682, 6267101, 5286833, 5142621, and 6267045."  Availink Countercls. at 40 ¶ 150.

[13] Because subject matter jurisdiction and standing are dispositive, the Court does not reach HDMI LA's third argument.  The Court likewise does not reach the issues addressed by the parties' trademark experts.  Thus, the *Daubert* motions as to these experts – ECF Nos. 165, 168 – are terminated as moot.

United States District Court
Northern District of California

Ct. 190 (2023).  However, the "mere presence of a registered trademark" in a case does not empower the district court to cancel the trademark registration; instead, the case must involve "the right to use the mark and thus the right to maintain the registration."  *Windsurfing Int'l Inc. v. AMF Inc.*, 828 F.2d 755, 758 (Fed. Cir. 1987); *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 873 (3d Cir. 1992) ("[A] controversy as to the validity of or interference with a registered mark must exist before a district court has jurisdiction to grant the cancellation remedy.").[14]  Here, subject matter jurisdiction is lacking.

First, the most logical basis for subject matter jurisdiction is lacking because this case does not involve any claim of trademark infringement.  Although HDMI LA initially asserted claims under the Lanham Act, those claims were dismissed long ago at the pleading stage.  Before the case was reassigned to this Court, Judge Gilliam held that HDMI LA failed to allege that Availink used the marks in domestic commerce, and dismissed HDMI LA's Lanham Act claims as a result.  10/12/23 Hr'g Tr. 4:17-5:2, ECF No. 68; *see also Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 428 (2023) (holding that 15 U.S.C. § 1114(1)(a) and § 1125(a)(1) "are not extraterritorial and that the infringing 'use in commerce' of a trademark provides the dividing line between foreign and domestic applications of these provisions").  HDMI LA elected not to amend its complaint and therefore abandoned its Lanham Act claims.  HDMI LA later explained that it found no basis to assert infringement given the lack of Availink's use of the marks in the United States.  MSJ Hr'g Tr. 10:20-11:9.  Moreover, Availink acknowledged that its counterclaim for declaratory judgment of non-infringement is moot because it has no reasonable apprehension of a future infringement claim.  *Id*. at 24:21-25:1, 29:14-30:20.  HDMI LA consented to withdrawal of the counterclaim.  *Id*. at 58:16-18.  Therefore, this case does not involve the assertion of a trademark or any question of infringement.

---

[14] Although on a different procedural posture, the Ninth Circuit has held "[t]he mere fact that the underlying facts of the case involve trademark infringement does not confer federal question jurisdiction over" a contract dispute. *Baghdassarian v. Baghdassarian*, 552 F. App'x 702, 703 (9th Cir. 2014); *see also Postal Instant Press v. Clark*, 741 F.2d 256, 257 (9th Cir. 1984) (stating that "[i]t is clear that this action fundamentally asserts contract claims and only incidentally involves the Lanham Trade-Mark Act" and holding that "the mere existence of the protected trade name and attendant symbol herein does not provide a basis for federal jurisdiction").

United States District Court
Northern District of California

Second, Availink initially argued that the case "involve[s]" a registered mark under Section 1119 because HDMI LA is "attempting to force Availink to pay royalties" on the registered marks. Availink Opp. at 2. However, Availink's own expert witness, Dr. Stoner, opined that the royalty due under the Adopter Agreement is based on patents – **not** the trademarks that Availink seeks to cancel. Stoner Report ¶ 27 (opining that royalties are tied to patents, "not any other bundled IP"), ¶ 27 n.40 ("There is no allocation based on trademarks or copyright."), ¶ 128 n.193 (opining that "patents are the basis for collecting royalties"). At the motion hearing, Availink agreed that "the payment of royalties relates to the patents at issue," not to HDMI LA's trademarks. MSJ Hr'g Tr. 26:10-14. Therefore, even if a demand for royalties may confer subject matter jurisdiction for trademark cancellation, here, HDMI LA's demand for royalties does not "involve" trademarks.

Finally, Availink pivots to the theory that this case involves a registered mark because some portion of the annual fee due under the Adopter Agreement is effectively a licensing fee for registered marks.[15] Availink has not cited any authority holding that a common law breach of contract claim, without any other Lanham Act infringement claim at issue, is sufficient to vest the district court with subject matter jurisdiction over a trademark cancellation claim. To the contrary, courts typically dismiss trademark cancellation claims following the resolution of any Lanham Act claims directly asserting a registered mark.[16]

---

[15] This theory was not briefed in any meaningful capacity by Availink.

[16] *See e.g., Quintessential, LLC v. Quintessential Brands S.A.*, No. 20-CV-01722-JD, 2022 WL 357502, at *2 (N.D. Cal. Feb. 7, 2022) (dismissing trademark cancellation claims because the "case does not involve infringement allegations for [the] marks that plaintiff seeks to have canceled"); *Vital Pharms. v. PhD Mktg., Inc.*, No. CV 20-6745-RSWL-JC, 2021 WL 6882435, at *5 (C.D. Cal. Mar. 3, 2021) ("Cancellation under 15 U.S.C. § 1119 is a remedy dependent on the valid challenge to a trademark. . . . Because the Court dismisses PhD's trademark infringement claim relating to the BHC Marks, there is no independent cause of action concerning the trademark registration that PhD seeks to cancel."); *Marshall Tucker Band, Inc. v. M T Indus., Inc.*, 238 F. Supp. 3d 759, 766 (D.S.C. 2017) ("Given the Court has already dismissed Plaintiffs' federal trademark infringement and trademark dilution claims, which were the only claims providing independent jurisdiction over the action, the Court will dismiss Plaintiffs' federal trademark cancellation claim as well for lack of subject matter jurisdiction."); *Yurman Design Inc. v. Chaindom Enters., Inc.*, No. 99-cv-0937-JFK, 2000 WL 897141, at *5 (S.D.N.Y. July 5, 2000) ("The Complaint does not include any claims for trademark infringement or any legal claims involving trademarks. The Court concludes that the validity of Yurman's registered trademark is not in issue for purposes of conferring standing on Chaindom.").

United States District Court
Northern District of California

1      Moreover, there is no evidence that the annual fee is allocated specifically to the registered

2   trademarks.  Instead, Availink's *antitrust* expert merely asserts that "it makes sense to think of the

3   annual fixed fee . . . as covering . . . enforcement of the trademark[s]."  Stoner Report ¶ 156.  But

4   the Adopter Agreement does not state that any portion of the annual fee is based on the registered

5   marks, and neither Availink nor its expert quantified what portion of the annual fee supposedly

6   depends on the registered marks.  *See* Stoner Report ¶ 165 (explaining that "up to a significant

7   portion" of the annual fee may consist of the "presumed value" of the HDMI LA registered

8   marks).  This analysis is too speculative to put the registered marks at issue via the annual fee.

9   *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019) ("The expert's opinion must

10  rest on 'facts or data in the case that the expert has been made aware of or personally observed,'

11  not merely assumptions and speculation." (citing Fed. R. Evid. 703)).  Thus, even if a contract

12  claim could in theory put the trademarks at issue, Availink has failed to produce evidence that the

13  contract claim in ***this*** case involves the HDMI LA registered marks.

14      In sum, this case does not involve "the right to use the [HDMI] mark and thus the right to

15  maintain the registration."  *Windsurfing Int'l Inc.*, 828 F.2d at 758; *see also Ditri*, 954 F.2d at 873.

16  There are no trademark claims in this case, and Availink acknowledges that it has no apprehension

17  of future trademark infringement liability.  Moreover, the royalties due are based on patents, not

18  trademarks, and the mere possibility that the annual fee is indirectly based on trademarks is

19  insufficient to support jurisdiction over Availink's trademark cancellation counterclaim.  *See*

20  *Windsurfing Int'l Inc.*, 828 F.2d at 758 (holding that the "mere presence" of a trademark in a case

21  does not confer subject matter jurisdiction).  More broadly, Availink's position is inconsistent with

22  the remedial nature of Section 1119 as it would permit jurisdiction over cancellation claims

23  anytime a trademark licensee seeks to avoid paying contractual fees.  *See Airs Aromatics*, 744 F.3d

24  at 599 (noting that Section 1119 is not "an independent basis for jurisdiction").  Therefore, the

25  Court lacks subject matter jurisdiction to hear the cancellation counterclaim.

26

27

28

United States District Court
Northern District of California

1

2

#### b.     Statutory Standing

To establish statutory standing to cancel a registration under the Lanham Act, Availink "must show a real and rational basis for [its] belief that [it] would be damaged by the registration sought to be cancelled[.]" *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 735 F.2d 346, 349 (9th Cir. 1984). Here, it is undisputed that "Availink does not design, develop, market, or sell its SoCs in the United States," and that Availink has "never imported any of its SoCs that incorporate the HDMI interface functionality . . . into the United States." HDMI Statement at 10 (Facts 4-5). It is also undisputed that, in contrast to the necessary patents, Availink "does not use the [HDMI LA] trademarks on its products." Availink Opp. at 18. Because the Lanham Act does not apply extraterritorially and because Availink does not use the registered marks, Availink lacks standing to cancel the registered HDMI LA marks because the registration of HDMI LA's marks does not damage Availink.

Nevertheless, Availink advances the same arguments for statutory standing as it does for subject matter jurisdiction – that "HDMI LA is attempting to force Availink to pay to license generic marks" and that the registered marks are "part and parcel of HDMI LA's anticompetitive licensing scheme." Availink Opp. at 24. For the reasons set forth above, the Court likewise rejects these arguments as they relate to standing. *See supra* § III.B.2.a. Finally, Availink argues that "HDMI LA is using the registrations 'as a sword' against Availink." Availink Opp. at 24 (relying on and quoting *Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 897 F. Supp. 2d 856, 870 (N.D. Cal. 2012)). However, the so-called "sword" in *Petroliam Nasional* was an affirmative Lanham Act cybersquatting claim in which a registered mark was being asserted. *Petroliam Nasional*, 897 F. Supp. 2d at 870 (holding that Go Daddy had standing to seek cancellation because "Go Daddy [was] in danger of being financially affected by Petronas assertion of its mark").[17] There is no such affirmative Lanham Act claim at issue in this case. Therefore,

---

[17] Availink also cites to *DRL Enterprises, Inc. v. North Atlantic Operating Co.*, 301 F. Supp. 3d 824, 835 (N.D. Ill. 2018) and *Meehanite Metal Corp. v. International Nickel Co.*, 262 F.2d 806, 807-08 (C.C.P.A. 1959) for the proposition that a party need not actually show that it is using or intends to use the mark in order to seek cancellation. Although accurate, these cases do not advance the analysis here because they still require that the party seeking registration demonstrate that it has reason to believe it will be damaged by the registration of the mark. *DRL Enters.*, 301

1  Availink lacks statutory standing to pursue its trademark cancellation counterclaim.

2
### c.    Article III Standing

3          To establish Article III standing, Availink must show that it "has suffered, or will suffer,

4  an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged

5  action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024)

6  (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).  Even if Availink suffered a

7  concrete injury by paying an excessive annual fee, that injury is not redressable by cancellation of

8  HDMI LA's registered marks.  Cancellation has the limited effect of removing a trademark from

9  the federal register – it does not extinguish all rights in the marks.  *Tonka Corp. v. Rose Art Indus.,*

10 *Inc.*, 836 F. Supp. 200, 213 n.12 (D.N.J. 1993) ("[W]hat is in issue in a cancellation proceeding is

11 the cancellation of a *registration,* not the cancellation of a trademark."); *IOW, LLC v. Breus*, 425

12 F. Supp. 3d 1175, 1198 (D. Ariz. 2019) ("'[C]ancellation of a trademark registration does not

13 necessarily translate into abandonment of common law trademark rights.'" (quoting *Crash*

14 *Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1391 (Fed. Cir. 2010))).  Indeed, the only

15 relief that Availink seeks is an order directing cancellation of certain trademark registrations.  *See*

16 Availink Countercls. at 45 ¶ 183G (requesting the Court to "[d]irect the Director of Patents and

17 Trademarks to cancel [certain] U.S. Registration [numbers]").  It does not follow that cancellation

18 of the HDMI trademark registrations would relieve Availink of its contractual obligation to pay

19 annual fees that accrued ***prior to*** cancellation.  Nor does it follow that HDMI LA would be

20 required to eliminate or even reduce the annual fee on a going-forward basis if the registrations

21 were canceled.  Therefore, Availink has not shown that its alleged injury is redressable by

22 cancellation of HDMI LA's registered marks.  Availink does not have Article III standing to seek

23 cancellation.

24

25 F. Supp. 3d at 835 (holding that "there is sufficient evidence from which a reasonable jury could
conclude that Defendants have a real interest in the proceedings" based, in part, on the fact that the
26 parties "are longtime competitors"); *Meehanite Metal Corp.,* 62 F.2d at 807-08 (holding that
appellee had demonstrated a likelihood of damage if a "spherulite" was registered because
27 appellee owned and manufactured under a patent that was properly described by the word
"spherulite" and there was evidence that "spherulite" had been used to describe the particular type
28 of castings in the metallurgical field).

United States District Court
Northern District of California

* * *

For the reasons discussed above, the Court lacks subject matter jurisdiction over the trademark cancellation counterclaims and Availink lacks both statutory and Article III standing to pursue cancellation.  Therefore, HDMI LA is entitled to judgment as a matter of law.  HDMI LA's motion for summary judgment as to the trademark cancellation counterclaim is GRANTED.

## C.    Sherman Act Counterclaim

Availink contends that the Adopter Agreement violates Section 1 of the Sherman Act, which prohibits unreasonable restraints of trade.  15 U.S.C. § 1; *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).  Courts "generally evaluate whether a practice unreasonably restrains trade in violation of Section 1 under the 'rule of reason.'"[18]  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012).  To prevail on a Section 1 claim, the plaintiff must prove "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce . . . ; (3) which actually injures competition," and (4) harms the plaintiff as a result.  *Id*. (quoting *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008)).  Additionally, the plaintiff must prove that its harm arises from the domestic effects of the anticompetitive conduct in the United States.  *See* 15 U.S.C. § 6a.

For the reasons discussed below, the Court finds that HDMI LA is entitled to summary judgment on three independent grounds.  The undisputed facts demonstrate that:  (1) the Adopter Agreement did not harm competition; (2) Availink did not suffer antitrust injury; and (3) even if Availink could demonstrate antitrust injury, its injuries do not arise from the domestic effects of the Adopter Agreement.  As discussed further below, these deficiencies also entitle HDMI LA to summary judgment on Availink's counterclaims under the Cartwright Act, the Unfair Competition Law, and the Donnelly Act.

---

[18] *See also Epic Games, Inc. v. Apple, Inc*., 67 F.4th 946, 998 (9th Cir. 2023); *Ohio v. Am. Express Co.*, 585 U.S. 529, 540-41 (2018) ("Typically only 'horizontal' restraints – restraints 'imposed by agreement between competitors' – qualify as unreasonable per se." (quoting *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988))).

United States District Court
Northern District of California

United States District Court
Northern District of California

### 1.     Harm to Competition

The rule of reason sets forth a burden-shifting framework.  At step one, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) (quoting *Am. Express*, 585 U.S. at 541).  After this initial burden is met, at step two, the defendant has an opportunity to present evidence of the procompetitive effects of the challenged restraint.  *Id.*  At step three, the plaintiff may seek to demonstrate that the procompetitive effects are achievable through less restrictive means.  *Id.*

A plaintiff may make its "step-one showing" of harm to competition either "directly or indirectly." *Epic Games*, 67 F.4th at 983 (quoting *Am. Express*, 585 U.S. at 542).  "To prove a substantial anticompetitive effect *directly*, the plaintiff must provide 'proof of actual detrimental effects [on competition],' such as reduced output, increased prices, or decreased quality in the relevant market." *Id.* (quoting *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022)).  "To prove substantial anticompetitive effects *indirectly*, the plaintiff must prove that the defendant has market power and present 'some evidence that the challenged restraint harms competition.'" *Id.* (quoting *Am. Express*, 585 U.S. at 542).[19]  However, these distinct methods of proof are not materially different, as "there is really only one way to prove an adverse effect on competition under the rule of reason:  by showing actual harm to consumers in the relevant market." *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016).

The undisputed facts preclude Availink from showing anticompetitive effects directly or indirectly because the real-world market evidence establishes that prices decreased while output, quality, and innovation increased.

---

[19] The Court assumes without deciding that Availink has produced sufficient evidence of a relevant market and HDMI LA's market power.  Even with these assumptions, HDMI LA is entitled to summary judgment.  Accordingly, the Court terminates as moot HDMI LA's motion to exclude Availink's antitrust expert, Dr. Stoner, because that motion primarily seeks to exclude his opinions on market definition and market power.  *See* ECF No. 173.  Likewise, the Court terminates as moot Availink's motion to exclude HDMI LA's expert, Professor Contreras.  *See* ECF No. 169.  The Court did not consider Professor Conteras's report or testimony, which primarily addresses the procompetitive aspects of the Adopter Agreement, because Availink fails to meet its burden at step one of the "rule of reason" analysis.

United States District Court
Northern District of California

First, as to pricing, it is undisputed that the nominal royalty rate in the Adopter Agreement – which is the per-product price that Availink pays for the license – has remained the same since 2002 because HDMI LA has not imposed a ***single*** price increase in more than two decades. HDMI Statement at 19 (Fact 2). This means that the real, inflation-adjusted royalty rate has decreased dramatically over time. Zetenyi Report ¶ 86, ECF No. 161-106 (PX107); Stoner Tr. 78:8-25, ECF No. 211-33 (DX96). Additionally, the annual fee under the Adopter Agreement has also decreased from $15,000 to $10,000. Zetenyi Report ¶ 83. This real-world pricing data refutes Availink's claims of direct anticompetitive effects, or indirect anticompetitive effects based on market power and barriers to entry.

Second, output has also expanded dramatically over the same period. More than 2,000 companies are licensed to use the HDMI Specification, and nearly 14 billion HDMI-enabled products have shipped since HDMI Specification 1.0 first launched. HDMI Statement at 17 (Fact 1), 19 (Fact 3). Evidence that output is increasing indicates that demand for products is growing, and evidence that numerous suppliers are offering HDMI-compliant devices indicates that competitors have not been excluded from the relevant markets.

Third, there has also been significant innovation in the HDMI Specification over the years. Zetenyi Report ¶¶ 90-93. For example, between 2002 and 2011, the HDMI Founders jointly developed and released eight more versions of the HDMI Specification 1.x. HDMI Statement at 19 (Fact 5). New versions of the HDMI Specification have supported new, higher-quality audio-visual technologies, such as 3D, 4K, 8K, and HDR video formats. *Id*. at 19-20 (Facts 4, 6). There is also evidence of innovation in other audio-visual interfaces that have entered the market since the HDMI Specification was first introduced, including DisplayPort, Thunderbolt, USBC, and wireless interfaces such as WiFi and Bluetooth. *Id*. at 20-21 (Fact 1). In sum, all available market evidence reflects that competition is thriving, not that competition has been impaired by the Adopter Agreement.

Availink tries to avoid summary judgment by arguing that the Adopter Agreement "as a matter of economic theory harms competition." MSJ Hr'g Tr. 37:13-38:10. It is true that indirect proof of harm to competition "need not always be extensive or highly technical," and that a

plaintiff may prove anticompetitive effects as a "matter of economic theory" – for example, by identifying "barriers to entry" or the reduction of consumer choice through the exclusion of "would-be competitors that would offer differentiated products." *Epic Games*, 67 F.4th at 983-84. But this does not mean that a Sherman Act claim may proceed to trial based merely on *theoretical* harm to competition when actual market evidence reflects decreasing prices and increasing output and innovation. *Cf. Matsushita*, 475 U.S. at 586. In other words, a plaintiff cannot avoid summary judgment by asserting that, in "a but-for world, purchasers would have been offered [even] more choices . . . at [even] more competitive prices." *Sterling Merch. v. Nestle S.A.*, 656 F.3d 112, 119-22 (1st Cir. 2011) (affirming summary judgment for defendant); *see also 1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 (2d Cir. 2021) (per curiam) (rejecting "theoretical" claim of increased prices that was unsupported by "empirical analysis").[20]

Availink's other arguments fare no better. Availink points to HDMI LA's purportedly high market share, but market share is not enough to show an actual adverse effect on competition if there is no evidence that competitors or would-be competitors have been excluded. *Clorox Co. v. Sterling Winthrop*, 117 F.3d 50, 59 (2d Cir. 1997) (finding no harm to competition despite defendant's dominant market share because the challenged conduct did "not significantly restrict" competition). Availink also argues that HDMI LA has recently made a greater effort to collect royalties from component manufacturers, and these manufacturers "capitulated." *See* Stoner Report ¶ 115. Availink suggests that these royalty demands are coercive, but this view rests on Availink's misunderstanding of when royalties are due under the Adopter Agreement. *See infra* § III.A.2.b. The fact that other component manufacturers – unlike Availink – pay royalties is not evidence that HDMI LA has market power, or evidence of harm to competition.

---

[20]Availink's expert Dr. Stoner did not attempt to calculate what a "competitive" royalty rate would be in the but-for world. Stoner Report ¶ 179. Instead, he simply assumed that Adopters like Availink would "license a fraction of the unexpired patents in the pool" and the competitive royalty rate "is thus less than the total royalty rate." *Id*. ¶¶ 178-179. Dr. Stoner did not conduct any economic analysis to explain why an alternative licensing scheme, which may involve significantly greater transaction costs, would necessarily reduce the royalty rate. It is also notable that Dr. Stoner observed that a competing audio-visual interface requires licensees to pay a significantly *higher* per-unit royalty compared to the royalty rate under the Adopter Agreement. *Id*. ¶ 148.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Ultimately, either direct or indirect proof of harm to competition requires "some evidence

2    that the challenged action has *already* had an adverse effect on competition." *MacDermid*

3    *Printing Sols.*, 833 F.3d at 182-84 (rejecting speculation that but-for prices would be lower in the

4    absence of "an actual adverse effect on price"). Simply put, that evidence is lacking here, and as a

5    result, HDMI LA is entitled to summary judgment.

6                     **2.    Antitrust Injury**

7    In addition to proving harm to competition in the market as a whole, Availink must

8    establish that it has personally suffered "antitrust injury"– that is, injury "of the type the antitrust

9    laws were intended to prevent" – that flows from the harm to competition. *Am. Ad Mgmt., Inc. v.*

10   *Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999) (quoting *Atl. Richfield Co. v. USA*

11   *Petroleum Co.*, 495 U.S. 328, 334 (1990)). "Antitrust injury requires the plaintiff to have suffered

12   its injury in the market where competition is being restrained." *Id*. at 1057. By contrast, "[p]arties

13   whose injuries . . . are experienced in another market do not suffer antitrust injury." *Id*.; *see also*

14   *Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985); *In re Aluminum Warehousing*

15   *Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016) ("[T]o suffer antitrust injury, the putative

16   plaintiff must be a participant in the very market that is directly restrained.").

17   Although Availink initially identified several relevant markets, it has since focused its

18   argument on injury that it purportedly suffers as a customer in the market for licensing audio-

19   visual interfaces, including the HDMI Specification. Stoner Tr. 137:20-22 (opining that "this case

20   is about the licensing market"); *see also* MSJ Hr'g Tr. 32:1-18 (Availink's counsel: "I just want

21   to make clear that the harm to Availink is primarily in the licensing market."). By definition, in

22   the absence of harm to competition, Availink cannot show that it suffered antitrust injury. *See*

23   *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (holding that antitrust

24   injury "flows from that which makes defendants' acts unlawful"). Nonetheless, the Court now

25   addresses the particular aspects of the Adopter Agreement that Availink challenges, and finds no

26   evidence of antitrust injury.

27   First, no aspect of the Adopter Agreement contractually restrains competition. The

28   Adopter Agreement does not prevent Adopters from using or developing any other audio-visual

interface, including interfaces that may compete directly with the HDMI Specification. MSJ Hr'g Tr. 42:19-23. Moreover, Availink – like every other Adopter – is free to withdraw from the Adopter Agreement at any time without penalty. *See supra* § III.A.1. The Adopter Agreement is simply a non-exclusive and terminable licensing agreement, and there is no evidence that it excludes actual or potential competitors.

Second, Availink complains that the Adopter Agreement provides a blanket license option that bundles together patents, trade secrets, the HDMI Specification, and trademarks. Availink's view is that the license includes intellectual property rights that it does not need, including because it operates outside of the U.S. market, and because some patents have expired over time. Availink Opp. at 18-19. But the Ninth Circuit has rejected the theory that royalties are anticompetitive "unless they precisely reflect a patent's current, intrinsic value and are in line with the rates other companies charge for their own patent portfolios." *Qualcomm*, 969 F.3d at 999.[21] Thus, HDMI LA's practice of charging a flat licensing fee to all Adopters does not harm competition, and Availink's alleged overpayment of a royalty is not antitrust injury.[22]

Third, Availink's complaints about the non-assertion or "grantback" provision are unpersuasive. Leading antitrust scholars recognize that, generally, "nonexclusive grantbacks are

---

[21] *See also Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 454 (2015) (holding that "royalties may run until the latest-running patent covered in the parties' agreement expires"). At the motion hearing, Availink relied on *Beckman Instruments, Inc. v. Technical Development Corp.*, 433 F.2d 55 (7th Cir. 1970), for the proposition that the lack of a step-down in royalties upon expiration of some patents in a pool is anticompetitive. But in *Beckman Instruments*, the plaintiff was required to pay royalties on products that *only* practiced expired patents. *Id.* at 60-61. There is no evidence in this case that any portion of Availink's SoCs are covered solely by expired patents.

[22] Under some circumstances, a dominant firm may harm competition by "raising its rivals' costs sufficiently to prevent them from growing into effective competitors." *McWane, Inc. v. FTC*, 783 F.3d 814, 832 (11th Cir. 2015). The raising rivals' costs theory posits that a dominant firm may impede rivals by restricting their access to an input (*e.g.*, essential patents), or by providing the input at a supracompetitive price. However, Dr. Stoner acknowledged that he did not seek to prove that the raising rivals' costs theory applies to the facts of this case. Stoner Tr. 177:14-25. Availink has also conceded that it lacks evidence to support a raising rivals' cost theory. MSJ Hr'g Tr. 33:21-34:13 (acknowledging that the "raising rivals' costs theory . . . does require a number of elements" that "Dr. Stoner did not go into" in his analysis), 35:23-36:12 (conceding that Availink is "not really alleging that [it is] unable to compete with the [F]ounders on price" or that "fees and royalties prevented [Availink] from reaching minimum efficient scale"). Likewise, although Availink claims that HDMI LA licenses the HDMI Specification on discriminatory terms, there is no evidence that this purported discrimination harms competition generally, or Availink in particular.

competitively harmless." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles & Their Application ¶ 707h (Sep. 2025 update). A non-exclusive grantback serves the original licensor's "legitimate aim of access to" improvements in the technology at issue, and parties "usually find it mutually beneficial to cross-license each other." *Id.* When a patentee chooses to license its invention, it runs the risk that, "by practicing the invention, the licensee learns how to do it better" and obtains improvement patents that "may destroy any market for the patentee's original product." *Id.* ¶ 1782e. A grantback provision overcomes this concern by enabling the original licensor "to share in the value of future innovations to which it has contributed by providing access to its invention. Were it unable to share in the value of these future improvements, it would insist on a higher royalty or perhaps no license at all." *Id.* Thus, as a matter of economic theory, the non-assertion provision in the Adopter Agreement would not be expected to harm competition or cause antitrust injury.

Furthermore, Availink has not produced any evidence that it suffered antitrust injury from the non-assertion provision. It is undisputed that Availink has not contributed any patents to the HDMI technology. MSJ Hr'g Tr. 36:15-25. Therefore, Availink has not been required to grantback any patent rights to the Founders or other Adopters, and it has not lost any potential royalties that it might have earned in the absence of the non-assertion provision. Availink suggests that it suffered injury in the form of reduced innovation. The theory is that the non-assertion provision reduces Adopters' incentive to innovate because it prevents them from charging a royalty on patents that improve the HDMI Specification. However, there is no evidence that innovation in the HDMI Specification has been stalled. *Cf.* Stoner Report ¶ 46 (hypothesizing reduced incentives to innovate, without citing to any supporting evidence). To the contrary, the HDMI Specification has been updated many times to support new technology. *See supra* § III.C.1.[23]

---

[23] Availink's theory makes little sense for another reason. Availink desires a but-for world in which more Adopters can charge royalties for their contributions to the HDMI Specification. But Availink is a ***consumer*** (*i.e.*, licensee) in the market for licensing audiovisual interfaces, so it would face theoretically higher royalties in this scenario. Additionally, transaction costs may be higher if licensees had to separately negotiate multiple agreements to obtain the required licenses.

1    In sum, no provision of the Adopter Agreement viewed individually, nor the Adopter

2    Agreement as a whole, harms competition.  Moreover, Availink has not produced evidence that it

3    suffered antitrust injury.  HDMI LA is entitled to summary judgment on this independent basis.

### 3.    FTAIA

5        The Foreign Trade Antitrust Improvements Act ("FTAIA") "excludes from the Sherman

6    Act's reach much anticompetitive conduct that causes only foreign injury."  *F. Hoffmann-La*

7    *Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 158 (2004).  Even when conduct has an "adverse

8    domestic effect" on competition, if the plaintiff's claim arises from "an independent foreign

9    effect," the conduct remains outside the scope of the Sherman Act.  *Id.* at 159.  Availink therefore

10   bears the burden of proving that its alleged injuries flow from a "direct, substantial, and

11   reasonably foreseeable effect" on domestic commerce in the United States.  *United States v. Hui*

12   *Hsiung*, 778 F.3d 738, 756 (9th Cir. 2015) (quoting 15 U.S.C. § 6a).  HDMI LA has shown that

13   Availink cannot meet its burden.

14       The undisputed facts demonstrate that Availink's hypothetical injuries flow solely from

15   effects of the Adopter Agreement on foreign commerce.  Availink is incorporated in the Cayman

16   Islands and maintains its principal places of business in Beijing, China, and in Taiwan.  HDMI

17   Statement at 9-10 (Facts 2-3).  Availink does not design, develop, market, or sell its SoCs in the

18   United States.  *Id.* at 10 (Fact 4).[24]  Availink has never imported any of its SoCs that use the

19   HDMI Specification into the United States.  *Id.* at 10 (Fact 5).  Instead, Availink's SoCs "are only

20   made and sold in China, Hong Kong and Taiwan."  Stoner Report ¶¶ 54, 171.

21       In response, Availink argues that some of HDMI LA's operations occur in the United

22   States.  Specifically, "HDMI LA is headquartered in [California]; the Adopter Agreement must be

23   enforced in the courts of California; and the payments under the agreement are paid by wire

24   transfer to a bank in Palo Alto."  *See* HDMI Statement at 11 (Add. Fact 5).  These facts are not

25   material under the governing legal standard because the relevant question is whether ***Availink's***

26   ***injury*** arises from domestic anticompetitive effects of the Adopter Agreement.  Although the

27

28   [24] Although Availink has an office in Maryland, it does not design, market, or sell SoCs that
incorporate the HDMI interface functionality from that office.  *Id.* at 10 (Fact 6).

United States District Court
Northern District of California

Adopter Agreement may be enforced, in part, in the United States, Availink's claimed injuries are felt exclusively in the foreign markets where Availink makes and sells its SoCs.  Availink has not produced any facts that suggest a nexus between its purported harms and anticompetitive effects in a domestic market.  To the contrary, Availink's expert identified material differences between how the challenged conduct affects market conditions in China as compared to other markets.  Stoner Report ¶¶ 186-188, 200 (opining that HDMI LA has "advantaged Chinese competitors").  Accordingly, HDMI LA is entitled to summary judgment on Availink's Sherman Act counterclaim on this separate basis as well.

### D.    State Law Counterclaims

#### 1.    Cartwright Act Counterclaim

Availink also asserts that the Adopter Agreement violates the Cartwright Act.  *See* Cal. Bus. & Prof. Code § 16700 *et seq*.  The Ninth Circuit has consistently recognized that the "analysis of a claim under the Cartwright Act 'mirrors the analysis under federal [antitrust] law.'" *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 n.8 (9th Cir. 2022) (en banc) (quoting *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001)); *see also CoStar Group, Inc. v. Commercial Real Estate Exch., Inc.*, 150 F.4th 1056, 1066 (9th Cir. 2025) (same).  Therefore, because HDMI LA is entitled to summary judgment on Availink's Sherman Act counterclaim, it is also entitled to summary judgment on the Cartwright Act counterclaim.

Availink's rebuttal is not persuasive.  Availink argues that the Cartwright Act "reaches beyond the Sherman Act to threats to competition in their incipiency."  Availink Opp. at 22 (quoting *AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1110 (9th Cir. 2013)).  But it does not follow from this principle that Availink may proceed to trial without any evidence of harm to competition.  Nor can the Adopter Agreement plausibly be viewed as an "incipient" threat to competition when it has been in place for more than two decades, and there is no evidence that it has harmed competition during that extended period.

### 2. Unfair Competition Law ("UCL") Counterclaim

Next, Availink contends that the Adopter Agreement violates the UCL, which prohibits "unlawful," "unfair," and "fraudulent" business acts and practices. Cal. Bus. & Prof. Code § 17200 *et seq.* Availink invokes the "unlawful" and "unfair" prongs. Availink Opp. at 22.

First, Availink failed to produce evidence of a violation of the Sherman Act or any other law, so the UCL "unlawful" prong counterclaim necessarily fails as well. *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 54 n.7 (9th Cir. 2022); *see also Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co*., 20 Cal. 4th 163, 180 (1999) (explaining that the UCL unlawful prong borrows violations from other laws).

Second, Availink argues that its "unfair" prong counterclaim should proceed to trial because conduct may be unfair if it threatens an "incipient" violation of the antitrust laws, if it is injurious to consumers, or if the conduct's adverse impacts outweigh its justifications. Availink Opp. at 23 (citing *Doe v. CVS Pharm., Inc.*, 982 F.3d 1204, 1214-15 (9th Cir. 2020)). It is true that a failure of proof on a Sherman Act claim does not automatically doom an "unfair" prong claim. *See Epic Games*, 67 F.4th at 1001 (holding that a mere "proof deficiency" on a Sherman Act claim does not preclude a UCL unfair prong claim); *see also Gamboa v. Apple Inc.*, No. 24-cv-01270-EKL, 2025 WL 660190, at *12-13 (N.D. Cal. Feb. 28, 2025). However, "as a practical matter, Sherman Act and UCL unfair prong claims may fail for the same reasons," and that is the case here. *Gamboa*, 2025 WL 660190, at *14. As discussed above, there is no evidence that the Adopter Agreement is an incipient violation of the antitrust laws. *See supra* § III.D.1. Moreover, on this record, the lack of evidence of harm to competition also forecloses any argument that the Adopter Agreement is injurious to consumers, or that its adverse impacts outweigh its justification. *See supra* § III.C; *see also Realtek Semiconductor Corp. v. LSI Corp.*, No. 12-cv-03451-RMW, 2012 WL 4845628, at *7 (N.D. Cal. Oct. 10, 2012). Therefore, HDMI LA is entitled to summary judgment on Availink's UCL counterclaim.

### 3. Donnelly Act Counterclaim

Availink asserts that the Adopter Agreement violates New York's Donnelly Act. N.Y. Gen. Bus. Law § 340 *et seq.* The Donnelly Act "is modeled after the Sherman Act and 'should

generally be construed in light of Federal precedent.'" *Biocad JSC v. F. Hoffmann-La Roche*, 942

F.3d 88, 101 (2d Cir. 2019) (quoting *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 81

(2d Cir. 2013)).  In this case, the Donnelly Act counterclaim fails along with the Sherman Act

counterclaim because Availink's alleged injury does not arise from domestic anticompetitive

effects.  *Id.* (affirming dismissal of Donnelly Act claim because the challenged conduct was

outside the scope of the Sherman Act pursuant to the FTAIA); *In re Foreign Exch. Benchmark*

*Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 601 (S.D.N.Y. 2015) (dismissing a parallel Donnelly

Act claim where plaintiff's claim was based on foreign anticompetitive effects "beyond the

Sherman Act's reach"); *see also Global Reins. Corp. U.S. Branch v. Equitas Ltd.*, 969 N.E.2d 187,

195 (2012) (holding that the Donnelly Act "cannot reach foreign conduct deliberately placed by

Congress beyond the Sherman Act's jurisdiction").  Accordingly, HDMI LA is entitled to

summary judgment on the Donnelly Act counterclaim.

### E.    Patent Misuse Counterclaim

Finally, Availink seeks a declaratory judgment that the Adopter Agreement constitutes

patent misuse.  Patent misuse occurs when a patent holder impermissibly broadens the scope of its

patent grant "with anticompetitive effect." *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995,

1001 (Fed. Cir. 1986).  "In the licensing context, the doctrine limits a patentee's right to impose

conditions on a licensee that exceed the scope of the patent right." *Princo Corp. v. Int'l Trade*

*Comm'n*, 616 F.3d 1318, 1321 (Fed. Cir. 2010) (en banc).  For example, a patent holder may not

"requir[e] the purchase of an unpatented product as a condition for obtaining a license to the

patent," *id.* at 1327, because such an arrangement improperly extends a lawful patent monopoly to

products outside of the patent's scope.  "[A] holding of misuse renders the patent unenforceable

until the misuse is purged; it does not, of itself, invalidate the patent." *C.R. Bard, Inc. v. M3 Sys.,*

*Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998).

Here, the patent misuse counterclaim fails for the same reason as the Sherman Act

counterclaim:  because there is no evidence that the Adopter Agreement has anticompetitive

effects.  *See supra* § III.C; *see also Princo*, 616 F.3d at 1334 ("Congress intended to limit patent

misuse to practices having anticompetitive effects.").  Moreover, the Federal Circuit has held that

United States District Court
Northern District of California

offering a bundled license and charging "a fixed licensing fee" regardless of "which patents the licensee used in its manufacturing process" is not patent misuse.[25]  *Princo*, 616 F.3d at 1323.  To the contrary, "including additional patents in the package [i]s the functional equivalent of promising not to sue licensees on any of the patents in the group, which had the advantages of minimizing transaction costs and ensuring against the risk of post-agreement disputes as to whether those additional patents were required to practice the patented technology."  *Id.* at 1324.  A blanket license allows "a number of different firms to produce and market competing products compatible with a single standard" like the HDMI standard in this case.  *Id.* at 1335 (quoting Herbert Hovenkamp et al., IP & Antitrust § 35.2b (2010)).  A blanket license offers procompetitive benefits such as "greater product interoperability, including the promotion of price competition among interoperable products; positive network effects, including an increase in the value of products as interoperable products become more widely used; and incentives to innovate by establishing a technical baseline for further product improvements."  *Id.*  Accordingly, there is no genuine dispute of fact that HDMI LA is entitled to summary judgment on Availink's patent misuse counterclaim.[26]

## IV.    CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1.    HDMI LA's motion for summary judgment on its breach of contract claim is GRANTED.  Triable issues remain as to the appropriate remedies for Availink's breach.

2.    Availink's cross-motion for summary judgment on its obligation to pay royalties under the Adopter Agreement is DENIED.

---

[25] To be clear, the blanket license includes many active patents – including some practiced by Availink's SoCs – and there is no evidence or argument that these patents are invalid.  *See* Stoner Report ¶¶ 54, 141, 171.

[26] Patent misuse is traditionally asserted as an affirmative defense to patent infringement claims.  *C.R. Bard, Inc.*, 157 F.3d at 1372; *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1428 (Fed. Cir. 1997); *Windsurfing*, 782 F.2d at 1001.  Whether it is appropriate to assert patent misuse as a counterclaim, as Availink does here, is immaterial to the Court's analysis.  In its answer, Availink asserted an affirmative defense that HDMI LA's claims are barred by "the doctrine of unclean hands and/or trademark misuse."  Availink Countercls. at 6 ¶ 88.  In its opposition, Availink stated in passing that the Adopter Agreement violates "federal trademark and patent misuse doctrine," Availink Opp. at 8, but did not elaborate on this point nor offer any evidence of trademark misuse.

1       3.       Availink's counterclaim for declaratory judgment of non-infringement of HDMI

2   LA's trademarks is DISMISSED as moot, pursuant to the parties' stipulation at the motion

3   hearing.

4       4.       HDMI LA's motion for summary judgment on Availink's remaining counterclaims

5   is GRANTED.  No triable issues remain as to Availink's counterclaims.

6       5.       The parties' *Daubert* motions are TERMINATED as moot.

7       6.       By January 9, 2026, the parties shall meet and confer regarding the impact of this

8   Order on pretrial preparations, including the expected trial length, evidence to be presented at trial,

9   and the procedure for addressing potential injunctive relief.  The parties should address these

10  issues in the joint pretrial statement due January 16, 2026.  *See* Pretrial Order at 8, ECF No. 217.

11      **IT IS SO ORDERED.**

12  Dated: December 31, 2025

13

14  _____

15  Eumi K. Lee
    United States District Judge